UNOFFICIAL ENGLISH
TRANSLATION

EXHIBIT

**B**

**Ouellet v. Rail World Inc.**                                    **2015 QCCS 2002**

# SUPERIOR COURT

CANADA
PROVINCE OF QUÉBEC
DISTRICT OF MÉGANTIC


N°:        480-06-000001-132


DATE:    May 8, 2015
_____

**PRESIDING:  JUSTICE   MARTIN BUREAU, J.S.C.**
_____


**GUY OUELLET**
and
**SERGE JACQUES**
and
**LOUIS-SERGES PARENT**

        Plaintiffs
v.
**RAIL WORLD, INC.**
and
**RAIL WORLD HOLDINGS, LLC**
and
**MONTREAL MAINE & ATLANTIC RAILWAY LTD**
and
**EARLSTON ASSOCIATES L.P**.
and
**PEA VINE CORPORATION**
and
**MONTREAL, MAINE & ATLANTIC CORPORATION**
and
**MONTREAL, MAINE & ATLANTIC CANADA COMPANY**
and
**EDWARD BURKHARDT**
and
**ROBERT GRINDROD**

and
**GAINOR RYAN**
and
**DONALD GARDNER, JR.**
and
**JOE MCGONIGLE**
and
**CATHY ALDANA**
and
**THOMAS HARDING**
and
**IRVING OIL LIMITED**
and
**IRVING OIL COMMERCIAL G.P.**
and
**WORLD FUEL SERVICES CORP.**
and
**WORLD FUEL SERVICES, INC.**
and
**WORLD FUEL SERVICES CANADA, INC.**
and
**DPTS MARKANDING LLC**
and
**DAKOTA PANDROLEUM TRANSPORT SOLUTIONS, LLC**
and
**WESTERN PANDROLEUM COMPANY**
and
**PANDROLEUM TRANSPORT SOLUTIONS, LLC**
and
**STROBEL STAROSTKA TRANSFER, LLC**
and
**MARATHON OIL COMPANY**
and
**SLAWSON EXPLORATION COMPANY INC.**
and
**OASIS PANDROLEUM INC.**
and
**OASIS PANDROLEUM LLC**
and
**QEP RESOURCES INC.**
and
**ARROW MIDSTREAM HOLDINGS LLC**

and
**DEVLAR ENERGY MARKANDING LLC**
and
**THE CIT GROUP/EQUIPMENT FINANCING INC.**

**UNION TANK CAR COMPANY**
and
**TRINITY RAIL LEASING 2012 LLC**
and
**GENERAL ELECTRIC RAILCAR SERVICES CORPORATION**
and
**CANADIAN PACIFIC RAILWAY COMPANY**
and
**ATTORNEY GENERAL OF CANADA**
        Defendants
and
**XL INSURANCE COMPANY LIMITED**
and
**XL GROUP PLC**
        *Mises en cause*

_____

JUDGMENT FOR THE AUTHORIZATION OF THE BRINGING OF A CLASS ACTION
(Section 1003 of the Code of Civil Procedure (*Quebec*))

_____

[1]      The applicants, the three of whom are among the victims of the tragedy of July 6, 2013 in Lac-Megantic where a train transporting crude oil or shale liquids derailed, request the authorization of this court to bring a class action against those parties they consider responsible, in various capacities, for the damages caused.

[2]      The applicants, whose status as victims and as representatives of the victims is not questioned by any respondent, wish to obtain authorization to act for the all of the victims. In their name, they wish to initially institute a class action against nearly 50 separate legal entities. At the heart of the action, the applicants consider, for various reasons, that these legal entities are, in one way or another, responsible for the train derailment and more specifically, for any nature of losses that have resulted from this tragedy.

General nature of the action and the alleged faults

[3]     Essentially, the applicants consider that many parties involved in the extraction process, identification, transport, purchase and sale of petroleum products that leaked and caught fire on July 6, 2013 in Lac-Megantic are responsible for the damages that ensued. Accordingly, they require the authorization to institute a class action against these various parties claiming damages founded on Section 1457 of the Civil code of Quebec ("**CCQ**"), that is to say that they invoke the extra-contractual liability of the respondents.

[4]     Generally, the applicants allege that the respondents have the duty to follow rules of conduct and usage and legislation in ensuring the secure transport of shale liquids. They consider that the respondents must also ensure the proper functioning of the train carrying these products. The applicants further claim that the respondents had the duty to exercise reasonable care in the determination of the method of transportation, the choice of carrier and the type of tank cars used to transport shale liquids originating from Newport, North Dakota and transported to their destination in St. Johns, New Brunswick.

[5]     More specifically, the applicants argue that the derailment of July 6, 2013 and the deaths, injuries and damages resulting therefrom were caused by the faults of the respondents or their agents or their employees. The applicants accuse each category or group of respondents of various faults which contributed in some way to the derailment, the explosions, the fire and the contamination which ensued and the various types of damages sustained by a large number of victims.

Role of the Court at the authorization stage

[6]     The purpose of the present judgment, in light of the Quebec legislative criteria, is to determine if it is appropriate to allow the applicants to exercise a class action against one, the other or even all of the respondents included in the application for authorization in the name of the victims of the horrible tragedy of July 6, 2013.

[7]     It is therefore for the Court to decide, in conformity with the provisions of Section 1003 of the Code of Civil Procedure (*Quebec*) ("**CPC**"), whether the action that the applicants wish to exercise raises questions of law or fact which are identical, similar or related. If this is the case, the Court must question whether the facts alleged, which are to be held as true, seem to justify the conclusions sought.

[8]     In the context of its analysis, the Court must also conclude prior to authorizing the bringing of the action that the composition of the class renders it difficult or impractical to have an application for an action based upon a power of attorney (s. 59 CPC) or the exercise of individual recourses which are joined (s. 67 CPC).

[9]      Finally, in order for the Court to authorize the class action, it must be satisfied that the representatives of the class are in a position to ensure adequate representation of the members in the exercise of this class action.

[10]     These essential conditions and prerequisites to the authorization of a class action set out at Section 1003 CPC have, in recent years, been the subject of many analyses made by Quebec and Canadian courts. Some recent judgments of the superior courts have clearly established the role and responsibilities of the Court at the authorization stage to institute a class action[1].

[11]     For a better understanding of this judgment, it seems appropriate to summarize some of jurisprudential teachings that guide the Court in analyzing the request made by the applicants and the study of the objections submitted by the respondents.

<u>The fundamental principles in the analysis of the authorization of a class action</u>

$1^o$ The conditions or criteria applicable to the authorization of a class action are set out at s. 1003 CPC.

$2^o$ These conditions are cumulative and must all be satisfied in order for a class action to be authorized.

$3^o$ The Court exercises a filtering function. It must rule out frivolous or untenable demands and ensure that no party is unnecessarily involved in such a dispute which would obviously be unfounded.

$4^o$ The burden of the applicants at the authorization stage is a demonstration.

$5^o$ The authorization to exercise a class action will be granted if the facts alleged "appear to justify" the conclusions sought.

$6^o$ At the authorization stage, the Court must verify if the application and the elements of proof alleged show a case that is arguable, defendable and justifiable.

$7^o$ The Court cannot satisfy itself with allegations of facts which are vague, general or imprecise. The allegations of fact must be palpable to constitute sufficient evidence of the right claimed.

$8^o$ Allegations which, based on the evidence presented at the authorization stage, are too vague, imprecise, general, contradictory or unlikely, cannot be accepted as submitted.

---

[1] *Infineon Technologies AG* c. *Option consommateurs* 2013 CSC 59; *Vivendi Canada Inc.* c. *Dell'Aniello* 2014 CSC 1; *Fortier c. Meubles Léon Ltée* 2014 QCCA 195.

9$^{o}$ The Court, without deciding the merits of the case, particularly if the action is based on extra-contractual liability, must verify, prior to authorizing the action, whether there is sufficient evidence to consider that there is a defendable case, a serious appearance of a fault, damage and causality.

10$^{o}$ When there are several respondents, the requirements for obtaining authorization to exercise a class action must be followed, against each of them, for the authorization to be granted against them.

11$^{o}$ The representative must respect certain criteria to be suitable for this role. It must have a personal interest in the matter, be sufficiently competent to act and must not be in a conflict of interest with those who make up the class.

12$^{o}$ When assessing the criteria for authorization, the fundamental rules of proportionality must be kept in mind.

The parties involved as respondents

[12]     The applicants have amended their motion for authorization on five accounts since July 2013. In their latest version, the sixth, dated July 7, 2014, they request authorization to pursue 37 different respondent parties and wish to call the rail carrier's two insurers into warranty.

[13]     Over the course of the proceedings prior to the hearing of arguments on the application for authorization, the applicants desisted from their application, with the permission of the Court, against many of the respondents who were previously implicated. There remain a large number of respondents which the applicants classify in different categories in their application. It is appropriate to specify these categories in that, even if the applicants allege general elements of liability against all of the respondents, they specify on many occasions what they consider, for each category of respondent, the faults or the facts more specific to each of them.

[14]     Below are the categories of the respondents identified by the applicants in their application:

14.1.     Corporate respondents of Rail World;

14.2.     Natural person respondents of Rail World;

14.3.     Respondents Irving Oil;

14.4.     Respondents World Fuel;

14.5.     Oil producer respondents;

14.6.     Tank car lessor respondents;

14.7.     Respondent Canadian Pacific;

14.8.     Respondent Attorney General of Canada.

The initial suspension of the recourse under the CCAA against certain respondents

[15]     In the weeks that followed the tragedy of July 6, 2013, certain entities facing claims from the victims obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**")[2].

[16]     They had submitted an application for a stay[3] which had and still has, at the time of writing the present judgment, the effect of staying all proceedings against certain respondents.

[17]     As a result of the stay, some of the respondent companies and some individuals have not participated in the debates and hearings regarding the motion for authorization to bring a class action. Those respondent companies and individuals are the following:

- Montreal Maine and Atlantic Railway Limited; (MMAR)
- Earlston Associates LP;
- Montreal Maine and Atlantic Corporation; (MMAC)
- Montreal Maine and Atlantic Canada Company; (MMACC)
- Edward Berkhardt;
- Robert Grindrod;
- Gainor Ryan;
- Donald Gardner Jr.;
- Joe McGonigle;
- Thomas Harding;

As well as the *mises en cause*:

- XL Insurance Company Limited;
- XL Group PLC;

[18]     Therefore, the present judgment does not apply to these respondents although obviously some of them are clearly liable for the tragedy and the ensuing damages.

---

[2] SCR (1985) ch. C-36.
[3] Court file S.C. 450-11-000167-134. Initial Order of August 8, 2013 and subsequent orders, the last of which was issued on April 15, 2015 and suspends proceedings until December 15, 2015.

Moreover, some of these respondents and *mises en cause* who are their insurers have, in some respects, recognized their liability from the beginning.

<u>Subsequent stay based on a possible plan of arrangement</u>

[19]     Ever since this Court took this matter under advisement in order to determine if the class action should be authorized against certain respondents, there have been new developments in the plan of arrangement file implicating many of the respondents related to the rail carrier MMA in some way or who may be involved in the July 6, 2013 tragedy.

[20]     In the context of the insolvency file, many parties implicated in the motion for authorization to bring a class action seem to be on the brink of an agreement with the creditors or victims related to the tragedy of July 6, 2013. It is in the wake of these initiatives and discussions and based on a possible plan that the Superior Court sitting in virtue of the provisions of the CCAA and presided over by our colleague the honourable Gaétan Dumas has, as a first step, stayed all proceedings against all of the respondents in this matter for an initial period[4]. This stay has been held against a large number of respondents, but raised against certain others by the filing of a plan of arrangement[5].

[21]     This stay has ceased having its effect against certain respondents. It now seems appropriate that the Court render judgment, at this stage, on the request for authorization solely in respect of the following respondents:

1.   World Fuel Services Corporation (WFS Corp.);

2.   World Fuel Services Inc. ( WFS Inc.);

3.   World Fuel Services Canada Inc. (WFS Can) ;

4.   Petroleum Transport Solutions, LLC (Petroleum);

5.   Western Petroleum Company (Western);

6.   Strobel Strarostka Transfer LLC (SST);

7.   DPTS Marketing LLC (DPTS);

8.   Dakota Petroleum Transport Solution LLC (Dakota Petroleum);

---

[4] Order of February 24, 2015 Court file n° 450-11-000167-134.
[5] Plan of arrangement Court file no. 450-11-000167-134, March 31, 2015.

As well as respondent:

- Canadian Pacific Railway Company (CP).

[22]     With the exception of CP, each of these respondents are described by the applicants in their application for authorization as respondents World Fuel. They have not participated in the plan of arrangement filed in the MMA insolvency file.

[23]     As for all other respondents whose names still appear in the heading of the present judgment, the proceedings remain stayed due to the order under the CCAA and the filing of a plan of arrangement to which these respondents participate and which is to be submitted to the creditors on June 9, 2015 at a meeting of creditors. The Court does not have to rule, at least at this stage, on the request for authorization against them and perhaps will never have to if the plan is eventually accepted by the majority of creditors and is approved by the Court.

[24]     Although much effort and a considerable amount of time was spent by the parties and the Court for the preparation and the hearing of the proof and arguments for the application for authorization of the class action, there is no reason, at this stage, for the Court to consider the application for authorization other than towards the respondents World Fuel and respondent CP.

<u>Respondents World Fuel</u>

[25]     By using the term "respondents World Fuel", the applicants include many of those entities related to one another. They are all listed at paragraph 21 of the present judgment.

[26]     The applicants allege that these respondents all acted on behalf of one another and exercised control over their collective subsidiaries, directly or indirectly, for the transportation of shale liquids.

[27]     They allege that each World Fuel respondent is individually and solidarily liable towards the applicants and the members of the class.

[28]     More specifically, the applicants accuse respondents World Fuel, whether a parent company or a subsidiary, of the following:

a)          They were the vendor of shale liquids which were shipped by CP and MMA trains from North Dakota towards the Irving refineries in St. Johns, New-Brunswick.

b)      They operated trucks which received loads of shale liquids from exploration sites and transported these petroleum products to the transhipment site in Newtown, North Dakota.

c)      They were the vendors, owners and exporters of the shale liquids and rented tank cars (DOT-111) from many different entities which served to transport the shale liquids by train.

d)      They were all closely related to each other in the business of the purchase and sale of shale liquids and the transhipment operations and transport of these petroleum products to the purchasers.

e)      They contracted with the respondent CP for the transportation of these petroleum products to respondent Irving's refineries in St. Johns, New-Brunswick.

f)      They knew that the shale liquids, acquired from different producers and shipped by train to the purchaser Irving's refineries, were very volatile, explosive and extremely dangerous. Despite this, they did not furnish adequate information with regards to the classification and labelling of these products so that they could be transported safely.

g)      Due to the nature of the products being transported, they knew that additional precautions must be in place for the safe transportation by train, which they did not do. Instead, they misidentified the products, rented tank cars unsafe for the transportation of such dangerous products and chose an inadequate carrier (MMA) which possessed unsafe equipment, was underinsured and had a poor safety record.

[29]     More directly, in addition to the accusations addressed in a general manner to the all of the World Fuel entities, the applicants more specifically identified the participation of each of the entities of the group as follows:

1.   WFS Corp.                    They allege that this entity, which is the parent company, has itself or one of its subsidiaries, sold the shale liquids or was the owner of the shale liquids which were spilled on July 6, 2013 in Lac-Megantic and caused damage suffered by the victims.

2.   WFS Inc.                     They allege that, directly or indirectly through the subsidiaries or a joint venture, it effected the transportation by truck of the shale liquids from the transhipment station to their storage in the tank cars used for rail transport.

3. WFS Can.                    They allege that this entity or its subsidiaries directly or indirectly sold or were the owners of the shale liquids which caused the damage in the tragedy of July 6, 2013.

4. PETROLEUM.                  They allege that this entity is a subsidiary of one of the WFS entities and that it holds 50% of the DPTS entity.

5. WESTERN.                    They allege that this company, a subsidiary of WFS Corp. or WFS Inc. or WFS Can. is the entity that rented the tank cars which served to transport the shale liquids and it is this entity that entrusted such tank cars to the carrier, CP.

6. SST.                        They allege that it is this entity that effected the transfer of shale liquids into the tank cars at the transhipment site in Newtown.

7. DPTS.                       They allege that this respondent would be the result of a joint-venture between Dakota Plain Marketing and Petroleum Transport and that it would have acted as purchaser, seller and warehouser of petroleum products.

8. DAKOTA PETROLEUM.   They also allege that the respondent, which would be the result of a joint-venture between Dakota Plain Transloading and Petroleum Transport Solution, also acted as a purchaser and vendor of petroleum products which have caused damage to the victims.

[30]    During the days of the hearing reserved for the arguments of all parties involved, it was admitted and recognized that WFS Inc. is the entity that sold the crude oil or shale liquids to one of the Irving entities and that Western is the entity which rented the tank cars from different suppliers which contained the shale liquids in the spill and explosions which occurred in Lac-Megantic on July 6, 2013.

[31]    It appears from the evidence submitted in support of the application for authorization or the contestation by any of the respondents that it was the Western entity that contracted with the rail carrier CP[6] and that the costs of this transport were billed to respondent WFS Inc. [7]

[32]    It also appears from the evidence presented and the allegations in the application for authorization that it is WFS Inc., a wholly-owned subsidiary of WFS Corp., which sold the shale liquids to Irving which were to be transported to St. Johns, New-Brunswick to be refined.

_____
[6] Exhibit CP-7.
[7] Exhibit CP-8.

[33]     As part of all proceedings and hearings for the presentation of the application for authorization and its contestation, many respondents of the World Fuel group opted not to submit any evidence and did not make any request in this regard.

[34]     Certain evidentiary elements presented by other respondents, including certain from the World Fuel group, established that WFS Inc., Western and all other entities grouped by the applicants under the title respondent World Fuel have direct and obvious links between them[8].

[35]     Overall, the applicants take issue with the fact that the World Fuel entities, as owners, shippers, transporters, vendors or exporters of shale liquids, wrongly identified the product they transported, sold, or put into the market, that they made the wrong choice regarding the class of tank car (DOT-111) used to transport this dangerous product and lastly, that they opted for a poor route and poor carrier to transport the product, which was sold to Irving, to its destination.

Analysis and discussion about respondents World Fuel

[36]     There is sufficient evidence, although in certain respects such evidence is more or less accurate, which is raised against certain of the World Fuel entities so that at first, we can consider that they had a very important role to play in the identification and qualification of shale liquids prior to their transfer, labelling, as well as their transport (carrier and course) and as owners and vendors of shale liquids, they may be liable for damages resulting from the derailment of July 6, 2013.

[37]     Certainly, the evidence remains to be seen as to the poor identification or characterization of the shale liquids having a direct and immediate effect as well as an important role with respect to the damages suffered by the victims and the consequences of the tragedy of July 6, 2013. However, this aspect of the file, which remains to be analyzed in a more specific and extensive manner at an eventual hearing on the merits, must not, at this stage, be discarded or set aside by the Court considering the criteria which are to be applied in considering an application to authorize a class action.

[38]     The Court is also justified in seriously asking whether there a fault exists by the mere fact of transporting these types of shale liquids in tank cars (DOT-111). These tank cars (DOT-111) are still authorized or accepted by American and Canadian regulatory authorities despite certain findings and recommendations that suggest the contrary, seeing their potential fragility.

[39]     It remains for the applicants to demonstrate that the use of tank cars that are different than those used would have prevented or limited the damages which ensued

_____
[8] Exhibits DPH-1A and DPH-1B.

from the derailment of July 6, 2013. It will be the role of the trial judge, following the presentation of evidence that is more detailed and probably strongly contradictory, to arrive at a definitive conclusion in this regard.

[40]     The arguments made by the applicants against respondents World Fuel for having chosen a rail carrier or route upon which control was exercised by an inadequate company with a poor reputation and who was inadequately insured, are, at first glance, serious and can be the object of evidence which, if conclusive, would possibly allow for the establishment of the existence of causality between the fault and certain of the damages.

[41]     The applicants' allegation that it is respondent Western that specifically chose between two different routes – one which is the property of MMA and one under the control of another carrier, Canadian National – and that it opted for the route owned by MMA and consequently, it chose this carrier, does not in itself automatically create liability. However, such allegations are serious and evidence of their veracity and their influence on liability, although such evidence remains to be made, analyzed and evaluated, allows us, at the authorization stage, to consider that this is sufficient for the authorization of the action.

[42]     The recourse sought by the applicants and for which they seek authorization to exercise in a collective manner is essentially founded upon notions of extra-contractual liability. In light of the allegations of the applicants, given all of the circumstances and the significance of the consequences of the events of July 6, 2013, the Court considers that it appears justified at this stage to grant the applicants the authorization to pursue certain respondents of the World Fuel group but to refuse such authorization against others of the same group.

[43]     We must accept and give the applicants the opportunity to demonstrate that certain World Fuel respondents, as purchasers, shippers and vendors of shale liquids were negligent in the way they identified the products, chose the transport vehicles and routes to transport their products and their choice of carrier which proved negligent.

[44]     Obviously, nothing guarantees that the recourse, even if authorized against certain World Fuel respondents, would eventually be granted. It all depends on the evidence presented, particularly with respect to causation and the consequences of several elements such as the alleged misidentification or labelling of the shale liquids, the misuse of tank cars (DOT-111) which, although regulatory, could still be unsafe or inadequate. It would remain to demonstrate that the use of such tank cars resulted in the damages or that such damages were exacerbated therefrom compared to the use of other types of tank cars which could or should be used as they are safer.

[45]     Although it is far from certain that the applicants will be able to make such a demonstration, the Court is of the opinion that the serious allegations made by the applicants with regards to the errors or faults that were committed in the classification and labelling of products, those alleged regarding the use of tank cars (DOT-111) and the choice of route and consequently the carrier, are serious and if demonstrated can bring upon a finding of extra-contractual liability.

[46]     Depending on the usual criteria, that is the simultaneous existence of a fault, causality and damage resulting therefrom, and in considering the principles and criteria allowing for the authorization of a collective recourse, it may be held that these criteria are respected and that authorization to exercise a collective recourse against WFS Corp., WFS Inc., WFS Can. and Western should be granted.

[47]     However, regarding the other subsidiaries or entities of World Fuel, namely Petroleum, SST, DPTS and Dakota Petroleum, the allegations and faults alleged against them are too general and are not specific enough. The involvement of these entities in the process and the faults alleged do not appear to be sufficiently clear for the Court to be able to consider that as purchasers, vendors or transporters of shale gas, they had an interest in a way that would allow them to be to be reproached for a direct fault. Accordingly, authorization will not be granted against such World Fuel entities.

Respondent Canadian Pacific

[48]     At paragraphs 53.8.30 and following until paragraph 53.8.56 of the fifth amended motion for authorization to bring a class action, applicants state what they consider to be the elements and reasons justifying the liability of CP in the Lac-Megantic tragedy and the damages resulting therefrom.

[49]     These allegations, which are specific to respondent CP, follow a series of more general allegations whereby the applicants take issue with all of the respondents, including CP, regarding general negligence and an absence of prudence in all circumstances preceding the tragedy which are related to the nature and identification of the shale liquids which were transported, the imprudent behaviour of all the entities involved at each stage of the production, labeling, transhipment and transport of the shale liquids, including, the choice of carrier and the choice of route.

[50]     The applicants mention respondent CP more specifically at the above mentioned paragraphs and classify the reproaches against it according to the following five categories:

    50.1.     The corporate reorganization of CP and the significant dismissal of employees including employees responsible for rail safety and the maintenance of trains;

50.2.   Business ties between CP and various World Fuel respondents in the development of rail transport facilities for the rail transport of large quantities of shale gas;

50.3.   Business ties between CP and respondent MMA;

50.4.   CP's knowledge of the high level of volatility and the explosive nature of transported shale gas;

50.5.   Respondent CP's decision to ignore the problems with the locomotive used by MMA to transport the rail cars.

[51]   Other than the allegations of the applicants regarding certain facts which, according to them, would be related and would justify the liability of respondent CP in the July 6, 2013 tragedy and the damages resulting from the derailment, they accuse respondent CP of the following faults at paragraph 55 of the application and more specifically sub-paragraphs D) a) to sub-paragraph D) l):

a)   Although CP, as its former owner, was familiar with the tracks where the derailment occurred and knowing that this was an excepted track, it, despite all, sub-contracted with MMA knowing its poor safety record and the fact that it had inadequate insurance coverage.

b)   CP failed to retain the services of a rail carrier who was qualified, safe, solvent and adequately insured in case of substantial damages.

c)   CP failed or neglected to take reasonable precautions to ensure that the shale liquids would be transported adequately and in a safe manner.

d)   CP failed or neglected to ensure that the shale liquids were adequately identified and transported as hazardous material.

e)   CP failed or neglected to take reasonable and appropriate measures to ensure that the shale liquids were not transported in type DOT-111 tanker cars or at least type DOT-111 tank cars that were adequately reinforced in case of a collision.

f)   CP failed to retain the services of a qualified rail carrier having a good safety record in transporting shale liquids.

g)   CP failed to retain the services of a safe and qualified rail carrier who manned its trains with sufficient personnel so that it would not

be left without surveillance when transporting hazardous and explosive material.

h) CP failed or neglected to retain the services of a safe and qualified rail carrier who used only locomotives in good condition rather than contracting with MMA which had a poor safety record and whose tracks were considered to be excepted.

i) CP had an obligation to retain a safe and qualified rail carrier, compliant with the regulatory standards known in the industry and who was well regarded in terms of safety.

j) CP failed or neglected to adequately inspect the train and the track before contracting with MMA for the transport of shale liquids on MMA's track.

k) CP failed or neglected to identify the risks of a derailment of a train when, considering the circumstances, it was reasonable to consider and prevent such an incident.

l) CP allowed for a dangerous situation to exist when it would have been possible, if it had made the reasonable efforts, to prevent the derailment or limit the extent of the resulting damages.

Analysis and discussion about the respondent CP

[52]    Of all of the applicants' allegations to justify the elements it considers to be at the foundation of CP's liability as well as the faults against it, CP argues and considers that the applicants base their application for authorization against it on two legal theorems. In other words, in the eyes of CP, the theory of the applicants' case rests on two foundations.

52.1.    First, respondent CP has itself committed faults triggering its liability pursuant to Section 1457 CCQ.

52.2.    Secondly, CP is liable for the faults committed by the rail carrier it does business with, MMA.

[53]    Most of the allegations made by the applicants against CP regarding its own actions are essentially summarized as follows:

53.1.    CP made errors which trigerred its liability because it, as a business partner of respondents World Fuel, accepted to transport shale liquids which were, to its knowledge, very volatile and explosive in nature, without such liquids

being adequately identified.

53.2.   As a business partner of respondents World Fuel group, CP also accepted
to transport the shale liquids in inadequate tank cars, despite meeting
regulatory standards.

53.3.   Moreover, CP, as a partner of Western, proposed a route for transporting
shale liquids to the Irving refineries in New-Brunswick knowing well that the
user of the track and its owner as well as the equipment which runs
thereupon was poorly insured, insolvent, used equipment in a poor state
and these tracks were not in good condition.

53.4.   Finally, CP knew that this company, MMA, used this equipment with a
single mechanic conductor.

[54]     Several of the allegations against CP are vague, imprecise, too general in
nature to be considered seriously and do not allow for the arrival at the conclusion that
they are facts giving way to authorization.

[55]     The fact remains, however, in view of the matters alleged, if the applicants are
able to demonstrate that CP and the respondents World Fuel collaborate regularly for
the shipping of petroleum products and that CP, because of its knowledge of railway
networks and MMA that operated in the Lac-Megantic area and its knowledge of how
the latter was conducting its operations, was unable to ignore the considerable risks
stemming therefrom, it is far from impossible that this could form the basis of the extra-
contractual liability of CP.

[56]     Obviously, these elements must be joined to the allegations that respondents
World Fuel, and particularly Western, contracted with CP so that it could do business
with regards to the transportation of shale liquids and that the route was determined
upon the recommendations of CP.

[57]     It is possible, depending on the evidence that will be presented regarding the
discussions, negotiations and steps that took place between respondents World Fuel
and CP for the completion of transport agreements, that a Court comes to the
conclusion that CP should have, both in terms of its relation with the respondents World
Fuel and with MMA, informed the respondents World Fuel of the heightened risk in
choosing MMA.

[58]     It is possible that a court arrives at the conclusion that CP, a specialist in the field
of rail transport, heavily involved in the regular transport of petroleum products including
shale liquids and a frequent user and carrier of tank cars (DOT-111), has been
negligent or has committed a fault by not properly informing its Western counterpart of
the risks and dangers of using the route operated by MMA rather than a longer, more

expensive route of another carrier that is solvent and larger, Canadian National. This is possible despite the strong and very specific rules in the field of rail transport.

[59]    Moreover, if the applicants are able to demonstrate, based on and in relation to the evolution of standards, rules and practices in the transportation of petroleum products, that the tank cars (DOT-111), although regulatory, were not sufficiently safe to be used reasonably and adequately, particularly in an urban setting, it would then be possible that a Court, faced with such evidence, could also arrive at the conclusion that there was a fault committed by the main carrier, an important partner of the shipper, as much in the choice or advice given for the route as in the equipment used.

[60]    There is obviously nothing certain with regards to the fate of an eventual action especially since, in addition to having to prove the faults of CP, the applicants must also demonstrate that these faults have a direct link of causality to the damages. However, at this stage of the file, the applicants definitely have an arguable case.

[61]    In this regard we find, although they are in some ways quite tenuous, various links which can justify the alleged faults of CP, particularly with regards to the use of DOT-111 tank cars which aggravated the damages that occurred compared to the use of other tank cars of the same type which are reinforced.

[62]    The applicants do not clearly or directly specify that the use of reinforced tank cars would have resulted in a lesser extent of damages that occurred from the derailment. However, it is possible in reading certain of the allegations made towards all of the respondents, or specifically those towards CP, to consider the existence of certain elements of proof to this effect. We find such elements of proof at paragraphs 55 A. a. 1 b) and paragraphs 53.7, 53.8, 55 A. i), 55 C. h), 55 D. e) of the 5th amended application.

[63]    It is important to underline the fact that the applicants do not invoke any contractual link with CP and that their recourse against this respondent is founded exclusively on the extra-contractual liability CP would have towards them.

[64]    Without even being able to produce or establish the existence of a subcontract between CP and MMA other than by mentioning it, the applicants nonetheless allege such a legal relationship between these rail carriers.

[65]    Depending on the evidence the Court allows and in view of the affidavit filed by a representative of CP, James Clement, the evidence is such that a legal relationship between the initial carrier, CP, and the subsequent carrier, MMA, is governed by the

provisions of the *Canada Transportation Act*[9] and the bill of lading which was permitted as evidence (Exhibit CP-7).

[66]     The applicants' allegations regarding the existence of a subcontract between CP and MMA are contradicted by the testimony of James Clement as well as by the bill of lading itself (Exhibit CP-7). Moreover, the legislative scheme that determines the majority of obligations and rules which apply to rail transport specifies the existence and nature of the relations between the different railway companies.

[67]     It therefore appears, at first glance, that it is difficult to attribute the faults commited by MMA directly to CP since, in matters of extra-contractual liability in Quebec, liability for the fault of another is limited to the cases provided for in Sections 1459, 1460, 1461 and 1463 CCQ.

[68]     In Quebec law, extra-contractual civil liability towards a third person for a fault committed by a subcontractor does not exist. However, even if this type of liability does not exist at first sight, the Court believes that it remains possible in certain cases to pursue extra-contractually, not the fault of the subcontractor, but the negligence and recklessness of the primary contractor as to who it entrusted part of its contract to for execution. This is possible especially if the main contractor knew or should reasonably have known that this party chosen is particularly negligent, is adorned with a bad reputation or is ill equipped to execute the whole or part of the contract.

[69]     In this case, the Court considers that in many ways it is not so much the liability for the acts committed by MMA that the applicants blame or can blame CP for, but it is more so the fact that CP should never have advised, suggested or even accepted for MMA to transport shale liquids on its tracks.

[70]     CP argues that, as a result of the provisions of the *Canada Transportation Act*, it had no choice but to accept to transfer the tank cars to MMA, which it had carried on its own tracks, if that was the route determined by the shipper.

[71]     While this is true, the fact remains that, according to the evidence which could be presented in an elaborate and developed matter at an eventual trial, it is possible that a Court concludes that as a principal transport partner of respondents World Fuel, CP would have had to adequately inform them and more particularly Western and WFS Inc. of the risks, dangers and deficiencies of MMA and nevertheless, after having adequately informed them, allow them to make an informed decision as to the routes and transporters available to carry the shale liquids to its ultimate destination in New-Brunswick.

---

[9] S.C. 1996 ch. 10.

[72]    It is not a question of liability for the fault of another but potential liability for an extra-contractual fault in choosing a subcontractor.

[73]    The Court is of the opinion that, based on the elements alleged by the applicants against CP, the applicants have demonstrated the existence of an arguable case against it and consequently, authorization to bring a class action against CP should be granted.

<u>The questions the Court must ask on liability and damages in the class action</u>

[74]    The Court has established that authorization must be granted to the applicants to bring a class action against respondents WFS Corp., WFS Inc., WFS Can., Western and CP. It is now necessary to indicate what the trial judge must address, that is to say what are the main questions that will be addressed collectively and which conclusions sought are related thereto.

[75]    Based on the above, the Court is of the opinion that, with regards to the facts alleged, the evidence authorized in the context of an application for authorization and in considering the stay of proceedings for many of the respondents, the main points upon which the debate will be focused as to liability and damages are as follows:

75.1.    Did the respondents World Fuel act reasonably so that the shale liquids it conveyed for rail transport to St. Johns, New-Brunswick were classified and labelled adequately in conformity with the legislation and regulations applicable to the transport of hazardous materials?

75.2.    Were the shale liquids sent by rail transit at the request of respondents World Fuel properly classified and labelled?

75.3.    If the shale liquids transported at the request of respondents World Fuel were not classified and identified in conformity with the applicable legislation and regulations, are these errors of classification and identification the cause or did they foster the fire, the explosions and the contamination that resulted from the July 6, 2013 derailment in Lac-Megantic?

75.4.    Did respondents World Fuel act reasonably in order to ensure that the shale liquids that were transported from Newtown, North Dakota to St. Johns, New-Brunswick, were transported appropriately and safely?

75.5.    Did respondents World Fuel and respondent CP know or ought to have known that the shale liquids transported from Newtown, North Dakota to St. Johns, New-Brunswick in DOT-111 tanker cars were not properly classified or identified?

75.6.   Did respondents World Fuel and respondent CP know or ought to have known that the shale liquids transported by rail from Newport, North Dakota to St. Johns, New-Brunswick were more volatile, explosive and flammable than normal crude oil?

75.7.   Were respondents World Fuel and respondent CP negligent in allowing the shale liquids to be transported from Newport, North Dakota to St. Johns, New-Brunswick in DOT-111 tank cars?

75.8.   Were the DOT-111 tank cars which were used to transport the shale liquids appropriate and did the decision to use such tank cars cause or foster the fire, the explosions and the contamination resulting from the July 6, 2013 derailment in Lac-Megantic?

75.9.   Was the respondent CP negligent in its discussions and negotiations with respondents World Fuel in choosing the route used to transport the shale liquids from Newport, North Dakota to St. Johns, New-Brunswick and did it have a leading role in the final determination of the route and, consequently, the carrier used?

75.10.  Were the respondents World Fuel and respondent CP negligent in choosing, suggesting, recommending or allowing the shale liquids to be transported from Newport, North Dakota to St. Johns, New-Brunswick on the tracks which were owned by the rail carrier MMA?

[76]    As to the appearance of damages, according to the allegations in the application for authorization, the representations made by the applicants and the respondents and given the circumstances of this file, it seems appropriate that the Court collectively examine the following:

76.1.   What is the nature and extent of the damages and other remedies that the class action members can claim?

76.2.   Do the class action members have the right to claim bodily, moral and material damages and interest? If yes, what is the amount of the damages?

[77]    Considering the allegations, the circumstances of the file and the nature of the recourse, the Court does not consider that the applicants have demonstrated a real possibility that exemplary or punitive damages should be granted.

[78]    In Quebec civil law and according to the provisions of Section 1621 CCQ, punitive damages cannot be granted unless a specific provision of law allows. The only

legislative provision in Quebec law which gives way to such punitive damages is Section 49 of the *Charter of Human Rights and Freedoms* (Quebec) [10].

[79]    This Section provides:

> "Any unlawful interference with any right or freedom recognized by this Charter entitles the victim to obtain the cessation of such interference and compensation for the moral or material prejudice resulting therefrom.
>
> In case of unlawful and intentional interference, the tribunal may, in addition, condemn the person guilty of it to punitive damages."

[80]    For punitive damages to be granted, it must be alleged and subsequently proven that there was unlawful interference to a right or freedom and that this interference is intentional.

[81]    There are no allegations or facts mentioned in the fifth amended application for authorization which show such an unlawful and intentional interference by either of the respondents.

[82]    In these circumstances, the applicants have not demonstrated the elements allowing the Court to analyze and grant punitive damages to the victims, regardless of the significance and gravity of the July 6, 2013 tragedy.

[83]    They can collectively attempt to obtain compensatory damages from certain World Fuel respondents and CP, but are not justified in requesting punitive damages.

<u>The group whose members will be bound by the judgment</u>

[84]    At various stages over the course of the proceedings and during the hearings pertaining to the application for authorization, the parties made various submissions to the Court with regards to the ideal description of the group whose members would be bound by any judgment related to the class action.

[85]    The majority of the respondents had no submissions as to the creation of the group but certain of them made submissions regarding the suggestions and recommendations made by the applicants and as to the description found in the conclusions of their application for authorization.

[86]    The Court is of the opinion that, although this aspect was not really the subject of any debate, the applicants are, as representatives of the group, in a position to adequately represent the members.

---

[10] CQLR c. C-12.

[87]    The significance of the application, the large number of potential victims, the nature and differences that can exist between different categories of victims, although they all have an interest in pursuing the parties responsible for their damages, are so that in accordance with Section 1003 c) CPC, the composition of the group renders it difficult and makes the application of Sections 59 and 67 CPC even less practical. In the Court's view, although respondent CP argued the contrary, this is a clear case in applying the provisions relating to class actions. It is a situation which the legislator intended when it introduced the rules applicable to class actions.

[88]    Certain World Fuel respondents and respondent CP oppose the description proposed by the applicants. These respondents raised certain weaknesses with regards to this description. Particularly, they underline that the proposed description does not have a territorial limitation unless the entire town of Lac-Megantic makes up the relevant area, which they consider to be excessive.

[89]    They also emphasized that the relation with the town of Lac-Megantic members of the proposed group is too uncertain. They also submit that the description of the group casts too wide a net particularly when it extends to people who were present in Lac-Megantic at the time of the incident, which they consider to be excessive.

[90]    The respondents also believe that the terms "who have suffered a loss" in the description causes the group to be dependent on the outcome of the case, which is not acceptable.

[91]    Finally, they submit that the use of the terms "indirectly" is too vague and causes the description to be too uncertain.

[92]    Over the course of the proceedings, the applicants modified the description of the group and in their fifth and final amended application of July 7, 2014, they describe the proposed group:

> " All persons and entities (natural persons, legal persons established for a private interest, partnerships or associations which had no more than 50 employees during the 12-month period preceding the Motion for Authorization) residing in, owning or leasing property in, operating a business in or being employed by a person resident in or a business located in Lac-Mégantic , and/or were physically present in Lac-Mégantic (…) on July 6, 2013, the date of the train derailment (The train Derailment ») [including their estate, successor, spouse or partner, child, grandchild, parent, grandparent and sibling], or any other group to be determined by the Court;"

[93]    Following the hearings on the application for authorization and the submissions of certain respondents and probably following discussions between certain of them, the applicants reformulated the description of the suggested group.

[94]    The Court considers that the last recommendation suggested by the applicants is reasonable. Essentially, it adequately describes the victims they seek to represent on the basis of the elements known at this stage.

[95]    It should be noted that, as part of a class action, the Court can revisit the authorizing judgment and modify or split the group at any time and even *ex officio* if the circumstances require (1022 CCQ).

[96]    Although the designation suggested by the applicants is in English, since their application for authorization is drafted in this language despite the victims being francophone, the Court considers that it is more appropriate, seeing the members of the group, that given the circumstances, the group is to be defined and future public notices are to be given in the French language.

[97]    Accordingly, the group is described as follows:

    97.1.    "All persons and entities (physical persons, legal persons of private law, company or association which do not have more 50 employees in the 12 months preceding the application for authorization), residing, possessing or renting a property, exploiting an enterprise or who was employed by a resident person or company located in Lac-Megantic or who was physically present in Lac-Megantic on the date of the train derailment, July 6, 2013 [including their succession, heirs, spouse, partner, children, grandchildren, parents, grandparents, brothers or sisters], or any other group determined by the Court."

[98]    This description has the advantage of not being dependent on the existence or the description of the group which is the subject of the dispute. It excludes terms which are too vague, it specifies the members of the group in time and territorially without being too restrictive, but also avoids a wide territorial net all the while considering the dramatic consequences that the tragedy has had on the entire community of Lac-Megantic.

### FOR THESE REASONS, THE COURT:

[99]    **GRANTS** part of the fifth amended application for authorization to bring a class action.

[100]    **ACKNOWLEDGES** the stay of proceedings against a number of respondents as a result of the orders granted by the honourable Gaétan Dumas in court file no  450-11-000167-134 of the Superior Court, District of St-François, and **RESERVES** its jurisdiction on this matter should it become necessary.

[101]   **AUTHORIZES** the bringing of a class action by way of a motion introductive of suit in damages against respondents World Fuel Services Corporation (WFS Corp.), World Fuel Services Inc. (WFS Inc.), World Fuel Services Canada Inc. (WFS Can.), Western Petroleum Company (Western) and Canadian Pacific Railway Company (CP).

[102]   **DECLINES** authorization to bring a class action against respondents Petroleum Transport Solution, LLL (Petroleum), Strobel Straroska Transfer LLL (SST), DPTS Marketing LLL (DPTS) and Dakota Petroleum Transport Solution LLL (Dakota Petroleum).              **WITHOUT costs.**

[103]   **ASSIGNS** the petitioners Guy Ouellet, Serge Jacques and Louis-Serge Parent the status of representatives of the persons included in the following group:

103.1.   "All persons and entities (physical persons, legal persons of private law, company or association which do not have more 50 employees in the 12 months preceding the application for authorization), residing, possessing or renting a property, exploiting an enterprise or who was employed by a resident person or company located in Lac-Megantic or who was physically present in Lac-Megantic on the date of the train derailment, July 6, 2013 [including their succession, heirs, spouse, partner, children, grandchildren, parents, grandparents, brothers or sisters], or any other group determined by the Court."

[104]   **IDENTIFIES** the main questions of fact and law which will be collectively addressed in the following manner:

104.1.   Did the respondents World Fuel act reasonably so that the shale liquids it conveyed for rail transport to St. Johns, New-Brunswick were classified and labelled adequately in conformity with the legislation and regulations applicable to the transport of hazardous materials?

104.2.   Were the shale liquids sent by rail transit at the request of respondents World Fuel properly classified and labelled?

104.3.   If the shale liquids which were transported at the request of respondents World Fuel were not classified and identified in conformity with the applicable legislation and regulations, are these errors of classification and identification the cause or did they they foster the fire, the explosions and the contamination that followed the July 6, 2013 derailment in Lac-Megantic?

104.4.    Did respondents World Fuel act reasonably in order to ensure that the shale liquids that were transported from Newtown, North Dakota to St. Johns, New-Brunswick, were transported appropriately and safely?

104.5.    Did respondents World Fuel and respondent CP know or ought to have known that the shale liquids transported from Newtown, North Dakota to St. Johns, New-Brunswick in DOT-111 tanker cars were not properly classified or identified?

104.6.    Did respondents World Fuel and respondent CP know or ought to have known that the shale liquids transported by rail from Newport, North Dakota to St. Johns, New-Brunswick were more volatile, explosive and flammable than normal crude oil?

104.7.    Were respondents World Fuel and respondent CP negligent in allowing the shale liquids to be transported from Newport, North Dakota to St. Johns, New-Brunswick in DOT-111 tank cars?

104.8.    Were the DOT-111 tank cars which were used to transport the shale liquids appropriate and did the decision to use such tank cars cause or foster the fire, the explosions and the contamination resulting from the July 6, 2013 derailment in Lac-Megantic?

104.9.    Was the respondent CP negligent in its discussions and negotiations with respondents World Fuel in choosing the route used to transport the shale liquids from Newport, North Dakota to St. Johns, New-Brunswick and did it have a leading role in the final determination of the route and, consequently, the carrier used?

104.10.   Were the respondents World Fuel and respondent CP negligent in choosing, suggesting, recommending or allowing the shale liquids to be transported from Newport, North Dakota to St. Johns, New-Brunswick on the tracks which were owned by the rail carrier MMA?

104.11.   What is the nature and extent of the damages and other remedies that the class action members can claim?

104.12.   Do the class action members have the right to claim bodily, moral and material damages and interest? If yes, what is the amount of the damages?

[105]    **IDENTIFIES** the conclusions sought as follows:

"**GRANT** the class action of the applicants and the class members;

**DECLARE** the respondents solidarily liable for the damages sustained by the class members;

**CONDEMN** the respondents to pay each class member the specified amounts as compensation for the damages sustained and **ORDERS** the collective recovery of such sums.

**CONDEMN** the respondents to pay interest at the legal rate and the additional indemnity provided at Section 1619 CCQ on the sums mentioned above from date of service of the application to authorize a class action.

**ORDER** the respondents to file with the clerk of this Court all of the amounts making up the collective recovery in capital, interest and costs.

**ORDERS** that the individual claims of each group member be the object of a collective liquidation if the evidence allows or, alternatively, an individual liquidation.

**CONDEMN** the respondents to support the costs of the present recourse including expert fees and publication and notice fees.

**RENDER** any other order that the Court may decide and that would be in the interest of the class members."

[106]   **DECLARES** that all class members who did not ask to be excluded will be bound by any judgment rendered regarding the class action in accordance with the conditions established by law.

[107]   **ESTABLISHES** an exclusion period of 60 days from the date of publication of the notice to class members, upon which date the class members who have not exercised their right to be excluded will be bound by any judgment to be rendered.

[108]   **ORDERS** the publication of a notice to class members pursuant to Section 1006 CPC within 60 days of the judgment in the following newspapers: La Presse (national edition), Le Devoir, La Tribune, l'Écho de Frontenac and le Journal de Québec.

[109]   **REFERS** the matter to the Chief Justice so that it may fix the district wherein the recourse will be exercised.

[110]   **THE WHOLE with costs** against respondents WFS Corp., WFS Inc., WFS Can. Western and CP including the costs to publish the notice.

480-06-000001-132                                                    PAGE: 28


_____
MARTIN BUREAU, J.S.C.


Dates of the hearing: June 9, 10, 11, 12, 13, 16, 17, 18, 19, 20, 2014 and August 25,
2014

480-06-000001-132                                                    PAGE: 29

Me Daniel Larochelle
Me Jeff Orenstein
CLG

Me Joël Rochon
Rochon Genova

Attorneys for applicants
**GUY OUELLET**
**SERGE JACQUES**
**LOUIS-SERGES PARENT**


Me Laurent Nahmiash
Me Mélanie Jacques
Dentons Canada
Attorneys for respondents
**RAIL WORLD INC.**
**RAIL WORLD HOLDINGS, LLC**
**EARLSTON ASSOCIATES LLP**
**PEA VINE CORPORATION**
**EDWARD BURKHARDT**
**ROBERT GRINDROD**
**GAINOR RYAN**
**DONALD GARDNER JR.**
**JOE MCGONICLE**
**CATHY ALDANA**


Mes Yves Martineau
Me Frédéric Paré
Me Caroline Plante
Stikeman Elliot
Attorneys for respondents
**WESTERN PETROLEUM COMPANY**
**WORLD FUEL SERVICES CANADA, INC.**
**WORLD FUEL SERVICES CORP.**
**WORLD FUEL SERVICES, INC.**
**PETROLEUM TRANSPORT SOLUTIONS LLC**

Me Jean-Philippe Lincourt
Me Martin Pichette
Lavery
Attorneys for respondents
**MMA LTD.**
**MMA CORP.**
**MMA CANADA CO.**
**MMA RAILWAY LTD.**
**THOMAS HARDING**


Me Sylvain Lussier
Me Elizabeth Meloche
Osler
Attorneys for respondents
**IRVING OIL LTD.**
**IRVING OIL COMMERCIAL G.P.**


Me André Durocher
Me Enrico Forlini
Fasken Martineau
Attorneys for respondent
**CP RAILWAY COMPANY**


Me Stéphane Pitre
Borden Ladner Gervais LLP
Attorneys for respondent
**TRINITY RAIL LEASING 2012 LLC**


Me André Ryan
Me Caroline Beaudoin
BCF
Attorneys for respondent
**MARATHON OIL COMPANY**

Me Pascale Caron
Me Marie-Julie Croteau
Donati Maisonneuve
Attorneys for respondents
**OASIS PETROLEUM INC.**
**OASIS PETROLEUM LLC**


Me Panagiota Kalantzis
Me Yves Tourangeau
GILBERT SIMARD TREMBLAY
Attorneys for respondent
**QEP RESOURCES INC.**


Me Richard R. Provost
FRATICELLI PROVOST
Attorneys for respondent
**ARROW MIDSTREAM HOLDINGS LLC**


Me Serge Amar
Me Fadi Amine
MILLER THOMSON
Attorneys for respondent
**THE CIT GROUP/EQUIPMENT**
**FINANCING INC.**


Me Peter Kalichman
IRVING MITCHELL KALICHMAN
Attorneys for respondent
**DEVLAR ENERGY MARKETING LLC**

480-06-000001-132                                              PAGE: 32

Me Jacques Rossignol
Me Mélissa Rivest
Me Philippe Dumaine
Lapointe, Rosenstein, Marchand, Mélançon
Attorneys for respondent
**SLAWSON EXPLORATION COMPANY, INC.**

Me Francis Rouleau
Me Robert J. Torralbo
Blakes
Attorneys for respondents
**UNION TANK CAR COMPANY**
**PROCOR LIMITED/PROCOR LIMITÉE**

Me André Migneault
Me Marc Lemaire
Me Pierre-Alexandre Fortin
Tremblay Bois Mignault Lemay
Attorneys for respondent
**STROBEL STAROSTKA TRANSFER, LLC**

Me Geneviève Bertrand
Me Sylvie Rodrigue
Me Marie-Ève Gingras
Torys Law Firm LLP
Attorneys for respondents
**DPTS MARKETING LLC ET DAKOTA TRANSPORT SOLUTIONS LLC**
**DAKOTA PETROLEUM TRANSPORT SOLUTIONS, LLC**

Me Patrick Ferland
Me Bernard Amyot
Me Dominique Ménard
Me Nicolas Daudelin
LCM Avocats inc.
Attorneys for respondent
**GE RAILCAR SERVICES CORP.**

Me Dominique Naud
Me Prachi Shah
Me Dominique Naud
Clyde & Co.
Attorneys for respondents
**XL INSURANCE COMPANY LIMITED**
**XL GROUP PLC**


Me Linda Mercier, Me Nathalie Drouin
Me Michelle Kellam et Me Caroline Laverdière
Attorneys for the
**ATTORNEY GENERAL OF CANADA**