EXHIBIT

I

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

In re:

JOE R. WHATLEY, JR., solely in his
capacity as the WD Trustee of the WD
Trust,

    Plaintiff,

      v.

CANADIAN PACIFIC RAILWAY
LIMITED, CANADIAN PACIFIC
RAILWAY COMPANY, SOO LINE
CORPORATION, SOO LINE RAILROAD
COMPANY, AND DAKOTA,
MINNESOTA & EASTERN RAILROAD
CORPORATION,

    Defendants.

Case No. 1:16-cv-00074-DLH-CSM

**Canadian Pacific Railway Company's
answer to the complaint and jury trial
demand**

Canadian Pacific Railway Company (CP) answers the complaint against
defendants Canadian Pacific Railway Company, Canadian Pacific Railway Limited (CP
Limited), Soo Line Corporation (Soo Line Corp.), Soo Line Railroad Company (Soo
Line) and Dakota, Minnesota & Eastern Railroad Corporation (DME) as follows:

1.    Except as admitted or qualified below, denies all allegations in the
Complaint and states that because plaintiff directs most allegations at "defendants" in the
aggregate, states that, in most instances, CP cannot discern the particular defendant to
which the allegation refers.

2.    As to paragraph 1, lacks information sufficient to form a belief as to the
truth of the allegations.  Nonetheless, all the incorporated exhibits speak for themselves.

3.      As to paragraph 2, admits only that CP Limited is organized under the laws of Canada with a principal place of business in Calgary, Alberta.

4.      As to paragraph 3, admits only that CP, a Class I railroad and a subsidiary of CP Limited, is headquartered in Calgary, Alberta and organized under the laws of Canada.

5.      As to paragraph 4, admits only that Soo Line Corp. is organized under the laws of Minnesota with its principal place of business in Minneapolis, Minnesota.

6.      As to paragraph 5, admits only that Soo Line is organized under the laws of Minnesota, has its principal place of business in Minneapolis, Minnesota, operates in the Midwest, and moved Train 282 between New Town, North Dakota and the point of transfer to CP.

7.      As to paragraph 6, admits only that DME is organized under the laws of Delaware and operates in the Midwest; further states that plaintiff agreed to dismiss DME from this case.

8.      As to paragraph 7, admits only to the laws under which the various entities are incorporated and that the defendants listed in the chart are subsidiaries of CP Limited.

9.      As to paragraphs 8, 9, and 11 admits, but states that the damages sought are not permitted under the Carmack Amendment.

10.     As to paragraph 10, admits only that Soo Line conducts business in North Dakota, that CP operates rail lines in Canada, and that Soo Line operates rail lines in the U.S.

2

11.     Admits paragraph 12, but states that the shipper generated the Bill of Lading based on data entered by the shipper into CP's electronic system and that to the extent the action seeks damages other than for loss or damage to the Cargo itself, the damages sought are not authorized by the Carmack Amendment.

12.     Admits paragraph 13.

13.     As to paragraph 14, lacks information sufficient to form a belief as to the truth of the allegations.

14.     Admits paragraphs 15-16.

15.     As to paragraph 17, admits only that historically crude oil has been transported in DOT-111 cars and that U.S. authorities continue to authorize the shipment of crude oil in those cars; lacks information sufficient to form a belief as to the truth of the remaining allegations; and states that U.S. federal law and Interstate Commerce Commission Termination Act (ICCTA) common carrier obligations require rail carriers to accept shipments of crude oil packaged in DOT-111 tank cars that are tendered by the shipper for transport.

16.     Denies paragraphs 18-22, and states that federal law and regulations govern rail carrier obligations to transport lading; further states that DOT-111 tank cars are authorized by federal law and regulations for the transport of all classifications of crude oil.

17.     Admits that paragraphs 23-25 purport to summarize various TDGRs and U.S. federal regulations, but states that the full text of those regulations speak for themselves and more accurately describe regulatory obligations.

18.     As to paragraph 27, admits only that one or more of the World Fuel Entities generated a Bill of Lading which provided, subject to CP's terms and conditions, for the shipment of the Cargo from New Town, North Dakota to Saint John, New Brunswick (Canada); and states that, as plaintiffs' counsel was previously informed, the only defendants that had any involvement with Train 282 were CP and Soo Line; further states that Irving was the intended recipient of the Cargo and was not the shipper.

19.     Denies paragraph 28, and states that upon information and belief Irving Oil Commercial GP was the purchaser of the Cargo.

20.     Denies paragraph 29; states that more than 72 cars comprised the original consist; states that along the route initially Soo Line and later CP removed several cars from the consist as bad-ordered; and states further that the shipper, not any defendant, affirmatively selected the route utilizing MMA or MMAC (together, MMAR);[1] the shipper could have selected an alternative but a more expensive route over which Canadian National, rather than MMAR would have been the connecting carrier that would have moved the crude oil; and neither CP nor Soo Line subcontracted with MMAR or any other carrier for the movement of the crude oil lading.  The interchange of trains does not implicate subcontracting.

21.     As to paragraph 30, admits only that Soo Line was the originating carrier, but denies as to other Soo Line affiliates and parent.

---

[1] CP understands some references in the complaint to MMA to include MMAC and responds accordingly.

4

Case 1:16-cv-00074-DLH-CSM   Document 23   Filed 08/26/16   Page 5 of 13

22.      Denies paragraphs 31-33 and states the World Fuel Entities were sophisticated shippers which, as alleged in paragraph 37 of the Complaint, had "extensive dealings" with CP.   CP further states that the World Fuel Entities had entered into numerous similar transactions with CP regarding the movement of crude oil prior to the movement of Train 282 and were well aware of CP's terms and conditions, all of which were readily available online and by request, were incorporated by reference into the Bill of Lading, and were expressly accepted by the World Fuel Entities when generating the Bill of Lading for Train 282.   CP further states that the World Fuel Entities misrepresented the crude oil packing group classification, made the decision to utilize the DOT-111 tank cars for the Cargo and contractually agreed to indemnify defendants with respect to any damages.

23.      As to paragraph 34, admits only the shipper misclassified the crude oil lading.

24.      Admits paragraph 35.

25.      Denies paragraphs 36-38 and states that, as a matter of law, classification of the crude oil was the responsibility of the shipper, and that CP justifiably relied upon the World Fuel Entities' classification.

26.      Admits paragraphs 39-40, except that Soo Line, not any other defendant, began moving Train 282 at New Town, North Dakota, which was turned over to CP on the Canadian side of the Detroit-Windsor international border.   The other defendants never touched Train 282.

5

27.     As to paragraph 41, admits only that CP interchanged Train 282 and states that along the route Soo Line and CP removed several cars from the consist as bad-ordered.

28.     As to paragraphs 42-47, lacks information sufficient to form a belief as to the truth of the allegations (except how to spell "brake"); further states that single person train operations are permitted under Canadian law, and that MMAR held a certificate of fitness from Canadian authorities and that post-Derailment, CP attempted to refuse to interchange DOT-111 tank cars with MMAR but was required to do so by Canadian authorities.

29.     Denies paragraph 48.

30.     Admits paragraph 49.

31.     As to paragraph 50, lacks information sufficient to form a belief as to the truth of the allegations.

32.     Admits paragraph 51, except denies that MMAR "secured Train 282 on its main track[.]"

33.     Based upon media reports and governmental investigations, admits paragraphs 52-54; admits further that the train derailed while in MMAR's custody and control and that Derailment caused extensive damage, injuries, and the loss of life.

34.     Denies paragraph 55 because some original Train 282 cars did reach the Irving Oil refinery.

35.     As to paragraph 56, admits the allegations regarding the existence of the Bankruptcy Case and the appointment of the chapter 11 Trustee, but denies based on a

6

lack of information sufficient to form a belief as to whether the Bankruptcy Case was
"precipitated" by the Derailment.

36.     As to paragraph 57, admits only that various parties initiated numerous civil
actions in the wake of the Derailment; denies that the Derailment completely destroyed
all crude oil; and lacks information sufficient to form a belief as to the truth about
liability Irving and the World Fuel Entities faced.

37.     As to paragraph 58, lacks information sufficient to form a belief as to the
truth and therefore denies.

38.     Denies paragraphs 59-61 and states that the World Fuel Entities were
responsible for the decision to use DOT-111 tank cars as well as the Packing Group
misclassification, and that plaintiff, as assignee of the World Fuel Entities, stands in their
shoes for purposes of this litigation and cannot seek recovery from any defendant based
on their own wrongful acts.  CP also states that, based on investigation by Canadian
regulatory authorities, MMAR failed to follow required procedures and protocols that
would have prevented the Derailment.

39.     As to paragraph 62, admits only that the World Fuel Entities sent a Notice
of Claim, which CP disallowed for the reasons specified in the Exhibit J, and states that
the World Fuel Entities had previously sent a Notice of Claim which CP denied by letter
dated November 27, 2013.  Under the Bill of Lading and CP's incorporated terms and
conditions, the time by which the World Fuel Entities were required to bring suit under
the Carmack Amendment expired no later than November 28, 2015, thereby making this

lawsuit untimely as to the claims brought by plaintiff as assignee of the World Fuel Entities.

40.     As to paragraph 63, admits only that Irving entered into a settlement agreement which speaks for itself; lacks information sufficient to form a belief as to the truth of the remaining allegations.

41.     As to paragraph 64, admits only that Irving wrote CP regarding a potential claim on or about April 16, 2015.  CP further states that Irving lacks standing to sue under the Carmack Amendment and, under the Bill of Lading and the incorporated terms and conditions, its alleged claim is barred because that claim was required to be presented within nine months of the Derailment.

42.     As to paragraph 65, admits only that the World Fuel Entities entered into settlement agreement—the terms of which speak for themselves.

43.     As to paragraphs 66-67, lacks information sufficient to form a belief as to the truth of the allegations, and states that the referenced documents speak for themselves.

44.     As to paragraph 68, CP restates and reasserts its responses to the allegations in paragraphs 1-67.

45.     As to paragraph 69, admits only that Soo Line began moving crude oil lading at New Town, North Dakota for delivery to the Irving refinery at Saint John, New Brunswick.

46.     As to paragraph 70, admits only that the World Fuels Entities were the shipper and owner of the crude oil.

Case 1:16-cv-00874-DLH-CSM Document 23 Filed 08/26/16 Page 9 of 13

47.     As to paragraph 71, admits only that Soo Line and CP are rail carriers that issued the Bill of Lading and that Soo Line originated Train 282.

48.     As to paragraph 72, admits only that CP and Soo Line moved crude oil in DOT-111 tank cars in Train 282.

49.     Denies paragraph 73, and states that federal regulations, the Bill of Lading and CP's incorporated terms and conditions, charge shippers, not carriers, with lading classification duties; further states that plaintiff, as assignee of the World Fuel Entities, cannot seek damages from any defendant for the World Fuel Entities' own lading misclassification.

50.     Generally admits paragraph 74, but denies that all Cargo was actually transported to Saint John, New Brunswick.

51.     Denies paragraph 75.

52.     Admits paragraph 76, except some of the crude oil lading was delivered to the Irving Oil refinery and the Derailment resulted in the loss of lives, not the "loss of lies".

53.     Denies paragraph 77; states that federal law and regulations govern rail carrier obligations in the U.S.; and further states that federal law authorizes all classifications of crude oil to be transported in DOT-111 tank cars.

54.     Denies paragraph 78, and states that U.S. federal regulations govern the conduct of rail operations in the U.S., including the acceptance of shipments of crude oil in DOT-111 tanks cars.

9

55.     Admits that paragraph 79 purports to summarize various TDGRs, but states that those regulations speak for themselves and further states that TDGRs are not applicable to the U.S. portion of the movement of Train 282.

56.     Denies paragraphs 80-83, and states that U.S. federal law and regulations govern rail carrier obligations and operations in the U.S.

57.     Denies paragraphs 84-87, and states that the shipper, not any of the defendants, chose MMAR as the carrier to interchange with CP.

58.     Admits paragraph 88-89.

59.     As to paragraph 90, lacks information sufficient to form a belief as to the truth of the allegations.

60.     As to paragraph 91, admits that various parties sustained damages from the Derailment while the crude oil was being shipped under a Bill of Lading, but the damages sought by plaintiff do not constitute loss or damage to the Cargo and are not recoverable under the Carmack Amendment.

61.     Denies paragraphs 92-95.

### Affirmative Defenses

1.     The complaint fails to state a claim upon which relief can be granted.

2.     Plaintiff's claims are time barred.  The World Fuel Entities failed to file suit within two years after denial of their damage claims related to the Derailment, as required by the Bill of Lading and the incorporated terms and conditions. Thus, plaintiff's suit, as assignee of the World Fuel Entities, is untimely.

3.      Irving Oil, and thus plaintiff as Irving Oil's assignee, lacks standing to sue CP under the Carmack Amendment.

4.      Even if Irving Oil had standing to sue under the Carmack Amendment, it failed to assert its claim within 9 months of the Derailment, as required by the Bill of Lading and the incorporated terms and conditions.

5.      The Carmack Amendment precludes recovery of the damages sought in this litigation.

6.      Claims against a rail carrier based upon conduct regulated by U.S. authorities in the U.S. are preempted by U.S. federal law.

7.      Foreign laws and regulations have no legal effect in the U.S. and create no legal duties in this country.

8.      The claims for damages are barred because plaintiff's alleged losses were not proximately caused by, or a result of, any defendant's alleged actions or inactions. Plaintiff or third parties caused plaintiff's damage, if any.

9.      The doctrine of *in pari delicto* bars plaintiff's claims.

10.     The unclean hands of MMAR, Irving, the World Fuel entities and other third parties bars or limits plaintiff's claims.

11.     The Court lacks personal jurisdiction over defendants.

12.     CP tariffs and the Bill of Lading and incorporated terms and conditions preclude or limit plaintiff's claims.

13.     Plaintiff's claims are barred in whole or limited in part by the doctrines of estoppel and waiver.

14.     Plaintiff's claims are barred in whole or in part because no selection was made by the World Fuel Entities to select Full Liability transportation under the Carmack Amendment rather than Restricted Liability.  Under the Bill of Lading and incorporated terms and conditions, the World Fuel Entities were required to affirmatively select such an option if they desired such rights and, if they had, they would have had to pay a higher price for that additional protection.

15.     The World Fuel Entities have a contractual obligation to indemnify defendants with respect to plaintiff's claims. Pursuant to the judgment reduction provisions of the Confirmation Order in MMA's Bankruptcy Case, any verdict in this action must be reduced to zero on account of this obligation.

16.     Pursuant to the judgment reduction provisions of the Confirmation Order in MMA's Bankruptcy Case, any verdict in this action must be reduced by the relative fault of other persons or entities, including without limitation MMAR, the World Fuel Entities, Irving Oil, Canadian regulatory authorities, and the operator of the train at the time of the Derailment.

**WHEREFORE,** CP requests dismissal with prejudice of all claims.

### Jury trial demand

CP demands a trial by jury on all issues.

Dated:  May 26, 2016

**BRIGGS AND MORGAN, P.A**

By: _s/Timothy R. Thornton_
    Timothy R. Thornton
    Paul J. Hemming
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
(612) 977-8400

**ATTORNEYS FOR CANADIAN
PACIFIC RAILWAY COMPANY**