UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

| | |
|---|---|
| In re:<br><br>MONTREAL MAINE & ATLANTIC RAILWAY, LTD.<br><br>Debtor | Chapter 11<br>Case No. 13-10670 |
| ROBERT J. KEACH, solely in his capacity as the estate representative of the post-effective date estate of MONTREAL MAINE & ATLANTIC RAILWAY, LTD.<br><br>Plaintiff<br>v.<br><br>CANADIAN PACIFIC RAILWAY COMPANY and SOO LINE RAILROAD COMPANY<br><br>Defendants | Adv. Proc. No. 14-1001 |

## MEMORANDUM OF DECISION

Pending before me is Canadian Pacific Railway Company and Soo Line Railroad Company's ("CP" and "Soo Line," respectively and the "Defendants," jointly) Motion to Dismiss Plaintiff Robert J. Keach's (the "Estate Representative") Third Amended Complaint (Docket Entry "DE" 230) (the "Complaint").[1]  This motion (the "Motion to Dismiss") is predicated on two general grounds: *forum non conveniens* and multiple

---

[1]  This adversary proceeding was filed on January 30, 2014, and has already traveled a long and winding road.  The Defendants were not named parties when the initial complaint was filed, and none of the original defendants, all of whom have settled, remain.

theories contesting the adequacy of the Complaint under Fed. R. Civ. P. 12(b)(6), made

applicable to this proceeding by Fed. R. Bankr. P. 7012(b).  For the reasons set forth

below, I will grant the Motion to Dismiss as to Count II and deny it as to the remaining

Counts of the Complaint.

## I.  Facts.

The facts that give rise to the Complaint are not really in dispute.  Instead, the

parties disagree about how to view those facts in light of the Counts in the Complaint.  At

the motion to dismiss stage, I take the facts alleged in the Complaint as true.  Rederford

v. U.S. Airways, Inc., 589 F.3d 30, 34-35 (1st Cir. 2009).

On or about June 29, 2013, multiple truckloads of crude oil were loaded into

seventy-two DOT-111 tank cars (the "Train") in New Town, North Dakota, bound for an

oil refinery in Saint John, New Brunswick, Canada.  The transport of the Train was in

accordance with a bill of lading in which the shipper, Western Petroleum Co., accepted

the terms and conditions of CP for the shipment of the freight (the "Bill of Lading").[2]

CP and its subsidiary Soo Line, the co-issuers of the Bill of Lading, were responsible for

operating and transporting the Train from North Dakota to Cote, Saint-Luc, Quebec.  On

July 5, 2013, they transferred control of the Train to the debtor, Montreal, Maine &

Atlantic Railway, Ltd. ("MMA").  No new bill of lading was issued.  MMA commenced

the second leg of the Train's transport towards its ultimate destination in Saint John, New

Brunswick.  Late in the evening of July 5, 2013, while the Train was in the control of

MMA, it was parked and left unattended on MMA's subsidiary Montreal, Maine &

---

[2] A copy of the Bill of Lading is attached as Exhibit A to CP and Soo Line's Memorandum of Law in
Support of Motion to Dismiss Third Amended Complaint. (DE 246.)  The Estate Representative has not
disputed its authenticity.

Atlantic Canada Co.'s ("MMA-Canada") track in Nantes, Quebec.  At around 1:00 the

next morning, the unattended Train began to roll downhill and soon after derailed in

downtown Lac-Megantic, Quebec, killing forty-seven people and causing massive

explosions, uncontrolled fire, and extensive property and environmental damage (the

"Derailment"). The Derailment has been (and remains) the subject of many lawsuits in

both the United States and Canada.  Shortly after the Derailment, in August of 2013,

MMA filed a Chapter 11 bankruptcy petition in this Court.  MMA's Chapter 11 Plan was

confirmed on October 9, 2015, and the Estate Representative now serves as the

representative of the post-effective date estate of MMA.

On January 30, 2014, the Estate Representative, then serving as Trustee of the

MMA bankruptcy estate, filed the initial complaint in this proceeding against several

defendants no longer parties to this action.[3]  (DE 1.)  Throughout 2014, the case remained

in a holding pattern while the parties conducted settlement negotiations. On January 9,

2015, the Estate Representative while acting as Trustee, filed the First Amended

Complaint which added CP and Irving Oil Ltd. as defendants.  (DE 95.)  Six days later,

CP moved to withdraw the reference, which motion was denied by the United States

District Court for the District of Maine on June 8, 2015.  Keach v. World Fuel Services,

Corp. (In re Montreal Me. & Atl. Ry., Ltd.) No. 1:15-mc-22-NT, 2015 WL 3604335 (D.

Me. June 8, 2015).  Following the District Court's ruling, CP filed its first motion to

dismiss in this Court, which I denied on August 20, 2015.  (DE 157.)  CP then filed its

answer to that complaint.  In February of 2016, having reached settlements with all of the

---

[3] Those defendants were World Fuel Services Corp., World Fuel Services, Inc., Western Petroleum Co.,
World Fuel Services Canada, Inc., and Petroleum Transport Solutions, LLC.

non-CP defendants, the Estate Representative either moved to dismiss or filed

stipulations of dismissal with respect to all of the non-CP defendants.  On June 16, 2016,

CP filed its second motion to withdraw the reference, on the grounds that all of the

wrongful death and personal injury lawsuits against MMA and others had been

consolidated in the District Court and those cases alleged the same basic facts as those

alleged in this case.  The District Court denied the second motion to withdraw the

reference on September 28, 2016.  Keach v. Canadian Pac. Ry. Co., No. 1:16-mc-00180-

JDL, 2016 WL 5416456 (D. Me. Sept. 28, 2016).

On September 29, 2016, after receiving approval from me over CP's objection,

the Estate Representative filed the Complaint, adding Soo Line as a defendant.[4]  (DE

230.)  The Complaint contains four counts: Negligence (Count I), Breach of

Contract/Breach of Warranty (Count II), Negligent Misrepresentation (Count III), and

Disallowance of Claim – namely CP's proof of claim in the bankruptcy case (Count IV).

On October 7, 2016, CP and Soo Line filed the Motion to Dismiss, seeking dismissal on

the grounds of *forum non conveniens* and failure to state a claim which entitles the Estate

Representative to relief.  Oral arguments were held on December 20, 2016.

## II.  Motion to Dismiss Standard.

When considering the Motion to Dismiss, I must accept as true the factual

allegations of the Complaint, and draw all reasonable inferences in favor of the plaintiff,

the Estate Representative.  Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc., 524 F.3d

315, 320 (1st Cir. 2008).  So considered, the Complaint must include "enough facts to

state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S.

---

[4]  The Second Amended Complaint was filed on May 18, 2015, adding SMBC Rail Services, LLC as a
defendant.  (DE 134.)  It is not relevant to today's decision.

544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "[E]valuating the

plausibility of a legal claim 'requires the reviewing court to draw on its judicial

experience and common sense.'"  Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12

(1st Cir. 2011) (quoting Iqbal, 556 U.S. at 679).  However, "[i]f the factual allegations in

the complaint are too meager, vague, or conclusory to remove the possibility of relief

from the realm of mere conjecture, the complaint is open to dismissal."  Haley v. City of

Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quotation marks omitted).

## III.  Analysis.

A.  *Forum non conveniens.*

The doctrine of *forum non conveniens* is a discretionary tool that permits a court

to dismiss a claim, even though it has jurisdiction, because there is a better venue in

which the parties may seek resolution of their conflict.  Although naturally subjective,

"better" in this context means fair to the parties and "substantially more convenient for

them or the courts."  In re Lac Megantic Train Derailment Litig., 210 F. Supp. 3d 218,

231 (D. Me. 2016) (quotation marks omitted).  The decision is discretionary, although not

by any stretch unfettered.  The defendant must show "that an adequate alternative forum

exists and that considerations of convenience and of judicial efficiency *strongly* favor

litigating the claim in the second forum."  Adelson v. Hananel, 510 F.3d 43, 52 (1st Cir.

2007) (quotation marks omitted).[5]  Moreover, the plaintiff is entitled to "some degree of

---

[5]  Both in his papers and again during oral argument, the Estate Representative maintained that the
appropriate question for me to ask is whether proceeding in the plaintiff's chosen forum (this Court) would
be "unjust, oppressive, or vexatious" for the defendant.  Although it is true that that language has appeared
in reported decisions, it is not the correct legal standard.  Iragorri v. Int'l Elevator, Inc., 203 F.3d 8, 15 (1st

deference for his original choice of forum," which may be heightened when the choice also happens to be the plaintiff's home forum. Id. at 53. *But see* Interface Partners Int'l Ltd. v. Hananel, 575 F.3d 97, 102 (1st Cir. 2009) (recognizing some ambiguity in the exact level of deference to which a plaintiff's choice of home forum is entitled).

Recently, in this district but in different litigation, Judge Levy granted a motion to dismiss filed by CP based in part on *forum non conveniens* grounds.[6] That case, In re Lac Megantic Train Derailment Litigation, 210 F. Supp. 3d 218, (D. Me. 2016), is a collection of state and federal wrongful death and personal injury cases filed by plaintiffs in Illinois and Texas and transferred to Maine. Not surprisingly, CP and Soo Line point to Judge Levy's decision as the correct result in both that case and this one, whereas the Estate Representative distinguishes the analysis as not relevant because of the different inquiries required in each case. I will deal with their arguments in my discussion below.

1. Alternative Forum.

The "adequate alternative forum" prong of the test is met if the defendant shows that "'the alternative forum addresses the types of claims that the plaintiff has brought and that the defendant is amenable to service of process there.'" Hananel, 575 F.3d at 101 (quoting Iragorri v. Int'l Elevator, Inc., 203 F.3d 8, 12 (1st Cir. 2000)). Although the Estate Representative argues that CP and Soo Line should be estopped from claiming that Canada is an adequate alternative forum because they have successfully petitioned for a jury trial in this district (which they would not be entitled to in a Canadian court), he does

---

Cir. 2000) ("The Koster Court's use of the term "oppressiveness and vexation" neither created an independent standard nor raised the bar for dismissal in forum non conveniens cases.").

[6] Judge Levy also dismissed the case on lack of personal jurisdiction and insufficient service of process grounds. In re Lac Megantic Train Derailment Litig., 210 F. Supp. 3d 218, 225-31 (D. Me. 2016).

not otherwise seriously contest that Canada is an adequate forum.  Because I agree with

CP and Soo Line that their demand for that which they are entitled to in this country (trial

by jury) does not prohibit them from litigating this matter in a forum that does not offer

them the same right, I find that they have carried their burden on the adequate alternative

forum prong.

2.  Convenience and Judicial Efficiency.

In weighing considerations of convenience and judicial efficiency, as I must under

the second prong of the *forum non conveniens* determination, I inquire whether the

defendants have met their burden to show that "the compendium of factors relevant to the

private and public interests implicated by the case strongly favors dismissal."  Irragori,

203 F.3d at 12 (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09 (1947)).  Relevant

private interests include "'the relative ease of access to sources of proof; availability of

compulsory process for attendance of unwilling, and the cost of obtaining attendance of

willing, witnesses; [and the] possibility of view of premises, if view would be appropriate

to the action.'"  Id. (quoting Gilbert, 330 U.S. at 508).  Relevant public interests include,

for example, "the administrative difficulties of docket congestion; the general goal of

'having localized controversies decided at home,' and, concomitantly, ease of access to

the proceedings on the part of interested citizens; the trier's relative familiarity with the

appropriate rules of decision; and the burdens of jury duty."  Id. (quoting Gilbert, 330

U.S. at 508-09).

*a.  The private interest.*

CP and Soo Line argue that the private interests favoring dismissal include the

most obvious, that Canada is where the Derailment occurred.  As a result, it is also where

7

virtually all of the "derailment-related" physical evidence is and where witnesses to the derailment and its aftermath live. CP and Soo Line also note that the majority of Lac-Megantic residents speak French, while few of them speak English. The Estate Representative replies that the Derailment itself, unlike in the <u>Lac Megantic Train Derailment Litigation</u> case, is not the focus of his injury. He argues that his claims spring from actions taken or not taken by the Defendants in the United States and that his damages - the destruction of MMA as a business - likewise occurred in Maine and the United States where MMA was headquartered and conducted most of its business. In fact, in open court on December 20, 2016, the Estate Representative twice offered to stipulate to the accuracy of the TSA report as to the Derailment[7] and he has declared under oath that that he does not expect to (a) seek discovery of any document that does not reside with MMA, Soo Line, CP, Western Petroleum Co., World Fuel Services Corp., World Fuel Services, Inc., or other entities located in the United States; (b) call any witnesses who are not U.S. domiciled employees of the previously listed companies, with the exception of a limited number of CP employees headquartered in Calgary; (c) call any

---

[7]

MR. KEACH: . . . We don't intend to call a single witness from Quebec or a single French-speaking witness at any point in time in our case.

THE COURT: And that's something that, if I were to deny the motion to dismiss, that you would be barred from doing so, unless in rebuttal.

MR. KEACH: Unless in rebuttal, Your Honor, because I don't know what they're intending to do. But we take the position that nothing that happened in Lac-Megantic is, frankly, relevant to this proceeding. We could stipulate that whatever -- you know, what was said in the TSA report is what happened. . .

But we could stipulate, frankly, as to all the facts in the TSA report; it wouldn't matter at all, because that's not the case we're pursuing.

Transcript of the Hearing held on December 20, 2016, pp. 32:6 – 32:17 and 32:23 – 32:25.

Québecois as witnesses; or (d) present any witnesses about the actions or inactions of

MMA Canada in Québec with respect to the Derailment.  (Declaration of Robert J. Keach

in Support of Estate Representative's Objection to Motion to Dismiss, DE 247, Ex. A, ¶¶

10-13).

In the Lac Megantic Train Derailment Litigation case, Judge Levy found that the

private interest factors favored the defendant, CP.  In re Lac Megantic Train Derailment

Litig., 210 F. Supp. 3d at 231-32.  Specifically, he determined that all of the injuries took

place in Canada, the evidence related to damages (injuries, deaths, etc.) was in Canada,

all of the plaintiffs were Canadian, and language issues would complicate trying the case

in the United States.  Id.  Lastly, Judge Levy noted the importance of CP being a

Canadian company doing "almost no business in the United States."  Id. at 232.

This case, however, is different from that which was before Judge Levy in many

respects.  For example, the two cases were initiated by different plaintiffs and they

concern distinct injuries.  Unlike the injury and death claims of Canadians in the Lac

Megantic Train Derailment Litigation case, this case involves the injury allegedly caused

by a Minnesota company (Soo Line, admittedly a subsidiary of a Canadian company, CP)

to a Delaware company domiciled in Maine (MMA), which injury was the alleged cause

of the bankruptcy filing of that Maine company in Maine.  The conduct complained of,

specifically, Soo Line's alleged negligence and (alleged) breaches of (alleged)

contract/warranty rights, took place in the United States.  It is likely that witnesses in this

case will not be those who saw or were present at the Derailment, but rather will be those

who work for the companies in question, in Minnesota, North Dakota, Maine, and

possibly Calgary, Alberta.  In other words, while it is true that the Derailment in Canada

is a critical link in the causation analysis, the acts giving rise to the Estate

Representative's particular causes of action in this case were taken or not taken in the

United States, and the specific injury to MMA (potentially) giving rise to damages

occurred in the United States.

So, while I agree with CP and Soo Line that there are private interests which

factor in their favor, I disagree that those factors strongly favor dismissal.

*b. The public interest.*

In their Motion to Dismiss, CP and Soo Line also argue that the public interest

factors - court congestion, the local interest in having local disputes decided at home, the

unfairness of burdening citizens in an unrelated forum, and potential application of law

difficulties - all weigh in their favor.  Most notably, the Defendants emphasize the

potential difficulty for this Court and any Maine jurors to deal with the French language

and the interest of the citizens of Quebec in being apprised of and involved in deciding

litigation concerning the Derailment.  Unsurprisingly, the Estate Representative sees the

matter through a different lens.  He argues that this Court is not currently congested, and

is where the bankruptcy case is pending, and therefore is most "interested" in trying the

matter; that there will be no language issues because the witnesses will be testifying in

English; and finally, that the true interested parties to this litigation, and any possible

recovery therefrom, are commercial creditors of the bankruptcy estate and Maine

residents who suffered the negative economic effects of a financially distressed local

company.

In the <u>Lac Megantic Train Derailment Litigation</u> case, Judge Levy found that the

most significant public interest was that of Canadian citizens because the Derailment

occurred in Quebec.  Lac Megantic Train Derailment Litig., 210 F. Supp. 3d at 233.  He

was also concerned about the significant burden on the court and U.S. jurors "trying a

case of this magnitude, a great deal of which would be conducted in a foreign language

and which would address a major calamity that occurred in a foreign country…." Id.

I agree with Judge Levy, CP, and Soo Line that the citizens of Quebec have a

significant interest in participating in and being kept apprised of ongoing litigation

regarding the Derailment.  However, as discussed previously, this proceeding differs

from the Lac Megantic Train Derailment Litigation case in critical ways.  In addition to

those noted above, it is certainly relevant that this matter is being pursued by a fiduciary

of a debtor in this Court who has already collected hundreds of millions of dollars on

behalf of creditors, *including* Canadian citizens directly harmed by the Derailment.  In

addition, the allegedly aggrieved party in this case -  unlike the Canadian residents in the

Lac Megantic Train Derailment Litigation case - was a Maine company that employed

Maine people.

As with my consideration of the private interest factors, I do not believe that CP

and Soo Line have shown that the public interest factors strongly weigh in their favor.  In

sum, I find that the Defendants have failed to show that dismissing this case in favor of

litigation in Canada would result in serious unfairness to the parties, and for these reasons

I will not grant the Motion to Dismiss on *forum non conveniens* grounds.

B.  Rule 12(b)(6).

CP and Soo Line also seek dismissal based on a variety of arguments under Rule

12(b)(6): they assert (a) Counts I and III must be dismissed because of the application of

the economic loss doctrine; (b) Count I fails to allege plausible facts to support a claim

that CP or Soo Line breached duties imposed upon them by 49 C.F.R. §171.2(e); (c) the

Counts in the Complaint are preempted by federal law; and (d) Count II fails because the

Estate Representative does not have standing to assert contract claims based upon the Bill

of Lading and even if he did, the claim is untimely, precluded by the terms of the Bill of

Lading and preempted.  I will address each in turn, but as a preliminary matter I will

dispense with the Estate Representative's arguments that my earlier decisions denying

CP's first motion to dismiss[8] (DE 140) and granting the Estate Representative leave to

file the Third Amended Complaint (DE 228) operate as law of the case and mandate the

denial of this motion to dismiss.

First, I examine the preclusive effect of my August 20, 2016 decision on CP's

first motion to dismiss. "Under the law of the case doctrine, 'when a court decides upon a

rule of law, that decision should continue to govern the same issues in subsequent stages

in the same case.'" Negron-Almeda v. Santiago, 579 F.3d 45, 50 (1st Cir. 2009) (quoting

United States v. Wallace, 573 F.3d 82, 87-88 (1st Cir. 2009)). The doctrine requires that

an issue be actually decided in order for it to have subsequent preclusive effect. *See*

United States v. Moran, 393 F.3d 1, 7 (1st Cir. 2004) (describing the second, more

flexible, branch of the doctrine as contemplating "that a legal decision made at one stage

of a criminal or civil proceeding should remain the law of that case throughout the

litigation"); Ellis v. United States, 313 F.3d 636, 646 (1st Cir. 2002) (explaining that the

more flexible branch of the law of the case doctrine, applicable here, "means that a court

ordinarily ought to respect and follow its own rulings").  I have reviewed the pleadings

relating to CP's first motion to dismiss and the transcript of the hearing on that motion

---

[8]  CP filed its first motion to dismiss on June 23, 2015 (DE 140). At that time, Soo Line had not yet been
added as a party to this case.

(DE 162), which includes the arguments of counsel and my oral decision denying it.   The

motion and my decision focused on two primary issues: whether this Court has personal

jurisdiction over CP and whether the Estate Representative's claims against CP must be

dismissed as a matter of law because Canadian regulations do not designate crude oil as a

"forbidden good".  Those are not the issues raised in the Motion to Dismiss.  Thus, the

August 20, 2016 decision cannot, as the Estate Representative suggests, preclude the

Defendants from asserting that the Complaint should be dismissed, notwithstanding the

additional fact that Soo Line was not even a party to this litigation at that time.

Next, I look at the implications of my decision granting the Estate Representative

leave to file the Complaint.  At the September 27, 2016 hearing on that motion, I

specifically explained that my decision to grant it did not foreclose the Defendants from

raising whatever arguments via whatever pleadings they believed they, in good faith, had

the right to assert in opposition to the Complaint.[9]  The colloquy between the Estate

---

[9]

    COURT: [O]n the Motion for Leave to Amend to add a third amended complaint, I looked to Federal
Rule of Civil Procedure 15(a)(2), and I believe that in this instance, the Trustee [n/k/a the Estate
Representative] has met its burden and that justice does require for leave to permit the amendment. In
doing this, Canadian Pacific and Soo Line have reserved all rights they have to file whatever
emotions [sic] they want, including some type of motion to dismiss if they believe that that is
something that would be appropriate.

(Transcript of the September 27, 2016 Hearing on Motion for Leave to File Third Amended Complaint (the
"September 27, 2016 Transcript"), pp. 73:18 – 74:1(DE 244).)

    COURT:  Now, you reserved all of your rights to make any kind of argument you want proceeding
forward in response to the filing of the service of this complaint, including raising any issues that you
think -- if you think that no relation-back is required, you can raise that argument.

Id. pp. 77:18 – 77:22.

    THE COURT: So what I'm going to do is, I believe that the order that I will sign, this order, Docket
Entry 210-3, still leaves you with whatever rights you may have on a motion to dismiss or some
other proceeding as the case moves forward.

    MR. THORNTON: Thank you.

Representative's counsel and me clearly underscores this.[10]  It is apparent from the

transcript that everyone, including the Estate Representative, anticipated something akin

to the Motion to Dismiss.  There are no law of the case grounds upon which to deny the

Motion to Dismiss.

        1.       Economic Loss Doctrine.

CP and Soo Line assert that the economic loss doctrine precludes the advance of

Counts I and III because both Counts seek recovery sounding in tort for economic loss

but there are no accompanying allegations of personal injury to the Estate Representative

or damage to other property.  Though CP and Soo Line concede that the choice of which

state's laws will govern this action or apply to specific Counts has not yet come to the

fore, they assert that such a decision is of no import because both of the states which are

---

MR. KEACH: We would not disagree with that, Your Honor. Thank you.

Id. pp. 78:11 – 78:18.

[10]

THE COURT: Would CP-- I'm sorry, would CP and Soo Line have the chance to make such arguments -- let's assume I granted the motion to amend.  Does this hearing, does this motion preclude them filing a motion to dismiss?

MS. ZAHRADKA: No, Your Honor.

THE COURT: And is it duplicative of what we discuss here?  Would I be construing the motion for leave to amend under 15(a)(2) similarly as how I would deal with the 12(b)(6), or 12(b)-whatever?

MS. ZAHRADKA: Well, Your Honor, the standard is different, the trustee's standard to amend the complaint is different than the defendant's standard would be to move to dismiss.  And so I don't think that the trustee's argument -- that this argument would be duplicative in that –

THE COURT: Therefore they wouldn't be foreclosed from raising it in good faith, if they felt they had the grounds to do so.

MS. ZAHRADKA: That's right, Your Honor.  And the trustee acknowledges that CP may very well think it has defenses against the amendments that the trustee seeks to incorporate. But that's for another day.  That's for the merits of the dispute, and doesn't go to the trustee's procedural ability to amend its complaint to assert those causes of action.

September 27, 2016 Transcript, 42:10 – 43:8.

relevant for choice of law purposes, Delaware and Maine, proscribe the recovery of economic damages in tort cases.  Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors, Inc., 659 A.2d 267, 270 (Me. 1995) ("A situation where the injury suffered is merely the failure of the product to function properly is distinguishable from those situations, traditionally within the purview of tort, where the plaintiff has been exposed, through a hazardous product, to an unreasonable risk of injury to his person or property.") (quotation marks omitted) (citations omitted); Danforth v. Acorn Structures, Inc., 608 A.2d 1194, 1198 (Del. 1992) (concluding that tort recovery is foreclosed in the absence of personal injury or damage to other property).

The Estate Representative seeks to counter this attack in several ways.  First, he argues that Count III is not necessarily a tort claim to which the economic loss doctrine would apply because, under North Dakota law (which the Estate Representative asserts may apply), such a claim may derive from that state's actual fraud statute.  Second, he asserts that some states have crafted exceptions to the economic loss rule for negligent misrepresentation claims.  Finally, he contends that it would be premature to dismiss his claims at this time.

This third argument resonates with me.  At this stage of the proceeding, when I must view the allegations in the Complaint through the prism of the motion to dismiss standard, I conclude that Counts I and III state plausible causes of action that survive the Motion to Dismiss, notwithstanding the application of the economic loss doctrine.  First, I have not been asked to determine which state's (or possibly states') laws apply to which counts.  Although CP and Soo Line are correct, and Maine and Delaware apply the economic loss doctrine in certain tort cases, I do not know at this time whether Maine,

Delaware or - as the Estate Representative suggests in his objection - North Dakota law will control this analysis.  Further, I am not convinced that the legal firmament as respects the application of the economic loss doctrine is as fixed as CP and Soo Line assert.  *See* In re Hannaford Bros. Co. Customer Data Sec. Breach Litig., 613 F. Supp. 2d 108, 127  (D. Me. 2009) ("Thus, the economic loss doctrine as Maine's Law Court has described it does not apply to prevent negligence-based tort recovery here."), *aff'd in part rev'd in part* Anderson v. Hannaford Bros. Co., 359 F.3d 151 (1st Cir. 2011); *see also* Schmid Pipeline Constr. v. Summit Natural Gas of Me., Inc., No. 1:13-cv-464-GZS, 2014 WL 3600437, at *4(D. Me. June 22, 2014) ("As a review of the cases suggests, given the limited scope of the issue in *Oceanside*, and given the Law Court's lack of further comment on the doctrine for almost twenty years, whether the doctrine applies beyond a product liability claim is uncertain.").

As I see it, even though some of the Counts of the Complaint might fall away as the case proceeds and discovery clarifies the topography, right now the Estate Representative is entitled to plead in the alternative.[11]  Thus given the lack of clarity at this stage of the proceeding as to what law to applies and the uncertainty of the state of the law on the economic loss doctrine, I will not grant the Motion to Dismiss on the basis of the application of this doctrine.  My denial of the Motion to Dismiss on this basis is obviously without prejudice to CP and Soo Line's rights to file a similar motion or a

---

[11] Fed. R. Civ. P. 8(a)(3), as made applicable by Fed. R. Bankr. P. 7008, provides: "A pleading that states a claim for relief must contain . . . a demand for the relief sought, which may include relief in the alternative or different types of relief."  Fed. R. Civ. P. 8(d)(2) allows: "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."

motion for summary judgment as the case moves forward and the choice of law becomes

clearer and as the facts crystalize.

2.     Preemption and 49 C.F.R. §171.2(f).

CP and Soo Line argue convincingly that federal law governing the rail shipment

of goods and the transportation of hazardous materials preempts any state law or other

standard of care, including that imposed by common law, that the Estate Representative

alleges they violated.  CP and Soo Line attack allegations in the Complaint that would

hold them to a standard of care different than that imposed by the Federal Railroad Safety

Act ("FRSA"), 49 U.S.C. § 20101 et seq., regulations promulgated by the Federal

Railroad Administration ("FRA"), the Hazardous Materials Transportation Act and

certain Packing Group regulations.  Specifically, they insist that U.S. shippers, not

carriers, are responsible for determining lading risks and that in fact carriers have no

discretion in choosing whether to provide rail service when a regulation-compliant

shipment is delivered to them.  CP and Soo Line point to additional regulations that, in

2013, authorized the use of the so-called DOT-111 tank cars for the shipment of low-,

medium-, and high-hazard liquids equivalent to Packing Groups III, II, and I,

respectively.  Thus, they argue, the Estate Representative's attacks against the use of

DOT-111 tank cars are meaningless because any such argument is preempted.  They urge

that accountability in the U.S. is limited to conduct outside the requirements of a covering

regulation, when the FRA has issued regulations.  *See also* <u>In re Montreal Me. & Atl.

Ry., Ltd.</u>, 2015 WL 3604335, at *3 (recognizing CP's argument that "the adversary

proceeding will be governed by the FRSA, which will preempt any common-law

standards of care").  At bottom, if CP and Soo Line are right, their liability hinges on the

question of whether they in fact complied with the relevant federal regulations.

The Estate Representative first contends that my denial of CP's first motion to

dismiss is law of the case and conclusive on the question whether he has pleaded

sufficient facts to overcome a 12(b)(6) motion arguing, *inter alia,* preemption.   As

discussed above, I did not decide CP and Soo Line's preemption argument before and

thus the doctrine is not applicable.

In a similar vein, the Estate Representative also urges that the District Court, in its

first order denying CP's motion to withdraw the reference, "disposed of" the preemption

argument and I should do the same.  I disagree with The Estate Representative's

characterization of Judge Torresen's ruling.  In her decision, Judge Torresen carefully

explained the parties' preemption arguments and then *declined* to withdraw the reference

under the federal law prong of 11 U.S.C. § 157(d), finding, first, that she could not

affirmatively determine that U.S. federal law will decide the case, and second, that

assuming U.S. law does govern, resolving the preemption issues would require little more

than "simple" or "routine" application of non-Code federal law.  In re Montreal Me. &

Atl. Ry, Ltd., 2015 WL 3604335, at **4-7.  This was hardly a disposition on the merits; it

was, in fact, quite the opposite.

Lastly, the Estate Representative responds to CP and Soo Line's preemption

argument with the rejoinder that preemption dictates only the standard of care, not the

cause of action.  In other words, the federal statutes and regulatory provisions cited by CP

and Soo Line dictate the burden he bears in proving negligence, not whether he's allowed

to try.  And because determining whether the defendants have met their burden is fact

specific and requires discovery - so this line of thinking goes - dismissal at this stage of the case is premature.

Except as to this last point, CP, Soo Line, and the Estate Representative actually agree. CP and Soo Line do not dispute that their conduct is governed by the applicable railroad regulations. Rather, they argue that those regulations expressly foreclose recovery from them as a carrier, such that nothing in the Third Amended Complaint could overcome the dictates of the statutes and regulations.

The question of whether CP and Soo Line complied with the covering regulations is one of fact. The Estate Representative is thus correct that to dismiss plausible allegations of their failure to do so would be premature. However, the inquiry does not end here. I must still determine whether the Estate Representative has pleaded such plausible allegations in the Third Amended Complaint. It is a close call,[12] but I find that the Estate Representative has done just enough to get him out of the starting gate.

49 C.F.R. § 171.2(f) states:

No person may transport a hazardous material in commerce unless the hazardous material is transported in accordance with applicable requirements of this subchapter, or an exemption or special permit, approval, or registration issued under this subchapter or subchapter A of this chapter. *Each carrier who transports a hazardous material in commerce may rely on information provided by the offeror of the hazardous material or a prior carrier, unless the carrier knows or, a reasonable person, acting in the circumstances and exercising reasonable care, would have knowledge that the information provided by the offeror or prior carrier is incorrect.*

---

[12] For example, the Third Amended Complaint is replete with allegations that suggest CP and Soo Line should not have used DOT-111 cars to transport crude oil, but those cars were expressly permitted for that use, so I do not see how using them could possibly provide the basis for a negligence claim.

(Emphasis added.)  Thus, this Hazardous Materials Regulation does place a duty on the carrier in certain circumstances: when it knows, or would know as a reasonable person exercising reasonable care, that the information provided to it by the offeror, or shipper, is incorrect.  *See, e.g.,* Borger v. CSX Transp., Inc., 571 F.3d 559 (6th Cir. 2009).[13]

The Estate Representative's theory of the case was set forth by him more than once during the December 20th hearing.[14]  Indeed, that very theory appears almost verbatim at ¶ 6 of the Third Amended Complaint.  In ¶¶ 58-68, 93-97, and 99-106 (including the details alleged in ¶ 103(a – g)), the Estate Representative sets forth detailed allegations, which when construed most favorably to him, allege a plausible negligence claim based in part on CP and Soo Line's failure to comply with 49 C.F.R. §171.2(f).  For these reasons, the Motion to Dismiss is denied, as respects this argument.

3.    Contract Arguments.

Finally, CP and Soo Line seek to extinguish Count II of the Complaint on the ground that the Estate Representative does not have standing to assert contract claims based upon the Bill of Lading.  They further argue that even if he did: (a) his claim is

---

[13]  CP and Soo Line cite Borger for the proposition that in order to prevail on his claim, the Estate Representative must establish "more than evidence that a person was injured by a shipment: the carrier must have had a reason to know of a problem."  Borger v. CSX Transp., Inc., 571 F.3d 559, 565 (6th Cir. 2009). Though CP and Soo Line cite the Borger holding correctly, the procedural context of that case and this one are different, making it inapplicable at this point in this matter.  The Borger Court was reviewing a summary judgment decision of the trial court; here I am presented with a motion to dismiss.

[14]

    MR. KEACH:  . . . In other words, did they reasonably have reasonable cause to believe that the order was misclassified? Because, if they did, they had a duty not to
let the train leave North Dakota.

    That's going to be the issue that determines their liability. And, frankly, we can stipulate to everything that happened in Lac-Megantic, because it's not relevant, frankly, to whether or not their liability is primary or not. If they had done their job, Lac-Megantic doesn't happen. It never has the opportunity to happen. That's why CP, frankly, is the most responsible party of any party we've named in this case.

(Transcript of the December 20, 2016 Hearing on Motion to Dismiss, p. 30:6 – 30:17; *see also* p. 51.)

untimely based upon the nine-month limitations term in CP's Tariff 1, Item 200 ¶ 13 (p. 39); (b) the damages he seeks are precluded by the terms of CP's Tariff 1, Item 200, ¶ 11(f); and (c) his claim is preempted by the Carmack Amendment. The Estate Representative does not agree. He maintains that (a) he can assert breach of contract and warranty claims against CP and Soo Line because they adopted the terms of the Bill of Lading to govern the CP/Soo Line and MMA/MMA-Canada relationship for the delivery of the crude oil at issue here; (b) it is too early to tackle the timeliness and damage preclusion issues given that the matter is at the motion to dismiss stage; and (c) the Carmack Amendment is inapplicable.

In Count II of the Complaint, the Estate Representative alleges that CP and Soo Line are liable to MMA for breach of contract and breach of warranty damages arising from the Bill of Lading, notwithstanding the uncontested fact that MMA is not a party to the Bill of Lading. The Estate Representative premises his breach of contract and warranties Count on his allegations (which are accepted as true for purposes of this exercise) that the entire shipment of crude oil was subject to the Bill of Lading and, even though no *new* bill of lading between MMA and CP and Soo Line was ever issued, CP and Soo Line adopted the Bill of Lading as the governing documents by and between CP, Soo Line, MMA, and MMA-Canada. (Complaint ¶¶ 3, 4.) If I were considering these allegations in a vacuum and ignored all other activity in this and related cases,[15] I might conclude that the Estate Representative has indeed met his burden under Iqbal/Twombley and would deny the Motion to Dismiss this Count. However, much has happened here

---

[15] The related proceedings include, for example, Wheeling & Lake Erie Railway Co. v. Robert J. Keach, Adv. Pro. 13-01033 (the "Wheeling v. Keach Adversary").

and in the related cases, and the landscape of relevant facts, allegations and positions is

not limited to the pleadings and arguments related to the Motion to Dismiss.[16]

For example, the Estate Representative has asserted or submitted as testimony

under oath the following:

> "The only place that the Debtor (in fact, not the Debtor, but the Debtor's track) is mentioned on the Bill of Lading is as part of the "Route," which lists the following: 'CPRS STJNS MMA.'"

(Statement of Undisputed Facts in Support of Trustee's Motion for Summary Judgment, <u>Wheeling v. Keach</u> Adversary, DE 83-2, ¶ 31.)

> "[MMA] is not listed as a party to the Bill of Lading, is not a signatory to the Bill of Lading, and is not a party to or intended third-party beneficiary of the Bill of Lading."

<u>Id.</u> ¶ 32.

> "[MMA] did not have and does not have any contracts of any kind with any of the defendants in the Tort Adversary (including CP), other than unrelated contracts with CP." [17]

(Affidavit of Robert J. Keach, Soley in his Capacity as Chapter 11 Trustee of the Montreal Maine & Atlantic Railway, LTD., And Not in His Individual Capacity, in Support of the Trustee's Motion for Summary Judgment (the "Keach Affidavit"), <u>Wheeling v. Keach</u> Adversary, DE 84, ¶ 26.)

> "A bill of lading is a contract between the carrier and the shipper, and courts apply general principles of contract interpretation when construing a bill of lading."

(Trustee's Memorandum of Law in Support of Trustee's Motion for Summary Judgment, <u>Wheeling v. Keach</u> Adversary, DE 83-1, p. 8.  (Internal quotations and citations omitted).)

---

[16]  I am permitted to take note of items on docket, including those of related cases.  Fed. R. Evid. 201 (governing judicial notice); *see also* <u>Giragosian v. Ryan</u>, 547 F.3d 59, 65-66 (1st Cir. 2008) (explaining that a court may consider matters of public record and other matters susceptible to judicial notice in ruling on Rule 12(b)(6) motion to dismiss, including "documents from prior state court adjudications") (quotation marks omitted).

[17] The "unrelated contracts with CP" refer to agreements between MMA and CP that have nothing to do with the Train or the Derailment.  See Schedule G (Executory Contracts) in <u>In Re MMA</u>, Case No.: 13-10670, DE 411 and the Schedule of Contracts included with the Trustee's Motion to Sell Property Free and Clear of Liens in In re MMA, Case No.: 13-10670, DE 490.

A bill of lading is a document signed by a carrier or his agent evidencing receipt of goods, describing them and the terms of the contract for carriage, identifying the consignor and evidencing title to the goods."

Id. (Internal quotations and citations omitted).

"As a contract, a bill of lading impose[s] a duty only upon the carrier to ensure proper delivery at a suitable location."

Id. (Internal quotations and citations omitted).

"In the absence of a contractual relationship, there can be no contractual remedy, and to succeed on a third party beneficiary theory, a non-party must be the intended beneficiary of the contract, not an incidental beneficiary to whom no duty is owed."

Id.

This principle holds true even in the context of a bill of lading; [w]hile the carrier and the shipper can extend certain contractual protections, such as the limitation on damages, to . . . third-party beneficiaries, they cannot contract to bind an unconsenting third party."

Id. p. 9 (Internal quotations and citations omitted).

"While a bill of lading can give certain third-parties the right to sue, those rights are statutory (under Title 49 of the U.S. Code), and explicitly not contractual. . . . A non-party to a bill of lading who holds the underlying goods for some purpose (e.g., storage or transit), does so only as an agent of the carrier (which is responsible for its acts); there is no duty owed by the non-party to the shipper or vice-versa."

Id. (Internal quotations and citations omitted).

"The non-party itself can only be liable for failure to act in good faith or in a commercially reasonably manner, and thus does not have contractual rights flowing from the shipper or other non-parties."

Id.

"The Trustee, of course, has not actually asserted any claims for breach of contract arising out of the Derailment against any of the Settling Parties, and there is no possibility for asserting any such claims in the future; all claims of the Debtor's estate against World Fuels or any other Settling Party are permanently released and all persons are enjoined from asserting such claims. Indeed, the Trustee has only formally asserted claims against CP, World Fuels, SMBC and

Irving, and such claims arise out of tort. Contract claims could not be brought, consistent with the Trustee's fiduciary duty and Rule 9011 of the Federal Rules of Bankruptcy Procedure."

(Trustee's Reply to Wheeling & Lake Erie Railway Co.'s Objection And Memorandum Of Law In Opposition To Trustee's Motion For Summary Judgment, <u>Wheeling v. Keach</u> Adversary, DE 164, p. 3.)

"Wheeling . . .attempts to construe and create a breach of contract claim by relying on inaccurate citations to the record and, absent any supporting case law, the lay employees' admittedly unqualified and incompetent analysis of various tariffs, statutes and the Bill of Lading. Wheeling's argument ignores controlling Supreme Court authority specifically negating its contention that the Debtor had viable contract claims arising from the Bill of Lading."

<u>Id.</u> p. 14.

"Wheeling's position, however, is that the Debtor was a <u>party</u> to the Bill of Lading because it was 'named as a connecting carrier in the designated route.' Opposition, p. 24. In support of this argument, Wheeling relies on Southern Pac. Transp. Co. v. Commercial Metals Co., 456 U.S. 336, 342-43 (1982). See Opposition, pp. 24-25. Wheeling simply misapprehends, or misstates, the rule of law established by Commercial Metals and ignores numerous cases decided under that case which categorically refute Wheeling's contention."

<u>Id.</u> p. 17.

In Commercial Metals, the Supreme Court simply repeated the generality that "[t]he bill of lading is the basic transportation contract *between the shipper-consignor and the carrier*; its terms and conditions bind the shipper and all connecting carriers." Id. at 342 (emphasis added). Even this phrase makes the point that the bill of lading is a contract only between the shipper and the originating carrier (in this case CP); other carriers (and the consignee-the ultimate recipient of the goods) may become bound only upon affirmative acceptance of its terms.

<u>Id.</u> p. 18.

Based upon these, and other representations, assertions and positions taken by the

Estate Representative in this case and the related litigation,[18] I conclude that Count II

_____

[18] See also <u>In re Montreal Me. & Atl. Ry., Ltd.</u>,2015 WL 3604335, at *2 (construing the initial complaint in this case narrowly as to CP after the then-Trustee (Mr. Keach) "clarified at oral argument" that the only claim he intended to bring against CP was that CP "'had reasonable grounds to suspect that the

must be dismissed.  The gist of the Estate Representative's position in the <u>Wheeling v.</u>
<u>Keach</u> Adversary and his position in connection with Wheeling's Motion to Intervene in
this proceeding is that MMA had no contractual claims against CP and others in
connection with the claims asserted in this adversary.  Those positions directly
contravene the position taken by the Trustee here.  As CP and Soo Line note:

> But Keach's assertions in the *Wheeling Adversary* constitute judicial
> admissions—bells that cannot be unrung. *See, e.g., Lima v. Holder*, 758 F.3d 72,
> 78-81 (1st Cir. 2014) (when the statements constitute "considered tactical
> decisions" made with the intention of obtaining relief, counsel's representations to
> the court constitute binding judicial admissions); *Schott Motorcycle Supply, Inc.*
> *v. Am. Honda Motor Co.*, 976 F.2d 58, 61 (1st Cir. 1992) ("A party's assertion of
> fact in a pleading is a judicial admission by which it normally is bound throughout
> the course of the proceeding.").

(CP and Soo Line's Memorandum of Law in Support of Motion to Dismiss Third
Amended Complaint, DE 246, pp 33-34.)

I agree, and Count II shall be dismissed.  The Estate Representative has
repeatedly argued and asserted the position that he has no relevant contract claims against
CP (and by extension Soo Line).  As such, he cannot assert Count II.   Given this
decision, I do not address CP and Soo Line's other arguments in favor of dismissing
Count II.

## IV.  Conclusion.

For the foregoing reasons, I will grant the Motion to Dismiss as to Count II and
deny it as to the remaining Counts of the Complaint.  A separate order shall enter.

---

classification of the crude oil shipment was incorrect'" and thus "had an affirmative duty to not carry the
shipment or stop the shipment until the classification was correct").