# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MAINE

|  |  |
|---|---|
| In re:<br><br>MONTREAL MAINE & ATLANTIC RAILWAY, LTD.,<br><br>Debtor. | Bk. No. 13-10670<br>Chapter 11 |
| ROBERT J. KEACH, solely in his capacity as the estate representative of the post-effective date estate of MONTREAL MAINE & ATLANTIC RAILWAY, LTD.,<br><br>Plaintiff,<br><br>*v.*<br><br>CANADIAN PACIFIC RAILWAY COMPANY, and SOO LINE RAILROAD COMPANY,<br><br>Defendants. | Adv. Proc. No. 14-1001 |

## REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.    SUMMARY OF THE ARGUMENT

Keach admits critical facts upon which CP's summary judgment is premised.  Keach admits

that CP transported the Train, without incident, from New Town to Montreal.  ECF 610 ("SMF

Response") at ¶ 29.  He admits that CP interchanged the Train to Montreal, Maine & Canada, Co.

("MMAC")[1] in Montreal, and that the Train then continued to Nantes on MMAC's tracks and under

---

[1] The fact that Montreal, Maine & Atlantic Railway, Ltd. "(MMAR") and MMAC were distinct corporate entities, putting aside the potential viability of alter ego claims by third parties, is critical to CP's argument that MMAR lacks standing to recover for claims that could only be asserted by MMAC. The corporate distinctness of MMAR and its subsidiary, MMAC, however does not impact CP's other arguments in the same way.  Thus for the remainder of this brief, both MMAR and MMAC are often

MMAC's control through the time of the Derailment.  SMF Response at ¶¶ 29-30.  The Derailment-related losses thus occurred directly to MMAC, not MMAR.  Because Keach is suing on behalf of MMAR, he lacks standing here: any alleged losses of MMAR are at best indirect and derivative.

Keach also admits that MMAC engineer Tom Harding parked the Train for the night on a descending grade on the main line track near Nantes and that Harding applied the locomotive independent brakes and only seven handbrakes.  *Id.* at ¶¶ 31-33.  Keach admits that MMAC rules required at least nine handbrakes, that the seven handbrakes set by Harding were not sufficient to hold the Train without additional braking forces, and that Harding's use of only seven handbrakes violated MMAC rules.  *Id.* ¶¶ 34-37.  Keach further admits that Harding failed to conduct a proper handbrake effectiveness test, another violation of MMA rules.  *Id.* at ¶¶ 40-41, 43-46.  Keach also admits that after setting only seven handbrakes and not performing a required handbrake effectiveness test, Harding contacted a rail traffic controller in Canada to advise that the Train was secure and another rail traffic controller in Maine to advise that he had experienced mechanical difficulties with the lead locomotive throughout the trip to Nantes.  *Id.* at ¶¶ 47-48.

Keach admits that when Harding left Nantes, the taxi driver who picked him up noted that oil droplets from the locomotive were landing on the taxi's windshield and that the driver questioned whether the locomotive should be left in that condition.  *Id.* at ¶ 49.  Keach also admits that Harding informed MMA of the locomotive's condition and it was agreed to leave the locomotive that way.  *Id.* Keach admits the locomotive caught fire, that the fire was caused by a non-standard repair performed by MMA, that the Nantes Fire Department shut down the lead locomotive with MMA's knowledge and based on discussions with MMA, that the MMA's dispatcher did not think a second locomotive

---

collectively referred to as "MMA" as many parties and witnesses have throughout this proceeding. Keach's reference to "MMA" in his Statement of Additional Undisputed Material Facts defines MMA as "Montreal, Maine & Atlantic Railway," which is a trade name that presumably includes MMAR and MMAC.  *See* ECF 599 at ¶ 16.

needed to be started because he assumed that Harding had applied enough handbrakes to immobilize the Train and expected Harding to follow the rules applicable to properly securing the Train. *Id.* at ¶¶ 50-59. Keach further admits that Harding knew he had only applied seven handbrakes, he knew that seven handbrakes was not sufficient to secure the train without the independent airbrakes, and he knew that he had not applied the required minimum of nine handbrakes. *Id.* at ¶¶ 60-61.

Notwithstanding the admitted negligence of MMA and its engineer, Tom Harding, Keach contends that the Derailment would have been prevented "if CP had made MMA aware that the oil was not in Packing Group III" because MMA would somehow have implemented never-before-implemented safety procedures and operated the Train differently. *Id.* at ¶¶ 85-87, 89. Keach's suggestion is directly contradicted, however, by every piece of evidence in the record, including sworn deposition testimony by Ed Burkhardt (MMA's Board Chair), Bob Grindrod (MMA's President), and Ken Strout (MMA's Manager of Operating Rules), all of whom agree that train operations would not have changed even if MMA had known the crude oil was Packing Group II rather than Packing Group III. ECF 588 (Hemming Dec.) at Ex. 29 (Grindrod 7/10/20 Dep. at 118:14-121:2); *id.* at Ex. 22 (Strout Dep. at 186:12-187:16; 204:24-25:12); Ex. 35 (10/18/13 email from Strout); *id.* at Ex. 6 (Burkhardt 1/9/20 Dep. at 170:4-11; 171:15-174:7); Ex. 26 (Burkhardt 7/16/20 Dep. at 42:13-43:3); *id.* at Ex. 1 (Burkhardt Dec. ¶ 13); *see also* ECF 587 (SMF) at ¶¶ 94; 100-101; 107-110; 113-114; 116-117; 119.

Although Grindrod has claimed that the Train would have been operated differently if he had been informed not only of the actual packing group, but had also been educated by someone about the "true nature" of the oil—which is not required under any US or Canadian regulation and which Keach does not even allege was a duty owed by CP to MMA—he expressly testified that train operations would *not have changed based on a correction of the packing group*:

Q:   Let's say the bill of lading for this train said that it was unit train carrying
     packing group II, so it was a unit train carrying U.S. 1267 crude oil, hazard
     class 3, packing group II.

A:   Yes.

Q:   If that's the information you had, would you have handled this train
     differently?

A:   No.

Q:   So in the same hypothetical, if you had a unit train carrying UN 1267 hazard
     class 3, packing group II crude oil, would have required a live crew-to-crew
     handoff if that is all the information you had?

A:   That isn't answering the question, though.  Did I or did I not know the true
     nature of the product being handled?  It all comes down to that.

Q:   All right.  I am going to ask another hypothetical.  And in the hypothetical you
     know exactly what you knew in July of 2013 and you get the bill of lading for
     a train of UN 1267 hazard class 3, packing group I petroleum crude oil.  Would
     you have handled that train differently based on the difference – the only
     difference being packing group I versus packing group III?

A:   I wouldn't have done anything differently.  I can give you the wrong answer
     because I forgot whether I should say yes or now to agree with you.

Q:   Fair enough.  You wouldn't have done anything differently.  Would you have
     required a live crew-to-crew if all of the information was the same with the
     only difference being the bill of lading said UN 1267 petroleum crude oil
     hazard class 3, packing group I?

A:   No.

ECF 588 (Hemming Dec.) at Ex. 29 (Grindrod 7/10/20 Dep. at 118:14-121:2) (objections omitted);[2]

*see also* ECF 587 (SMF) at ¶¶ 116-117; 119.

Strout and Burkhardt agree that the Train would not have been operated differently if the

crude oil had been classified as Packing Group I or II rather than Packing Group III.  *Id.* at Ex. 22

(Strout Dep. at 186:12-187:16; 204:24-25:12); *id.* at Ex. 35 (10/18/13 email from Strout); *id.* at Ex. 6

(Burkhardt 1/9/20 Dep. at 170:4-11; 171:15-174:7); *id.* at Ex. 26 (Burkhardt 7/16/20 Dep. at 42:13-

---

[2] *See also* ECF 588 (Hemming Dec.) at Ex. 29 (Grindrod 7/10/20 Dep. at 112:5-13 (referring to
Grindrod's Canadian deposition)):
   Q: In your prior testimony, I believe you indicated that you would have not done something
   different based on packing group alone. Do you remember testifying to that?
   A: Yes.
   Q: Is that accurate, that based on packing group alone, you would not have done something
   differently with this train?
   A: Yes.

43:3); *id.* at Ex. 1 (Burkhardt Dec. ¶ 13); *see also* ECF 587 (SMF) at ¶¶ 94; 100-101; 107-110; 113-114.

Keach denied CP's factual allegations regarding the views of Strout and Burkhardt "to the extent"

their statements implied that they were "MMA policy, which would have been set by Grindrod," but

does not dispute Strout's and Burkhardt's unequivocal statements or cite to any facts that support

either his denial or his view that Grindrod had unilateral authority to set MMA's policy.  SMF

Response at ¶¶ 110-111, 113. Burkhardt was the Chairman of MMA's Board and Strout was MMA's

Manager of Operating Rules, so they were both in a position to know whether MMA would have done

anything differently if the packing group classification had been different.  Moreover, Strout testified

that if MMA had sought to create rules that would be more restrictive than federal regulations, such

direction would have come from "Mr. Grindrod, Mr. Burkhardt and the safety committee that met

every three months."  *See* ECF 588 (Hemming Dec.) at Ex. 22 (Strout Dep. at 239:3-23).  And, as

noted, Grindrod himself concedes that MMA would have done nothing differently if the packing

group had been classified correctly.  *Id.* at Ex. 29 (Grindrod 7/10/20 Dep. at 112:5-13; 118:14-121:2);

ECF 587 (SMF) at ¶ 116-117; 119.

In short, based on the undisputed facts, even if CP had identified World Fuel Service's

("WFS") misclassification and changed the packing group designation on CP's own Bill of Lading

("BOL") to Packing Group I or II, MMA would not have operated the train any differently.  ECF 588

(Hemming Dec.) at Ex. 29 (Grindrod 7/10/20 Dep. at 118:14-121:2); *id.* at Ex. 22 (Strout Dep. at

186:12-187:16; 204:24-25:12); *id.* at Ex. 35 (10/18/13 email from Strout); Ex. 6 (Burkhardt 1/9/20

Dep. at 170:4-11; 171:15-174:7); *id.* at Ex. 26 (Burkhardt 7/16/20 Dep. at 42:13-43:3); *id.* at Ex. 1

(Burkhardt Dec. ¶ 13); *see also* ECF 587 (SMF) at ¶¶ 94; 100-101; 107-110; 113-114; 116-117; 119.

MMA would still have operated with a one-man crew, a live crew-to-crew transfer would not have

been used, and Engineer Harding would still have violated numerous safety rules, resulting in the

Train being left with insufficient brakes and derailing.  *Id.*  Given these undisputed facts, Keach cannot

establish a causal link between misclassification and the Derailment, mandating the dismissal of his negligence and negligent misrepresentation claims.  Keach's negligence claim also fails because the undisputed negligent acts of MMAC superseded and/or vastly exceeded any alleged negligence by CP.

Keach, who did not move for summary judgment, spends a majority of his opposition brief and almost the entirety of his 218 paragraph Statement of Additional Undisputed Material Facts, attempting to create a factual dispute regarding an issue that is not germane to CP's summary judgment motion – whether CP should have identified WFS's misclassification.  EFC 598 (Opp. Br.) at 5-20; ECF 599 (Keach Add'l SMF) at ¶¶ 1-59; 87-105; 161-184).

CP does not dispute, for purposes of this motion only, that Keach can identify sufficient facts to create a dispute regarding whether CP should have known that the crude oil was Packing Group II rather than Packing Group III as certified by WFS.  But it is undisputed that whether the oil was classified as Packing Group I, II, or III on the BOL would not have altered how MMA operated the train and would not have prevented the derailment.  ECF 588 (Hemming Dec.) at Ex. 29 (Grindrod 7/10/20 Dep. at 118:14-121:2); *id.* at Ex. 22 (Strout Dep. at 186:12-187:16; 204:24-25:12); *id.* at Ex. 35 (10/18/13 email from Strout); *id.* at Ex. 6 (Burkhardt 1/9/20 Dep. at 170:4-11; 171:15-174:7); *id.* at Ex. 26 (Burkhardt 7/16/20 Dep. at 42:13-43:3); *id.* at Ex. 1 (Burkhardt Dec. ¶ 13); *see also* ECF 587 (SMF) at ¶¶ 94; 100-101; 107-110; 113-114; 116-117; 119.  In any event, if the Court were to accept the position, which it should not, that misclassification somehow played a role in causing the Derailment, Keach's claim would be barred under the Judgment Reduction Provision of the Order Confirming Liquidation Plan because WFS would have an indemnity obligation that would eliminate the possibility of a judgment against CP.

This Court should reject Keach's attempt to distract it from the issue at the heart of CP's summary judgment motion through citation to pages upon pages of irrelevant alleged facts regarding whether CP should have identified WFS's misclassification in the first place, and should focus on the

only issues that matter for the motion, including that Keach's lacks standing because MMAR's alleged

injuries are at best derivative of the harm to its subsidiary, MMAC, that MMAC would not have

operated the train any differently based on packing group alone, that MMAC violated countless safety

rules causing the derailment, that the Judgment Reduction Provisions preclude any recovery by Keach,

that Keach's claims are barred under the economic loss doctrine, and that contracts between CP and

MMAC create an circuitous indemnity obligation to CP that defeats Keach's claim.

## II.    <u>KEACH LACKS STANDING TO BRING THIS ACTION</u>

This adversary proceeding is a classic example of litigation impermissibly brought on behalf

of a parent corporation for injury directly caused to the parent's subsidiary.  MMAR's subsidiary,

MMAC—not MMAR itself—interchanged with CP and operated the Train at the time of the

Derailment.  Any injury to MMAR as a result of the Derailment is at best derivative of the harm to

MMAC.  Yet a long line of First Circuit and other decisions makes clear that a shareholder has no

standing to sue for its own alleged injury, even if different from that inflicted on the subsidiary, when

the shareholder's injury results from the injury to the subsidiary.  Keach's opposition to CP's summary

judgment motion fails to point to a single item of damage to MMAR that is separate from and does

not result from the alleged damage to MMAC.  Nor does he cite a single case in which a shareholder

was found to have standing to sue for damages based, as Keach seeks here, on the lost enterprise value

of the corporation or otherwise resulting from the injuries to the corporation.  And while Keach has

raised various allegations and legal arguments during the many years of this litigation in his effort to

justify standing; each lacks merit.

### A.    <u>Keach Has Not Identified Any Specific, Non-Derivative Injury to MMAR</u>

Keach's calculation of MMAR's alleged damages is not based on any distinct injury to MMAR

itself, but instead reflects the lost value of MMAR's investment in MMAC due to the Derailment.  *See,*

*e.g.*, ECF 588 (Hemming Dec.) at Ex. 9 (Trustee's Objections and Responses to Canadian Pacific

Railway Company's Interrogatory No. 8 (at original response)[3] ("The damages calculation is based on the value of MMA's business, *including the value of its investment in MMA Canada*, prior to the Derailment, as determined by existing appraisals and other analyses, and the amount obtained for those businesses, at sale, after the Derailment.") (emphasis added); *Id.* at Supplemental Response to Interrogatory No. 8 ("[A]ny damages calculation will take into account the value of MMA, *including MMA Canada,* before the Derailment and the value of MMA after the derailment." (emphasis added)); ECF 486 at 5 (Estate Representative's Objection to Defendants' Motion and Supporting Memorandum to Compel Plaintiff to Provide Damages Calculations and Proper Responses to Interrogatories) ("Those damages are based on the difference in value of MMA, *including MMA Canada*, before the derailment and the value of MMA after the derailment, as determined by the sales process in the above-captioned Chapter 11 case.") (emphasis added); ECF 599 (Keach Add'l SMF at ¶ 212) ("In this action the Plaintiff seeks to recover damages for injuries to MMA, *which include*, but is not limited to, *its investment in MMA Canada*.") (emphasis added); ECF 587 (SMF) at ¶¶ 13-16.

No effort has been made by Keach or his damages expert, Brian Calvert, to identify any specific item of damage to MMAR itself, much less any such damage that did not result from injury to MMAR caused by the damage to MMAC. Indeed, Calvert testified that he did not differentiate between injury to MMAR as opposed to MMAC when performing his damages analysis, and he does not even know if such differentiation is possible:

> Q.   And I see on page 3 of your report, Mr. Calvert, in my copy it's got a shaded box that says, "Montreal, Maine & Atlantic Railway, Limited, and Montreal, Maine & Atlantic Canada Company." *Are those the two companies that together you're offering a valuation opinion on?*
>
> A.   *Yes.* Those are the two entities that my report and testimony are focused on.
>
> Q.   Can you split out the enterprise value of one of those companies as opposed to the other?
>
> A.   I have not done that.

---

[3] Because Keach's interrogatory answers (original and supplements) are contained in Keach's Third Supplemental Interrogatory Reponses, only that version is provided. *See* ECF 588 (Hemming Dec.) at Ex. 9.

Q.      And do you know whether it would be possible to do that?
A.      I do not know.

Hemming Supp. Dec. at Ex. 136 (Calvert Dep. at 19-20) (emphasis added).

Keach's 30(b)(6) deposition testimony is consistent with his expert's inability to identify any

damage to MMAR independent of the injury to MMAC:

Q.·    Mr. Keach, what is the amount of damages you are seeking in this case?
A.·    I think that — we are talking about the adversary. I think that's to be
determined. I think what we have said is that it is the value of the company
pre-derailment minus the amount obtained in the bankruptcy sale for the
company as a whole. *We are talking about the assets of MMA and MMA Canada
combined.*

ECF 588 (Hemming Dec.) at Ex. 4 (Keach Dep. at 198:13-22) (emphasis added).

As discussed in Section I.B below, courts uniformly hold that loss to a shareholder due to the

reduction in the value of the corporation is a derivative injury only and cannot justify shareholder

standing to sue for the injury.

Keach contends that MMAR suffered injury from the shut-down by the Canadian government

of the Maine-Quebec line because of the Derailment.  ECF 598 (Opp. Br.) at 63.  Neither Keach nor

his damages expert, however, has identified any damage to MMAR as opposed to MMAC as a result

of the order.  Indeed, the Disclosure Statement cited by Keach expressly states that because of the

order, "train activity was temporarily halted between Maine and Quebec, *on the MMA Canada line*," not

MMAR's line.  *See* Disclosure Statement For The Trustee's Plan of Liquidation Dated March 31, 2015

[Bk. 13-10670, D.E. 1385] at 21 (emphasis added).  Moreover, Keach's facts are wrong.  Although

there was an initial Canadian shut-down order, dated August 16, 2013, that was issued due to lack of

sufficient insurance coverage, the effective date of that order was postponed until August 20, 2013,

and then subsequent orders permitted the line to operate continuously even after that until the sale of

the assets in June 2014.  *See* Defendant's Reply to Material Facts ("Reply to Pl's SMF") at ¶ 214

(providing a chart of the relevant orders) and Hemming Supp. Dec. at Exs. 124-132 (copies of relevant orders).

Keach's allegation that suits have been brought against MMAR after the Derailment on account of MMAR's potential liability for the torts of MMAC, leading to MMAR's bankruptcy and cessation of operations, *see, e.g.*, ECF 230 (Third Am. Compl. ¶ 17), fares no better. As discussed in Section I.B below, under controlling case law these alleged damages to MMAR are also derivative only and do not justify MMAR standing. And Keach's assertions that this Court has already rejected CP's arguments against standing by granting a motion by Keach to amend his Complaint, and then denying a motion to dismiss by CP on a basis other than Keach's lack of standing to sue for derivative injuries, ECF 598 (Opp. Br.) at 1, fn 1), are plainly incorrect, as those decisions did not purport to rule on this issue.

**B.      Controlling Case Law Uniformly Rejects Keach's Position on Standing**

It is black letter law that a shareholder—even a sole shareholder—has no standing to assert its own damage claims when the direct injury was to the subsidiary. Indeed, there is a long and unbroken line of First Circuit decisions, as well as decisions of other Circuits, on this very point.[4] *See, e.g.*, *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 998 F.3d 35 (1st Cir. 2021); *Pagan v. Calderon*, 448 F.3d 16, 28–30 (1st Cir. 2006); *Diva's Inc. v. City of Bangor*, 411 F.3d 30, 42 (1st Cir. 2005); *Bolivar v. Pocklington*, 975 F.2d 28, 32–33 (1st Cir. 1992); *In re Dein Host, Inc.*, 835 F.2d 402, 406-07 (1st Cir. 1987). *Accord In re Ionosphere Clubs, Inc.*, 17 F.3d 600, 604–07 (2d Cir. 1994); *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir. 1970); *Smith Setzer & Sons, Inc. v. S.C. Procurement Rev. Panel*, 20 F.3d 1311, 1317 (4th Cir. 1994) *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 277 n. 27 (5th Cir. 1997); *American Biocare Inc. v.*

---

[4] The laws of Nova Scotia (MMAC's place of incorporation) and Canada are to the same effect. *See generally* ECF 588 (Hemming Dec.) at Ex. 7, Expert Witness Report of Barry Horne, Esq. ("Horne Report"). Because the laws of each potentially relevant jurisdiction on this issue are the same, there is no need for a choice of law analysis.

*Howard & Howard Attorneys PLLC*, 702 Fed Appx 416, 420–21 (6th Cir. 2017); *Rawoof v. Texor Petroleum Co.,* 521 F3d 750, 759 (7th Cir. 2008); *Brictson v. Woodrough*, 164 F.2d 107, 109 (8th Cir. 1947); *Stein v. United Artists Corp.,* 691 F.2d 885, 896 (9th Cir. 1982); *Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc.*, 295 F.3d 1065, 1073 (10th Cir. 2002); *LaTele Television, C.A. v. Telemundo Commc'ns Grp., LLC*, 9 F.4th 1349, 1358 (11th Cir. 2021); *Cowin v. Bresler*, 741 F.2d 410, 414 (D.C. Cir. 1984); *First Annapolis Bancorp, Inc. v. U.S.,* 644 F.3d 1367, 1366–1367 (Fed. Cir. 2011).

Most recently, in *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 998 F.3d 35, the First Circuit found that stockholders of a mutual fund damaged by a third party's defaults lacked standing to sue the defaulter to recover the stockholders' economic loss resulting from the decline in the value of the fund.

> As a general rule, a corporation and its shareholders are distinct juridical persons and are treated as such in contemplation of law and generally *"[a]ctions to enforce corporate rights or redress injuries to [a] corporation cannot be maintained by a stockholder in his own name ... even though the injury to the corporation may incidentally result in the depreciation or destruction of the value of the stock."* Here, the claimants have suffered no nonderivative injury separate from any injury the mutual funds may have suffered and they have not argued that any other exception to the general shareholder standing rule applies. *For that reason, as well, they lack standing.*

*Id.* at 41-42 (citations omitted; emphasis added).

In reaching its decision, the First Circuit relied heavily on its decision in *Pagan*, 448 F.3d at 28–30. In the *Pagan* case, "[i]n an effort to detour around this [shareholder standing] roadblock," the plaintiff argued "that he stood to benefit from the value of the subsidiary and thus suffered direct injury and had standing to sue for that." *Id.* at 30. This is precisely like Keach's contention that MMAR is entitled to recover the lost value of its investment in MMAC. But the First Circuit has rebuffed this argument, noting that the alleged injuries "are plainly derivative of the ascribed harm to [the subsidiary]." *Id.*

*Pagan* also rejected the stockholders' contention that they can sue themselves when they incur a different, though still derivative, injury from that suffered by the corporation.  In this instance, that injury was emotional distress, but the Court nevertheless held:

> The fact that the complaint contains a demand for emotional distress damages (which, presumably, were incurred by the individual plaintiffs and not by ARCAM) is insufficient to confer individual standing on any of the stockholders. After all, the complaint does not suggest that this injury is anything but derivative of ARCAM's failure to receive the loan. It is, therefore, squarely within the proscription of the shareholder standing rule.

*Id.* at 29; *see also Bellows*, 118 F.3d at 277 n.27 (holding that shareholder has no standing to sue for emotional distress when that distress was a result of the injury to the corporation).

Similarly, in *In re Ionosphere Clubs, Inc.*, 17 F.3d at 604–07, the court held that a preferred shareholder lacked standing to sue a third party whose wrongful acts caused the corporation to be unable to pay preferred dividends—even though the dividends were to be received only by the shareholder and thus the specific injury at issue was only suffered by the shareholder.  Because the failure to receive the dividends was a derivative injury to the shareholder resulting from the financial loss of the corporation, the shareholder lacked standing.  *See id.*

Given the rejection of standing for even distinct damage claims by a shareholder for emotional distress or failure to receive dividends, Keach is plainly wrong when he attempts to distinguish case law unfavorable to him on the ground that "the parent corporation's only injury was the depreciated value of its ownership interest in the subsidiary's stock."  ECF 598 (Opp. Br.) at 65.  And Keach's characterization of *Halo Tech Holdings, Inc. v. Cooper*, as one of those cases is incorrect because the parent company there sought damages not only for the loss of its investment in the subsidiary, but also for the fees and penalties charged to the parent itself by the parent's lender after the parent defaulted on debt owed by the parent owed directly. 2008 WL 4080081, at *4 (D. Conn. 2008); ECF 598 (Opp. Br.) at 65.  In other words, a shareholder has no standing to sue for its own alleged injury,

even if different from that inflicted on the subsidiary, when the shareholder's injury results from the injury to the subsidiary.

Keach has also argued that MMAR is entitled to damages from CP because plaintiffs harmed by the Derailment sued MMAR as well as MMAC. *See, e.g.*, ECF 230 (Third Am. Compl.) ¶ 17 (alleging that MMAR's damages include "the costs and expenses associated with being named in the numerous suits, action, and proceedings in various jurisdiction.") According to the Complaint, these "claims, suits and proceedings, in turn, impelled MMAR to seek bankruptcy protection under chapter 11 of the Bankruptcy Code and have, effectively destroyed MMAR's business, causing a serious devaluation of MMAR's assets." *Id.* ¶ 14. As Keach's Complaint recognizes, however, these "suit, actions, and proceedings" were brought against MMAR because "MMAR is or may be liable for the debts and obligations of MMA Canada."[5] *Id.* ¶ 22. If MMAC had been able to satisfy its own liabilities in full, there would be no reason for the suits to be brought against MMAR – which was not the legal entity that operated the train — for these same liabilities. There is simply no basis for characterizing MMAR's potential liabilities for MMAC's torts as anything but derivative.

Moreover, standing based even on undisputed shareholder liability for obligations of a financially impaired corporation was squarely rejected in *Pagan*. Certain of the shareholders in *Pagan* were express guarantors of the corporation's liabilities. *Pagan*, however, holds that the liability of a shareholder to third parties because of the insolvency of the subsidiary does not confer standing upon the shareholder to sue the party responsible for that insolvency, even if the shareholder is an express guarantor of the corporation's liabilities. 448 F.3d at 29; *see also Guides, Ltd.*, 295 F.3d at 1073 (rejecting

---

[5] As discussed in the Horne Report, MMAR has a conditional liability, even apart from alter ego liability, with respect to the debts and obligations of MMAC. Nova Scotia unlimited liability company law requires shareholders of an unlimited liability company to contribute under certain circumstances to the assets of the subsidiary during the winding-up process if and to the extent that the subsidiary itself is unable to satisfy its creditors. *See* ECF 588 (Hemming Dec.) at Ex. 7 (Horne Report, at 6, 10-22).

contention that status as a guarantor confers standing to assert an individual claim against the third

party creating the corporation's inability to perform, since the guarantor's harm is simply derivative of

that suffered by the corporation); *Stein,* 691 F.2d at 896 (concluding that a corporation's guarantors

lack standing to sue when their alleged injuries "reflect the injury to the corporation, which forced it

to default on the loans").  This potential liability as guarantor—akin to the liabilities MMAR faced

after the Derailment because "it is or may be liable for the debts and obligations of MMA Canada"—

"does not alter the decisional calculus," as the harm to the shareholders still resulted from the injury

inflicted upon the debtor corporation.  *Pagan,* 448 F.3d at 29.  *A fortiori*, this rule against shareholder

standing applies where, as here, the stockholder has not expressly guaranteed the company's

obligations and has not even been held liable for them.

The decision in *Dein Host*, 835 F.2d 402 is also instructive and dispositive.  In that case, as

here, the shareholder could have sought appropriate orders from the court overseeing the insolvency

proceedings of the subsidiary (Aries) rather than bringing its own direct action.  The failure to do so

was yet another reason to deny shareholder standing:

> Nor was Aries powerless to protect its corporate interests. Pignato had sought and
> received permission to answer the bankruptcy petition filed against Aries. Thus, he
> could have requested appointment of a trustee or receiver, or taken a variety of other
> steps within the confines of Aries' case to have the proper party in interest-the lessor-
> challenge the validity of the lease. He elected not to take that route, but chose instead
> to make an end run around Aries, and to take action in his own name in the DHI
> insolvency proceeding. Inasmuch as Aries' legitimate rights, if any, could have been
> safeguarded and enforced in a proper fashion within its bankruptcy case, there was no
> necessity to strain to recognize standing on Pignato's part in order to prevent injustice.
> Appellant's end run carried him well outside the field of play.

*Id.* at 406-407.

Keach chose, for forum shopping reasons, to "make an end run around" MMAC and, instead,

sued on behalf of MMAR in the United States.  Keach could have, but did not, ask the Canadian court

overseeing MMAC's insolvency proceedings to authorize MMAC to bring the action or to provide

permission for Keach to bring a derivative action on behalf of MMAC for the benefit of MMAC's

insolvent estate.[6] *See* ECF 588 (Hemming Dec.) at Ex. 7 (Horne Report at 23).  As a result, Keach, as

estate representative of MMAR, like the shareholder in *Dein Host,* lacks standing to bring this action.

*See also Bolivar*, 975 F.2d at 32–33 (affirming Rule 11 sanctions for complaint that alleged causes of

action belonging to the corporation but was being bought by the sole shareholder plaintiff for forum

shopping purposes).

## C.    Keach's Allegations and Legal Arguments in Favor of Standing Lack Merit

Obviously cognizant of the difficulties in suing CP for damages allegedly due to a Derailment

in which its subsidiary, rather than MMAR, operated that the train, Keach has devised a number of

different arguments over the many years of this litigation in an attempt to justify MMAR's alleged

right to recover.  None are meritorious.

### 1.    False Allegations that MMAR Itself Interchanged with CP and Operated the Train

Keach alleges in his Complaint that MMAR itself interchanged with CP and operated the train

at the time of the Derailment.  *See* ECF 230 (Third Am. Compl.) ¶¶ 4 ("The Train was originally

operated by the Defendants, who later 'handed it off' to MMAR"); 9 (alleging the tank cars were

"provided to MMAR for transport of the crude oil"); 75 ("On or about July 5, 2013, the Defendants

transferred the seventy-two DOT-111 tank cars and box cars to MMAR"); 77 ("MMAR connected

one of its locomotives at the head end of the Train, followed by a VB remote control car, followed by

four additional locomotives, followed by the seventy-two DOT-111 tank cars."); 78 ("MMAR then

commenced the second leg of the Train's transport toward its ultimate destination—an oil refinery in

Saint John, New Brunswick (Canada)"); and 84 ("Shortly before midnight on July 5, 2013, MMAR

---

[6] As Keach has previously acknowledged, any recovery obtained in his adversary proceeding would benefit MMAR's own commercial creditors, not the MMAC estate or the injured victims of the Derailment.  ECF 254 (Transcript from December 20, 2016 Hearing on CP's Motion to Dismiss) at 35:17-36:6.  The injured victims trial is currently occurring in Quebec.

parked and secured the Train on its main track near the town of Nantes, Quebec (Canada) and left it

unattended.  The main track at this location had a slight descending grade of approximately 1.2%.").

    If these allegations of MMAR's direct involvement were true, on a basis other than MMAR

being able to disregard its own subsidiary's corporate existence, MMAR might well have had standing

to sue for CP's supposed role in causing the Derailment.  It is clear, however, that, other than for

purposes of third parties holding MMAR liable for the torts of MMAC as a matter of Canadian law,

these allegations are false.[7]

    CP interchanged with MMAC – not MMAR – and MMAC – not MMAR – operated the train

at the time of the Derailment.  Indeed, during his 30(b)(6) deposition, Keach admitted that only

MMAC – and not MMAR – held the requisite Certificate of Fitness even to operate on the rail tracks

involved:

> A.    The derailment occurred in Lac-Mégantic, Quebec, right, so definitely within the geographic purview of Montreal, Maine & Atlantic Canada.
> Q.    So, MMA Canada was the railroad that was authorized to operate a railroad at the location of the derailment in Lac-Mégantic?
> A.    By virtue of the certificate of fitness, that's correct.

ECF 588 (Hemming Dec.) at 4 (Keach Dep. at 32); *see also* SMF Response at ¶¶ 4, 7-8.

    Because the allegations in the Complaint that MMAR itself interchanged with CP and operated

the train at the time of the Derailment are false, they cannot justify standing.

### 2.    Keach's Unjustified Reliance on MMAC's Status as a Nova Scotia Unlimited Liability Company

    For many years, Keach relied on the notion that MMAC's status as an unlimited liability

company under Nova Scotia law means that MMAC's liabilities are necessarily liabilities of MMAR

and, therefore, MMAR has the right to sue CP for breaching its duties to MMAC and to recover

MMAC's alleged damages. *See, e.g.*, ECF 588 (Hemming Dec.) at Ex. 4 (Keach Dep. at 19) ("[MMAC]

---

[7] Alter ego issues are discussed *infra*, at pages 18-22.

was a Nova Scotia unlimited liability company, which means it was essentially a complete conduit, passed through both assets and liabilities."); *id.* at Ex. 9 (Plaintiff's Second Supplemental Response to CP's Interrogatory No. 5) ("The Estate Representative states it was reasonably foreseeable that during a crude oil shipment made over multiple carriers' rail lines a derailment occurring on MMAC's line would cause damages to both MMAC and MMA.  In fact, because MMAC was an unlimited liability company, MMA incurred direct losses as result of the derailment."); Hemming Supp. Dec. at Ex. 135 (Transcript of July 2, 2019 of Hearing on CP's Motion to Stay) ("This case is about damage to MMA as a corporate entity; damage to its value.  That damage resulted as a consequence of the fact that MMAC's liabilities became MMA's liabilities as a matter of law based on the corporate structure, so that when CP hid the bomb on the train and it blew up, causing damage to MMAC, and then having it incur liabilities, those became MMA's liabilities.  Not because of any veil piercing but because of the pass through nature of that entity that just sent all of those liabilities equally to the U.S. entity."); EFC 254 (Transcript of December 20, 2016 Hearing on CP's Dispositive Motion) at 24 ("[T]he Canadian subsidiary was an unlimited liability company formed under Nova Scotia law.  All of its liabilities are the liabilities of the U.S. company.  And the entire case has been conducted on that basis.  So, when the Canadian entity incurred liabilities that led to its eventual demise, those same liabilities were incurred by the U.S. company and led to its demise.").

Like Keach's allegation that MMAR interchanged with CP and operated the Train at the time of the Derailment, this assertion regarding the effect of MMAC's status as a Nova Scotia unlimited liability is false.  As explained in the unrebutted expert report of Barry Horne, MMAC's status as a Nova Scotia unlimited liability company does not mean that MMAR is automatically or directly liable to MMAC's creditors.  Instead, under Nova Scotia law, a parent corporation merely has the obligation to contribute to the assets of a Nova Scotia unlimited liability company when it is winding up if and to the extent that the subsidiary's assets are insufficient to satisfy its obligations to its creditors during

the winding-up process. ECF 588 (Hemming Dec.) at Ex. 7 (Horne Report at 11-12, 19-20). There

is no direct right of action by a parent of a Nova Scotia unlimited liability company against persons or

entities that owe money to the subsidiary. *Id.* at 23. And unliquidated tort liabilities of the subsidiary

to third parties injured by the Derailment are not debts of the subsidiary for which the parent has an

obligation to contribute. *Id.* at 29.

In his opposition to CP's motion for summary judgment, Keach recognizes that his unlimited

liability company argument is meritless, as he does not attempt to resurrect it in his brief. Thus, that

alleged basis for recovery by MMAR of damages resulting from injury to MMAC is now out of the

case. The fact that Keach relied on this argument so heavily for so many years, however, highlights

the weakness of his position on standing now that his primary legal theory has been proven wrong.

### 3.      Keach's Position that MMAR and MMAC are Alter Egos

Keach has fluctuated during this litigation between contending that MMAR and MMAC were

and are completely separate corporations and contending that they are alter egos and that this

relationship permits him to sue for damages allegedly inflicted on MMAC. In fact, he has contended,

at different times and paradoxically, that the Plan and Confirmation Order have res judicata effect

both as to the entities' complete separateness and as to the liabilities of MMAC being those of MMAR.

Both of these things cannot be true and, in fact, neither is true. *Compare* ECF 419 (Keach's Opposition

Brief to CP's Motion to Stay) at 19 n.15 ("[T]his Court has already determined that MMA is a separate

legal entity from MMA Canada by, *inter alia*, confirming MMA's chapter 11 plan, which included

treatment of MMA Canada's claim against MMA. In addition, the CCAA court sanctioned the plan

in the CCAA Case, which definitively dealt with MMA's claims against MMA Canada. The entities'

legal separateness is thus res judicata.") *and* Hemming Supp. Dec. at Ex. 135 (July 2, 2019 Hearing

Transcript on CP's Motion to Stay)at 23 ("I am not there, MMAC is not here, and there is no identity

of interest between those two entities. And the separateness, complete corporate separateness of

those entities is res judicata as a matter of the confirmation of the U.S. Chapter 11 plan and the

sanction of the Canadian plan.") *with* Hemming Supp. Dec. at Ex. 9 (Plaintiff's Second Supplemental

Response to CP's Interrogatory No. 5) ("[T]he Estate Representative's damages concern only damages

to MMA and its alter ego MMAC."); *and id.* ("Further still, the Chapter 11 proceedings and

Confirmation and Plan were conducted on the basis that MMAC's liabilities were incurred by MMA.

The Confirmation Order and Plan accordingly were entered on that basis and CP consented to the

Confirmation Order.  The Confirmation Order has res judicata effect and bars CP from attempting

to litigate any separation, if any, between the liabilities of MMAC and MMA.")

Under both Canadian law and the law in this Circuit, a parent corporation has no legal right

to disregard the corporate veil of its own subsidiary for the parent's benefit.  ECF 588 (Hemming

Dec.) at Ex. 7 (Horne Report, at 22-29) (citing, *inter alia*, *Kosmopoulos v. Constitution Insurance Co of Canada*,

[1987] 1 SCR (shareholder, having chosen to incorporate the company as a separate entity, is not

permitted to disregard that entity's separate corporate existence) and *Brunette v. Legault Thiffault, sencrl*,

2018 SCC 55 (benefits of incorporation comes with corresponding limits on shareholder's rights, and

thus shareholder cannot reverse pierce the corporate veil of its own subsidiary)); *McCarthy v. Azure*, 22

F.3d 351, 362–63 (1st Cir. 1994) (where "appellant is not even arguably an innocent third party

disadvantaged by someone else's blurring of the line between a corporation and the person who

controls it, but rather, is himself the one who is claimed to have obscured the line, he cannot be

permitted to use the alter ego designation to his own behoof"); *Mass. Carpenters Central Collection Agency

v. A.A. Building Erectors, Inc.*, 343 F.3d 18, 21–22 (1st Cir. 2003) (alter ego doctrine is "a tool to be

employed when the corporate shield, if respected, would inequitably prevent a party from receiving

what is otherwise due and owing from the person or persons who have created the shield."); *Payphone

LLC v. Brooks Fiber Communications of Rhode Island*, 126 F. Supp. 2d 175, 179 (D. R.I. 2001) ("The First

Circuit has adopted the rule that a corporation may not pierce its own veil or apply the alter ego doctrine for its own benefit.").

Thus, MMAR and MMAC cannot be viewed as alter egos for the purpose of permitting MMAR to pursue recovery in its own right for damages allegedly inflicted directly on MMAC. As to third parties such as CP, however, the doctrine is available to use against the parent. *McCarthy*, 22 F.3d at 362–63 (the "alter ego doctrine is equitable in nature ... [and] can be invoked 'only where equity requires the action to assist a third party'"); *Kosmopoulos* at 13 ("There is a persuasive argument that those who have chosen the benefits of incorporation must bear the corresponding burdens, so that if the veil is to be lifted at all that should only be done in the interests of third parties who would otherwise suffer as a result of that choice.").

Nova Scotia law does permit a parent company to seek permission from the court overseeing the insolvency of the unlimited liability subsidiary to bring a derivative action on behalf of the subsidiary, but, as noted above, no such permission was either requested or provided. Contrary to Keach's assertion, based on an out-of-context snippet from CP's opening brief, the US bankruptcy court is not authorized to permit a derivative action on behalf of a Nova Scotia subsidiary in Canadian insolvency proceedings over which the Canadian CCAA court presides. That is an issue for the Canadian court. *See* ECF 588 (Hemming Dec.) at Ex. 7 (Horne Report at 23). This Court would not have jurisdiction to do so, and in any event, as discussed below with respect to Keach's reliance on the US Plan's definition of Residual Assets, this Court has not purported to do so.

Keach argues that MMAR and MMAC should be treated as alter egos, and advanced this theory in his Second Supplemental Response to CP's Interrogatory No. 5. ECF 588 (Hemming Dec.) at Ex. 9 ("[T]he Estate Representative's damages concern only damages to MMA and its alter ego MMAC.") In support of his position that MMAR can reverse pierce the corporate veil of its own subsidiary for its own benefit, Keach weakly suggests that CP should be is estopped from asserting

otherwise because, in separate Canadian litigation, CP has alleged that for purposes of third party claims MMAR should be treated as the alter ego of MMAC. *See* ECF 598 (Opp. Br.) at 62-63. This suggestion completely ignores the fact that, as discussed above, the standard for disregarding an entity's corporate veil is substantially different when it comes to third party claims, as opposed to a parent's efforts to disregard the subsidiary's corporate veil for the parent's own benefit. *See McCarthy*, 22 F.3d at 362–63; *Kosmopoulos*, 1 SCR 2 ¶ 13.

Keach also relies on a decision in the *Wheeling* adversary proceeding that he suggests holds that all of MMAC's receivables are MMAR's receivables. *See* ECF 598 (Opp. Br.) at 61-62. In fact, the Court made no such finding. The issue addressed in that *Wheeling* decision was a very narrow one concerning specific contractual receivables owed to MMAR pursuant to a "Track Maintenance Agreement" between MMAR and a third party, KMSI (the "TMA" (*see* ECF 576-3 in Case No. 13-10670)). MMAR was entitled to "45G tax credits" (tax credits received for maintaining railroad tracks), but MMAR had so little taxable income that it was unable to take advantage of those credits. As a result, it entered into the TMA with KMSI and assigned the tax credits to KMSI, and, in exchange, KMSI paid MMAR a portion of the value that it received from those tax credits. Wheeling, however, had previously entered into a security agreement with MMAR and MMAC (*see* ECF 576-1 in Case No. 13-10670), pursuant to which Wheeling had obtained a security interest in all accounts, payment intangibles, and other "rights to payment" owned or thereafter acquired by the "Debtor" (which was defined to include both MMAR and MMAC). Wheeling argued that this agreement gave Wheeling a security interest in the payments that MMAR received from KMSI pursuant to the TMA, but Keach disagreed.

Ironically, Keach took precisely the opposite position from the one he is taking now and argued that Wheeling was not entitled to the TMA proceeds because MMAR and MMAC were "separate legal entit[ies]," and the assets of one could not be conflated with the assets of the other.

Below are two of the relevant quotations from Keach's Objection to Wheeling's Motion to Enforce

Cash Collateral Orders concerning the lack of any alter ego relationship between MMAR and MMAC

(*see* ECF 707 in Case No. 13-10670):

- "The Debtor and MMA Canada are separate and distinct corporate entities, and any determination as to MMA Canada's property rights in the Canadian A/R is within the exclusive jurisdiction of the Canadian Court. A separate declaratory judgment would be necessary from the Canadian Court for Wheeling to establish an interest in the Canadian A/R . . . ." (¶ 3.)

- "Wheeling . . . assert[s] that MMA Canada is essentially an alter ego of the Debtor, and as such, the Canadian A/R is actually the property of the Debtor. It would be an extraordinary feat indeed if Wheeling were able to substantively consolidate the Debtor with a foreign affiliate through a motion to enforce a cash collateral order in the Debtor's chapter 11 case." (¶ 4.)

Ultimately, Judge Kornreich ruled in favor of Wheeling, because "for the purposes of the 45G

motion the evidence is clear and unambiguous that all the receivables were comingled and they were

all treated as receivables for the American entity." *See* ECF 809 in Case No. 13-10670 (Transcript of

March 13, 2014 Hearing on Motion to Enforce Cash Collateral Orders) at 13:1–6.) Judge Kornreich

was clearly dealing only with the contractual receivables under the TMA, not all of MMAC's

receivables and certainly not any causes of action belonging to MMAC rather than MMAR. *See id.* at

10:22–25 (noting that the order is final "with respect to Wheeling's interest in the proceeds of the

TMA").

### 4. Keach's Attempted Reliance on the Definition of Residual Assets in MMAR's Liquidation Plan

For the first time in the many years of litigating this case, Keach has suddenly asserted that the

definition of "Residual Assets" in MMAR's Liquidation Plan means that this Court has already held

that MMAR has standing to sue for damages to MMAC and that CP, by consenting to the Plan, has

agreed to such standing. Nothing could be further from the truth.

First, the fact that Keach never raised this contention before is itself strong evidence that no one—including Keach—construed the Plan as permitting MMAR to sue in its own right for damages to MMAC.

Second, Keach has no right to raise this argument at this late date, because he did not reference the definition of Residual Assets in his response to CP's Interrogatory 5. That Interrogatory was directly addressed to Keach's contentions for his position that MMAR has standing in this case even though CP interchanged with MMAC, not MMAR, and MMAC, not MMAR, operated the Train at the time of the Derailment. After being ordered by the Court to answer this Interrogatory by providing the basis for Keach's contention that he has standing in this litigation to sue, Keach's Supplemental Response made no mention at all of any reliance on the Plan's definition of Residual Assets. ECF 588 (Hemming Dec.) at Ex. 9 (Keach's Response to CP's Interrogatory No. 5, at original response, Supplemental Response, Second Supplemental Response, and Third Supplemental Response). Although he purported to rely on the "res judicata" effect of the Plan, just as he previously did in claiming it is res judicata that the two entities are completely separate, he made no mention at all of the Residual Assets provision, which he was certainly required to do if he intended to rely on it. Because of Keach's improper failure to disclose this contention in response to CP's Interrogatory, he is barred from relying on this argument. *See, e.g.*, *Day v. City of Indianapolis*, 380 F. Supp. 3d 812, 823-24 (S.D. Ind. 2019), *rev'd on other grounds sub nom.* *Day v. Wooten*, 947 F.3d 453 (7th Cir. 2020) (finding waiver of contention not properly disclosed in response to contention interrogatory; "for a contention interrogatory to serve as a useful tool to minimize the uncertainty of a plaintiff's] claims, the defendant must be able to rely on the answers the plaintiff gives."); *CPC International, Inc. v. Archer Daniels Midland Co.*, 831 F. Supp. 1091, 1102 (D. Del. 1993), *aff'd*, 31 F.3d 1176 (Fed. Cir. 1994) (finding waiver of contention because of failure to disclose that contention in response to interrogatory seeking such

information); *Asia Vital Components Co. v. Asetek Danmark A/S*, 377 F. Supp. 3d 990, 1003 (N.D. Cal. 2019) (granting motion to strike).

Third, the provision on which Keach relies clearly does not provide, and never was intended to provide, Keach with an advance ruling that he has standing in this litigation.  In order for the Plan to treat all of MMAC's causes of action and other assets as assets of MMAR, Keach would have been required to plead and prove substantive consolidation was appropriate, and the Court would have been required to make appropriate findings of fact and conclusions of law in the Plan, or Confirmation Order, after careful examination of the various substantive consolidation factors, including that "the interrelationships of the group are hopelessly obscured and the time and expense necessary even to attempt to unscramble them so substantial as to threaten the realization of any net assets for all the creditors."  *See In re Flora Mir Candy Corp.*, 432 F.2d 1060, 1062 (2d Cir. 1970) (internal citation omitted). No such finding was ever made, as Keach himself has recognized in the *Wheeling* case discussed above. Nor was substantive consolidation ever pled or sought by Keach.  *See Matter of Walsh Const., Inc.*, 669 F.2d 1325, 1330 (9th Cir. 1982) ("We need not decide whether consolidation would have been proper on these facts.  In the absence of consolidation, it was improper to use partnership assets to satisfy a corporate debt."); *In re Texas Extrusion Corp.*, 68 B.R. 712, 722 (N.D. Tex. 1986), *aff'd sub nom. Matter of Texas Extrusion Corp.*, 836 F.2d 217 (5th Cir. 1988), *aff'd sub nom. Matter of Texas Extrusion Corp.*, 844 F.2d 1142 (5th Cir. 1988) (consolidation of bankruptcy cases without pleading, proof, or adequate findings under law to support substantive consolidation is prohibited).

Fourth, the inclusion of two words — "MMA Canada" — in the definition of Residual Assets does not, as Keach asserts, mean that the Court has ruled MMAR has standing to sue for injuries to MMAC. The Plan defines Residual Assets as follows:

**1.114.** <u>Residual Assets</u> means all Assets, if any, belonging to the Debtor, the Estate or MMA Canada and not sold in the Asset Sale, including, without limitation, real estate, Cash, personal property, intangibles, rights to payment, Post-Confirmation Causes of Action, and any other Causes of Action of the Debtor or the Estate not previously

released or released pursuant to the Plan or included in the Initial WD Trust Assets, all of which Causes of Action are preserved under the Plan.

This definition merely provides that Causes of Action belonging to the Debtor or MMAC "are preserved under the Plan." It does not say that MMAR has standing to bring a Cause of Action belonging to MMAC.

Similarly Section 6.12(b) of the Plan merely provides that the Debtor may, but is not required to pursue, among other things, monetization or liquidation of Non-Cash Assets and Residual Assets:

(b) Selling, Monetizing or Liquidating Residual Assets. The Estate Representative may, but is not required to, sell, monetize or liquidate the Settlement Non-Cash Assets and the Residual Assets, including, without limitation, through the prosecution of Post-Confirmation Causes of Action.

This provision does not purport to excuse Keach from obtaining appropriate permission from the Canadian court overseeing MMAC's insolvency proceeding in order to be authorized to bring a Cause of Action belonging to MMAC. The provision arguably could have provided Keach with authority to go to the Canadian court and seek permission to bring a derivative action against CP on MMAC's behalf, but Keach made no effort do so.

Moreover Section 11.1(i) of the Plan, detailing the scope of this Court's jurisdiction, provides jurisdiction as to the Debtor's recovery of assets of the Debtor's Estate, not assets of MMAC's Estate:

ARTICLE 11 RETENTION OF JURISDICTION

11.1. Jurisdiction of Bankruptcy Court.

…

(i)      To recover all assets of the Debtor and property of the Estate, wherever located;

If Keach or this Court had wanted to treat MMAC's assets as MMAR's assets for purposes of the Plan, there were certainly established ways of doing it, such as the potential motion and order discussed above determining that MMAC's assets and liabilities should be substantively consolidated with MMAR's. There also could have been an assignment of MMAC's rights against CP, just as Keach

obtained an assignment of any rights WFS and Irving Oil had to sue CP under the Carmack Amendment. *Whatley v. Canadian Pac. Ry. Ltd.*, D.N.D. Docket No. 16-cv-00074, ECF 1-5 (Plan Support and Settlement Agreement with Irving, at ¶ 4.2(c)); *Id.* at ECF 1-6 (Plan Support and Settlement Agreement with Irving, at ¶ 4.2(c)); *Id.* at ECF 1-7 (Assignment Agreement). None of these means of treating MMAC's causes of action as MMAR's was attempted or accomplished.

Fifth, Keach's reliance on the definition of Residual Assets to confer standing to sue on behalf of MMAC is a red herring, as that is not what Keach alleges in his Complaint he is doing. He alleges instead that he is suing for injuries incurred by MMAR itself. There is no allegation in Keach's Complaint that he is asserting standing to sue for injuries to MMAC. The issue of standing has arisen only because Keach is wholly unable to assert any injuries to MMAR that are not derivative of the damage to MMAC, and his contention that MMAR is automatically and directly liable for MMAC's obligations because of its status as a Nova Scotia unlimited liability company has been proven to be incorrect. *See* ECF 588 (Hemming Dec.) at Ex. 7 (Horne Report).

Finally, even if this Court had purported to provide MMAR with standing to sue for derivative injuries to itself based on injuries to MMAC, and Keach's Complaint had actually alleged such standing, it would have exceeded the jurisdiction of the Bankruptcy Court to make such a finding. No consent by CP to the Plan could bind CP to a provision that, if construed as Keach now contends, was plainly outside of the Bankruptcy Court's jurisdiction to render. *In re 183 Lorraine St. Assocs.*, 101 F.3d 685 (2d Cir. 1996) ("The fact that plaintiff-appellee in its brief on appeal stated that it would 'voluntarily consent to Fischer's standing' did not relieve Fischer of his obligation to show standing, for standing cannot be conferred by agreement of the parties. If a party has no legally cognizable injury, the federal court lacks jurisdiction, for its ruling would be an advisory opinion in violation of Article III of the Constitution."). Further, it is always open for a Court to revisit the issue of standing.

*See, e.g., Pagan*, 894 F. Supp. at 46 ("revisit[ing] again the issue of standing, and finding that the individual plaintiffs in this action do not have the requisite standing").

In short, none of Keach's factual or legal arguments justify his standing to bring this litigation. Because Keach lacks standing, CP is entitled to summary judgment.

## III.   KEACH'S NEGLIGENCE CLAIM FAILS BECAUSE MISCLASSIFICATION DID NOT CAUSE THE DERAILMENT

Keach's negligence claim necessarily fails because he cannot establish a causal connection between misclassification and the Derailment.   MMA's management employees (President Bob Grindrod, Board Chair Ed Burkhardt, and Manager of Operating Rules Ken Strout) all agree that MMAC would not have operated the Train any differently even if the packing group had been correct on the BOL.   ECF 588 (Hemming Dec.) at Ex. 29 (Grindrod 7/10/20 Dep. at 118:14-121:2); *id.* at Ex. 22 (Strout Dep. at 186:12-187:16; 204:24-25:12); *id.* at Ex. 35 (10/18/13 email from Strout); *id.* at Ex. 6 (Burkhardt 1/9/20 Dep. at 170:4-11; 171:15-174:7); *id.* at Ex. 26 (Burkhardt 7/16/20 Dep. at 42:13-43:3); *id.* at Ex. 1 (Burkhardt Dec. ¶ 13); *see also* ECF 587 (SMF) at ¶¶ 94; 100-101; 107-110; 113-114; 116-117; 119.

Although Grindrod speculates that MMAC would have operated the Train differently if it had known that the "true nature" of the oil, CP did not owe a duty to MMA to educate it regarding crude oil characteristics and Keach cannot cite to any regulatory requirement that CP provide to MMA information beyond the hazard class and packing group classification.   That is because the regulations upon which Keach relies do not create any duty for carriers, like CP, to inform interchange carriers, like MMAC, about further properties or characteristics of the shipment, and therefore any attempt by Keach to impose such a duty on CP is preempted.   *See* 49 C.F.R. §§ 171.2(e)-(f); ECF 598 (Opp. Br.) at 52; *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).   *See also Baker v. Goodman*, 442 F. Supp. 3d 366, 374–81 (D. Me. 2020) ("[T]he Maine Supreme Judicial Court has rejected the theory that a person, who otherwise does not owe a legal duty, automatically owes a duty to prevent a foreseeable

harm.  Instead, … the Maine Supreme Judicial Court along with the Maine Legislature have defined the circumstances in which Maine law will impose a duty.  If, as the Plaintiffs propose, foreseeability alone is enough to establish a duty, the duty categories carefully limited by the Maine Supreme Judicial Court and the Maine Legislature would serve no discernable purpose because pure foreseeability would trump the absence of a recognized legal duty, imposing far-ranging duties that Maine law to date has not adopted."); *Emerito Estrada Rivera-Isuzu de P.R., Inc. v. Consumers Union of U.S., Inc.*, 233 F.3d 24, 29–30 (1st Cir. 2000) ("As a matter of policy, the law is slow to impose liability in favor of persons who were not directly injured by a wrong but suffer only derivatively or secondarily.")[8]

Keach's suggestion that CP should have stopped the Train pending confirmation of classification by WFS fares no better because WFS *confirmed* that the crude oil should be classified as Packing Group III both before and after the Derailment.  *See* ECF 588 (Hemming Dec.) at Ex. 17 (Jasso Dep. at Jasso Dep. at 38:13-17, 67:8-25) (SST employee Eli Jasso spoke with WFS's Joann Dietzler prior to signing the shipper's certification, and Dietzler confirmed that Packing Group III was accurate); ECF 587 (SMF) at ¶¶ 23-26; Reply to Pl's SMF at ¶ 136; Hemming Supp. Dec. at Ex. 133 (Dietzler confirmed, two days after the Derailment, that "packing group 3 is correct.")  And as noted, in any event, correction of the packing group would have made no difference at all to how MMAC operated the Train or to the Derailment resulting from MMAC's negligence.

## A.     Lack of Proximate Cause can be Determined on Summary Judgment

Keach contends that proximate cause cannot be determined on a motion for summary judgment.  *See* ECF 598 (Opp. Br.) at 31.  Contrary to Keach's argument, Maine courts have routinely determined proximate cause at summary judgment in cases, such as here, where "there is so little

---

[8] Keach did not respond to CP's argument that any attempts to impose upon CP a duty to educate MMAC about crude oil characteristics are preempted and thus waived his right to oppose it.  *See Nikijuluw v. Gonzales*, 427 F.3d 115, 120 n. 3 (1st Cir. 2005) ("It is well-established that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.")

evidence tending to show that the defendant's acts or omissions were the proximate cause of the plaintiff's injuries that the jury would have to engage in conjecture or speculation in order to return a verdict for the plaintiff." *Estate of Smith v. Salvesen*, 143 A.3d 780, 786 (Me. 2016) (internal quotation marks omitted); *Houde v. Millett*, 787 A.2d 757, 759 (Me. 2001) (same); *Merriam v. Wanger*, 2000 ME 159, ¶ 10, 757 A.2d 778, 781 (same); *Id.* ¶ 8, 757 A.2d at 781 ("The mere possibility of such causation is not enough, and when the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, a defendant is entitled to a judgment.")

*Crowe v. Shaw* is instructive. 755 A.2d 509, 512-513 (Me. 2000). In that case, the plaintiff lost control of her vehicle and collided with the defendant's stopped or nearly stopped vehicle, sustaining injuries. *Id.* at 512. The defendant had an elevated blood-alcohol level at the time of the collision. *Id.* at 512. The plaintiff sued for negligence, alleging that the defendant breached a duty by operating his vehicle under the influence. *Id.* The court granted the defendant's summary judgment motion because the plaintiff could not demonstrate causation. *Id.* The Law Court affirmed: "even if the factfinder were to find a breach of duty . . . [the breach] did not in any way contribute to [plaintiffs'] damages." *Id.* at 512-513. The defendant had stopped (or nearly stopped), his vehicle "well to the right on his side of the road when [plaintiff], having lost control of her vehicle, and collided with him. Because [plaintiff] presented no evidence that [defendant's] operation of his vehicle while intoxicated may have caused her injuries, the court appropriately granted a summary judgment." *Id.* at 513; *see also Lopez v. Riley*, No. 2:18-CV-00020-GZS, 2019 WL 2343836, at *2 (D. Me. June 3, 2019) (granting summary judgment because "the record here is also devoid of other admissible testimony or circumstantial evidence that would allow a reasonable factfinder to conclude [Defendant's] acts or omissions were the proximate cause of Plaintiffs' damages."); *Corey v. Norman, Hanson & DeTroy*, 1999 ME 196, ¶ 7, 742 A.2d 933, 937–38 (if the evidence produced by the plaintiff in opposition to a motion for summary judgment would, if produced at trial, entitle the defendant to a judgment as a matter of law, the

defendant is entitled to a summary judgment.); *Cyr v. Adamar Assocs. Ltd. P'ship*, 2000 ME 110, ¶ 7, 752 A.2d 603, 604 (finding alleged evidence of proximate cause "too uncertain and tenuous to hold [Defendant] liable.")

Here, even assuming that CP breached a duty to identify the misclassification and/or stop the Train pending confirmation of the classification,[9] there is even less uncertain and tenuous evidence than in *Shaw* tending to show that any breach by CP was the proximate cause of Keach's alleged injuries. Moreover, the evidence Keach argues exists would necessarily cause any jury to engage in conjecture or speculation in order to return a verdict for Keach. *See Shaw*, 755 A.2d at 512. Because "there is so little evidence tending to show that [CP's alleged] acts or omissions were the proximate cause of [Keach's] injuries," the Court can, and should, grant summary judgment. *See Estate of Smith*, 143 A.3d at 786.

### B.   Keach Cannot Demonstrate CP's Failure to Identify the Misclassification Proximately Caused the Derailment

Ignoring the overwhelming evidence that MMA caused the Derailment by, among other things, parking the Train on a descending grade with only seven handbrakes applied to secure the Train and without performing a mandatory handbrake efficiency test, Keach devotes numerous pages of his brief to the argument that there can be more than one proximate cause for the Derailment. *See, e.g.* ECF 598 (Opp. Br.) at 47-52. According to Keach, CP's failure to stop the Train until it had confirmation that the oil was Packing Group III could potentially be viewed as an *additional* proximate cause of the Derailment because if CP had stopped the Train, the Derailment supposedly would not have happened. *See, e.g., id.* at 41-43. Based on that assumption, Keach contends there is a material

---

[9] CP disputes that it breached any duties by not identifying WFS's misclassification and acknowledges for purposes of this motion that Keach can establish a factual issue on that point. Whether CP should have identified WFS's misclassification, however, is not relevant to the present motion because there is no causal connection between misclassification and the Derailment.

factual issue regarding whether CP should have identified WFS's misclassification and stopped the Train. *Id.* at 32.

For purposes of this motion only, however, CP did not dispute that Keach can point to evidence to create a factual dispute about whether CP—or anyone for that matter—should have identified the misclassification or stopped the Train until classification was confirmed. That is why CP did not move for summary judgment on that issue. That is also why Keach's extensive recitation of alleged facts and his lengthy argument that CP should have identified WFS's misclassification and stopped the Train is simply not relevant to the present motion.

Even assuming, *arguendo*, that CP should have identified WFS's misclassification and stopped the Train pending confirmation of packing group, Keach *must still* demonstrate that CP's failure to do so was a proximate cause of the Derailment. Keach cannot do that because the record is clear that even if the packing group had been correctly identified, MMAC would have done nothing differently. *See* ECF 588 (Hemming Dec.) at Ex. 29 (Grindrod 7/10/20 Dep. at 118:14-121:2); *id.* at Ex. 22 (Strout Dep. at 186:12-187:16; 204:24-25:12); *id.* at Ex. 35 (10/18/13 email from Strout); *id.* at Ex. 6 (Burkhardt 1/9/20 Dep. at 170:4-11; 171:15-174:7); *id.* at Ex. 26 (Burkhardt 7/16/20 Dep. at 42:13-43:3); *id.* at Ex. 1 (Burkhardt Dec. ¶ 13); *see also* ECF 587 (SMF) at ¶¶ 94; 100-101; 107-110; 113-114; 116-117; 119.

Keach's key witness, Bob Grindrod, expressly testified that MMA would not have operated the Train differently based on packing group alone:

> Q:   Let's say the bill of lading for this train said that it was unit train carrying packing group II, so it was a unit train carrying U.S. 1267 crude oil, hazard class 3, packing group II.
> A:   Yes.
> Q:   If that's the information you had, would you have handled this train differently?
> A:   No.
> Q:   So in the same hypothetical, if you had a unit train carrying UN 1267 hazard class 3, packing group II  crude oil, would have required a live crew-to-crew handoff if that is all the information you had?

A:      That isn't answering the question, though.  Did I or did I not know the true nature of the product being handled?  It all comes down to that.

Q:      All right.  I am going to ask another hypothetical.  And in the hypothetical you know exactly what you knew in July of 2013 and you get the bill of lading for a train of UN 1267 hazard class 3, packing group I petroleum crude oil.  Would you have handled that train differently based on the difference – the only difference being packing group I versus packing group III?

A:      I wouldn't have done anything differently.  I can give you the wrong answer because I forgot whether I should say yes or now to agree with you.

Q:      Fair enough.  You wouldn't have done anything differently.  Would you have required a live crew-to-crew if all of the information was the same with the only difference being the bill of lading said UN 1267 petroleum crude oil hazard class 3, packing group I?

A:      No.

ECF 588 (Hemming Dec.) at Ex. 29 (Grindrod 7/10/20 Dep. at 118:14-121:2) (objections omitted);

ECF 587 (SMF) at ¶¶ 116-117; 119.  This testimony clearly establishes that train operations would not

have changed even if WFS had properly classified the oil as Packing Group II instead of Packing

Group III as shown on the BOL.

## 1.    Keach Improperly Attempts to Discount Undisputed Evidence That CP's Failure to Correct WFS's Misclassification Did Not Cause the Derailment

Keach's conclusory and unsupported assertion that there may be "some reasonable

connection" between misclassification and the Derailment is not only belied by the undisputed

testimony of Burkhardt, Grindrod, and Strout that the misclassification made no difference, but in

addition, the TSB (which investigated the Derailment), the United States District Court for the District

Court of North Dakota in related litigation, WFS and Irving have also all concluded that

misclassification had nothing to do with causing the Derailment.

### a.    The TSB Report

It is undisputed that the TSB Report, which Keach has stipulated is admissible (*see* ECF 588

(Hemming Dec) at Ex. 2; SMF Response at ¶ 6), identified 18 causes and contributing factors to the

Derailment: none was related to misclassification, CP's alleged failure to identify misclassification, or

CP not stopping the Train pending confirmation of the packing group.  SMF Response at ¶¶ 70, 120-

125.  Instead, all of the causes and contributing factors identified by the TSB related to MMA's acts and omissions or Transport Canada's insufficient oversight of MMA.  *Id.* at ¶¶ 68-69.  Keach tries to minimize the importance of the TSB Report's findings by "qualifying" his response to CP's Statement of Undisputed Material Facts and citing the TSB's disclaimer that its role is to promote safety rather than to determine civil liability.  ECF 598 (Opp. Br.) at 50-51; *see also* SMF Response at ¶¶ 68-70, 120-126.  Keach misunderstands CP's argument.  CP does not argue that the TSB Report is dispositive of the cause of the Derailment.  *See* ECF 584 (Br.) at 28-29; 37-38.  Rather, CP argues that the TSB Report—the facts in which Keach expressly stipulated were true in his successful effort to avoid dismissal on *forum non conveniens* grounds (ECF 254 (Transcript of December 20, 2016 Hearing) at 32:12-17; 32:23-25; 70:1-5)—is simply *evidence* of MMA's negligence and evidence that CP's failure to identify the misclassification played no role in causing the Derailment.  *See also* ECF 588 (Hemming Dec.) at Ex. 2 (Stipulation as to Facts as Stated in the TSB Report wherein Keach admits as fact the information contained in the first 97 pages of the TSB Report and confirming the parties' agreement that the entire TSB Report is admissible); *see also* ECF 587 (SMF) at ¶ 6.

In addition to not citing any facts to dispute the TSB's findings and conclusion, Keach fails to articulate the relevance of the TSB Report's "disclaimer."  ECF 598 (Opp. Br.) at 50.  Regardless of whether the TSB Report determines civil liability, the TSB conducted an extensive investigation into the Derailment and issued a 181-page report that *did not identify a single CP act or omission* as a cause or contributing factor of the Derailment.  ECF 587 (SMF) at ¶¶ 70, 120-125.  The report constitutes admissible evidence that neither CP nor misclassification caused the Derailment.

> ### b.    Judge Wilson's Decision in *Whatley*

As he does with the TSB Report, Keach tries to discount the significance of an order by Judge Wilson in which Judge Wilson expressly found, in Derailment litigation pending in North Dakota, that "misclassification did not cause" or "impact the outcome of the Derailment" but rather "the

[D]erailment and disaster were caused by a number of negligent actions by another carrier, MMA, that filed for bankruptcy and ultimately liquidated." *Whatley v. Canadian Pac. Ry. Ltd.*, 2020 WL 8268878, at *3 (D. N.D. Aug. 6, 2020). *See* ECF 598 (Opp. Br.) at 51. Keach contends that Judge Wilson's finding should be ignored because that decision "involved different issues, different legal standards and different parties than this action." *Id.* at 51. Keach is incorrect.

First, Keach's argument that *Whatley* involved different legal standards is wrong. Although *Whatley* involved liability under the Carmack Amendment, Judge Wilson's finding that "misclassification did not cause . . . the derailment" was made in assessing whether CP had negligently caused, or contributed to the cause, of the Derailment (an element of CP's Carmack Amendment defense), *the same issue* being addressed here. *Whatley*, 2020 WL 8268873 at *3.

Second, although Keach was not a named party in *Whatley*, Whatley's deposition makes clear that Keach, together with the law firm in which he is a partner, was not only in privity with Whatley for purposes of binding him to Judge Wilson's summary judgment decision, but has been in control of every aspect of that litigation. Indeed, Whatley's ignorance, and Keach's control, of the litigation, extends, among other things, to the very summary judgment briefing that led to Judge Wilson's finding that misclassification had nothing to do with the Derailment or the injuries flowing therefrom. In fact, Whatley does not even recall reviewing the summary judgment motion papers filed in the litigation. *See* Hemming Supp. Dec. at Ex. 134 (Whatley Dep. at 54:20-55:14).

Whatley testified that he left all matters concerning the litigation, including the facts, claims, and strategy, to Keach and Keach's firm. *See, e.g., id.* at 12: 6-10 ("I really don't have an understanding about this matter, frankly, beyond what's in the Complaint"); *id.* at 35:13-15 ("[A]s I made clear earlier, and as I make clear in the Answers to Interrogatories, I am relying upon counsel in this litigation"); *id.* at 35: 18-19 ("I am relying on counsel for what the claims are and what they should be."); *id.* at 35:20-23 ("I understand you deposed Mr. Keach, and he would be in a much better position than I am to

describe the claims because he's the lawyer"); *id.* at 41:15-23 (acknowledging he has been taking

guidance from Keach, who has had "substantial input into the strategy and handling of the litigation.").

Whatley did not even have any knowledge concerning the purported facts set forth in his

sworn Verification of the Interrogatory Responses. *Id.* at 44:6-48:16 (all of the factual allegations in

his sworn Interrogatory Responses were based on information from Keach and others at Keach's

firm; Whatley made "no independent investigation" of the facts). Nor does Whatley recall even

reviewing the Complaint in the North Dakota case prior to its filing to satisfy himself that the

allegations were, as far as he knew, correct. *Id.* at 36:15-20.

Whatley's testimony regarding Keach's control of the litigation means that Keach was plainly

in privity with Whatley. *See Taylor v. Strugell*, 553 U.S. 880, 894 (2008) ("A nonparty is bound by a

judgment if [] he 'assume[d] control' over the litigation in which the judgment was rendered.") (quoting

*Montana v. United States*, 440 U.S. 147, 154 (1979) (second alteration in original)); *Gonzalez v. Banco Cent.*

*Corp.*, 27 F.3d 751, 758 ("If a nonparty either participated vicariously in the original litigation by

exercising control over a named party or had the opportunity to exert such control, then the nonparty

effectively enjoyed his day in court . . . .").

Thus, Keach should not be permitted to "obtain multiple bites of the litigatory apple."

*Gonzalez*, 27 F.3d at 761; *see also Ferris v. Cuevas*, 118 F.3d 122, 127-28 (2d Cir. 1997) (finding that federal

plaintiff was in privity with prior state court plaintiffs because interests were identical to that of prior

plaintiffs, the same attorney was involved in both and controlled every aspect of the federal and state

litigations, and one federal plaintiff was in close contact with the attorney throughout the state court

litigation); *Alman v. Danin*, 801 F.2d 1, 5 (1st Cir. 1986) (estopping party from re-litigating issues

decided in prior litigation where the party were on notice of all aspects of the prior litigation, "held

ultimate and had complete control over the litigation strategy," and had "an economic stake in the

outcome of the trial"). Here, Keach had an obvious economic stake in the outcome of the North

35

Dakota litigation because he is representing Whatley on a contingent fee basis. *See Montana*, 440 U.S. at 154; Hemming Supp. Dec. at Ex. 134 (Whatley Dep. at 29:25-30:4).

Third, even if Keach were not in actual privity with Whatley, Keach's filings in the *Whatley* litigation demonstrate that Keach's interests were adequately represented there, which is sufficient *See Taylor*, 553 U.S. at 895 ("[A] nonparty may be bound by a judgment because []he was adequately represented by someone with the same interest who [wa]s a party to the suit." (citation and internal quotation marks omitted)).

### c.     WFS

WFS also agrees that misclassification did not cause the Derailment. More specifically, WFS provided sworn deposition testimony that misclassification was not the cause of the Derailment. ECF 587 (SMF) at ¶ 130. As he does with the TSB's findings and Judge Wilson's Order, Keach tries to discount the WFS testimony by asserting a "qualification" that it is not material and constitutes inadmissible lay opinion testimony. *See* SMF Response at ¶ 130. Contrary to Keach's argument, the Rule 30(b)(6) testimony of WFS's corporate representative (David Hornaday) is admissible. "Under Rule 701, courts have allowed lay witnesses to express opinions about a business based on the witness's own perceptions and 'knowledge and participation in the day-to-day affairs of [the] business." *United States v. Munoz-Franco*, 487 F.3d 25, 35 (1st Cir. 2007) (internal quotation marks omitted). *See also Nat'l Starch & Chem. Trading Co. v. M/V STAR INVENTANA, No. 05-91-P-S*, 2006 WL 1876996, at *3 (D. Me. July 5, 2006) (a corporate employee could offer lay testimony about the propriety of rejecting a shipment even though he did not personally inspect the shipment because a lay witness may testify to inferences that he could draw from his perception of a business's records, or facts or data perceived by him in his corporate capacity); *United States v. Thompson*, 229 F. Supp. 3d 91, 93–94 (D. Mass. 2017) (lay witnesses may express certain opinions about business operations and industry practices). Hornaday, in his capacity as a Rule 30(b)(6) corporate representative, testified about WFS's (the

business's) opinions and beliefs concerning the Derailment, including what WFS believed (or did not believe) caused the Derailment.  SMF Response at ¶ 130.  This is exactly the type of lay opinion testimony permitted under Rule 701.  *See, e.g., Portland Pipe Line Corp. v. City of S. Portland,* 288 F. Supp. 3d 321, 335 n.10 (D. Me. 2017) (Woodcock, J.).

### d.   Irving

In a similar vein, Keach asks the Court to ignore Irving's guilty plea, in which Irving and the Canadian Crown agreed that misclassification, "had no impact on the Derailment nor on the faults committed by MMA and Harding, which caused the [D]erailment." ECF 388 (Hemming Dec.) at Ex. 37; *see also* ECF 587 (SMF) at ¶ 127.  Keach contends that the Irving plea is immaterial and that it constitutes inadmissible hearsay.  SMF Response at ¶ 131.  Keach is wrong again.

Irving's guilty plea is admissible hearsay under Federal Rules of Evidence 807 and 803(22). Under Rule 807, a hearsay statement is not excluded if "(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice." *See, e.g., In re Slatkin,* 525 F.3d 805, 811-12 (9th Cir. 2008) (admitting plea agreement under Rule 807 because, among other things, the plea agreement had equivalent circumstantial guarantees of trustworthiness because it was made under oath with advice of counsel, involved severe criminal penalties for the defendant, and was accepted by the court); *Scholes v. Lehmann,* 56 F.3d 750, 762 ("[T]he veracity safeguards surrounding a plea agreement that is accepted as the basis for a guilty plea and resulting conviction actually exceed those surrounding a deposition.").  Here, the Irving plea agreement was made under oath, subjected certain individuals to criminal penalties, and was accepted by the Canadian Court.  *See* SMF Response at ¶ 131; *see also* ECF 588 (Hemming Dec.) at Ex. 37. Irving's plea agreement is admissible under Rule 807.

Irving's guilty plea is also admissible under Rule 803(22), pursuant to which a guilty plea is not excluded by the rule against hearsay if the facts underlying the guilty plea are essential to the judgment. Fed. R. Evid. 803(22). Here, had the parties agreed that Irving's role in misclassification caused the Derailment, the Canadian court could have imposed a harsher sentence on Irving. In addition, it is unlikely that Irving would have plead guilty without the inclusion of a statement that misclassification did not cause the Derailment in the agreed statement of facts. Accordingly, the factual finding that the misclassification did not cause the Derailment was essential to the Court's sentence, which is part of the Court's final judgment. *See also Wiand v. Meeker*, 2012 WL 6930504, at *3 (M.D. Fla. Dec. 13, 2012), *rev'd in part on other grounds*, 572 Fed App'x 689 (11th Cir.) (admitting plea transcript from guilty plea and noting that amounts of restitution in judgment were "dependent on facts essential to their calculations").

CP's opening brief cites to extensive evidence, including the findings of the TSB and Judge Wilson, as well as the positions of WFS and Irving, that misclassification did not cause the Derailment, all of which supports the testimony Bob Grindrod, Ed Burkhardt, and Ken Strout that train operations would not have changed based on packing group. Keach did not dispute this evidence and instead, asserted inappropriate qualifications and legally insufficient objections. In addressing CP's motion, this Court should consider the TSB Report, Judge Wilson's decision, WFS's testimony, and Irving's guilty plea, all of which support CP's argument that misclassification did not cause the Derailment.[10]

### 2.    Keach Relies on the Irrelevant, Inadmissible, and Speculative Testimony of Bob Grindrod That He Would Have Done Something Differently if he Knew the "True" Characteristics of the Oil

The only evidence cited by Keach to support his argument that misclassification caused the Derailment is the speculative testimony of MMA President Bob Grindrod, who claimed, after the

---

[10] If the Court finds that misclassification act by WFS caused the Derailment, Keach's recovery is barred by the Judgment Reduction Provision of the Order Confirming the Plan of Liquidation. *See* Section V, pages 50-59.

Derailment, that even though MMAC would not have operated the Train differently if the correct

packing group had been identified on the BOL, it would have done something differently had it been

informed of the true characteristics and dangers of crude oil. ECF 598 (Opp. Br.) at 22. But not even

Keach asserts that CP had any duty beyond the BOL to inform Grindrod of the characteristics and

specific dangers of the oil that MMA was in the business of transporting. Moreover, Grindrod's

testimony—that MMA would have implemented additional precautions specific to one commodity

(crude oil) is speculative because (1) it was beyond any implemented ever before, (2) it had never been

implemented for more dangerous commodities than crude oil, (3) there was no rule or requirement to

do so, (4) MMA had no internal rule (written, verbal or otherwise) that would require different

handling, (5) and no MMA witness could not point to such additional precaution having *ever* been

implemented at any time before. *See, e.g.,* ECF 587 (SMF) ¶¶ 96, 100, 107-108, 100, 114. As Mr.

Burkhardt put it, his subordinate, Grindrod, was merely "speculating." ECF 588 (Hemming Dec.) at

Ex. 26 (Burkhardt 7/16/20 Dep. at 54:9).

Summary judgment is appropriate where the only evidence supporting a plaintiff's factual

assertion is speculative deposition testimony and there is "no evidentiary basis from which a fact-

finder could rational infer" a plaintiff's theory. *Murray v. Kindred Nursing Centers W. LLC*, 2014 WL

4411044 at *8 (D. Me. Sept. 8, 2014) (Levy, J.), *aff'd*, 789 F.3d 20 (1st Cir. 2015). In *Murray*, the plaintiff

asserted claims of unlawful discrimination in violation of the Maine Whistleblower Protection act. *Id.*

The defendant moved for summary judgment. *Id.* The defendant admitted that, for the purposes of

summary judgment, there were triable issues of fact concerning the first three elements of plaintiff's

claim. *Id.* Defendants argued, however, that plaintiff could not establish the remaining two elements

necessary to prevail on her claim. *Id.*

In granting defendant's motion for summary judgment, the court found, in part, that the

plaintiff's claim failed as a matter of law because the only testimony she cited in support was

speculative deposition testimony. *Id.* at 10. The court noted that speculation was "an insufficient basis to oppose summary judgment" and that "[i]n opposing summary judgment a nonmovant cannot rely merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Id.* (internal quotation marks omitted). Additionally, "conjecture [could not] take the place of proof in the summary judgment calculus." *Id.* (internal quotation marks omitted). The court then found that there was "no evidentiary basis from which a fact-finder could rationally infer [plaintiff's theory]" and consequently, summary judgment was appropriate. *See id.*; *see also Morin v. Hannaford Bros. Co., LLC,* 2018 WL 2746570, at *15 (D. Me. June 7, 2018) ("a court need not take at face value a party's subjective beliefs, even if offered in the form of testimony, if those subjective beliefs are conclusory, self-serving, and lack factual support in the record.") (internal quotation marks omitted); *J. Geils Band Emp. Ben. Plan v. Smith Barney Shearson, Inc.,* 76 F.3d 1245, 1251 (1st Cir. 1996) (a party opposing summary judgment cannot rely on "'conclusory allegations, improbable inferences, and unsupported speculation'" to defeat summary judgment).

As noted, even if CP had identified WFS's misclassification, all that would have happened was a paperwork change from Packing Group III to Packing Group II. *See* ECF 587 (SMF) at ¶ 114. Grindrod's testimony establishes that MMA would have operated the Train the same way regardless of whether the oil was classified as Packing Group I, II, or III. ECF 588 (Hemming Dec.) at Ex. 29 (Grindrod 7/10/20 Dep. at 118:14-121:2) (objections omitted); ECF 587 (SMF) at ¶¶ 116-117; 119. Thus, neither the misclassification by WFS nor the fact that CP did not identify it, caused the Derailment.

There is simply no evidence that WFS's misclassification, or CP not identifying it, caused the Derailment. The harm would still have occurred even if WFS had correctly classified the crude oil as Packing Group II or if CP had stopped the Train and corrected the packing group. Accordingly,

Keach cannot demonstrate proximate cause and the Court should grant CP's motion for summary judgment.

### C.   MMA's Own Negligence Was the Proximate Cause of the Derailment

In addition to there being no evidence (let alone admissible evidence) that misclassification caused the Derailment, the undisputed evidence establishes that MMAC Engineer Tom Harding, in violation of clearly established rules, parked the Train on a descending grade with an insufficient number of handbrakes applied to secure the Train and then failed to perform a handbrake effectiveness test to check the security of the handbrakes he applied. ECF 587 (SMF) at ¶¶ 30-77. MMA rules specifically called for more than seven handbrakes to be applied and also required that Harding conduct a handbrake effectiveness test to make sure the handbrakes would hold. ECF 587 (SMF) at ¶¶ 40, 46, 74-75. Yet Harding violated MMA's rules regarding the minimum number of handbrakes he needed to set, and failed to perform any handbrake effectiveness test. *Id.*

Key MMA officials (MMA President Bob Grindrod, MMA Board Chair Ed Burkhardt, and MMA Manager of Operating Rules Ken Strout) have all admitted that Harding's failures and rule violations caused the Derailment. ECF 587 (SMF) at ¶¶ 40, 46, 72-74, 97. Even Keach has admitted these facts. *See id.* at ¶¶ 37, 41, 44-46 (admitting that more than seven handbrakes were required, admitting that the seven brakes set were not sufficient to secure the Train, and admitting that Harding violated MMA rules on the night of the Derailment).

Faced with the overwhelming evidence that MMA caused the Derailment, Keach argues that there can be multiple proximate causes and that CP somehow caused the Derailment too. ECF 598 (Opp. Br.) at 47-51. Keach, however, utterly fails to reasonably connect, as established above, how CP's supposed negligence in not identifying the misclassification or stopping the train pending confirmation from the consignor of the classification was one of many supposed proximate causes of the Derailment. *See id.* Whether there can in theory be multiple proximate causes is of no moment—

Keach must still demonstrate how CP's supposed negligence with respect to misclassification amounts to one of them. Keach fails to do that, because, as discussed above, the overwhelming evidence establishes that misclassification was no factor at all in the Derailment, while MMA's undisputed negligence without a doubt did cause the Derailment.

The TSB determined that MMA (and not misclassification) caused the Derailment. *See* SMF Response at ¶¶ 69; 120-124. Judge Wilson found that MMA (and not misclassification) caused the Derailment. *Whatley*, 2020 WL 8268878 at *3. Three MMA management employees (Burkhardt, Grindrod, and Strout) testified that Tom Harding's rule violations caused the Derailment. *See, e.g.*, SMF Response at ¶¶ 7 (Burkhardt testifying that the proximate cause of the derailment was Harding "[n]ot properly setting handbrakes on the train, [and] not making the handbrake test."); 74 (It was Grindrod's understanding that the Derailment was caused by the locomotive engineer's failure to apply sufficient handbrakes to hold the Train in place, in violation of MMA rules); 75 (Strout testified that if Harding had applied enough handbrakes, "the train would not have rolled."). CP's experts have also stated that MMA caused the Derailment. ECF 587 (SMF) at ¶ 76 (According to CP expert witness Gary Wolf, "the sole cause of the derailment at Lac Megantic on July 6, 2013, was the failure of MMA Locomotive Engineer, Mr. Thomas Harding, to properly secure the Train."). Keach has put forth no expert testimony to the contrary,[11] and instead simply lodges baseless objections. Keach's attempts to discount this overwhelming evidence do not change the facts that MMA caused the Derailment and CP's failure to identify or correct WFS's packing group misclassification did not.

---

[11] Keach has identified two experts (Bob Richard and Maurice Gaudet) who opine that CP should have identified WFS's misclassification. *See* ECF 598 (Opp. Br.) at 37-40. CP has its own experts who provide opinion testimony to the contrary (Frits Wybenga and Douglas Kittle), and one of the experts identified by Keach (Gaudet) was excluded from the Canadian trial because of his lack of appropriate expertise. Hemming Supp. Dec. at ¶¶ 21 and 23; Exs. 120, 122, 123. This issue is not part of the present motion, and need not be because even though Keach's experts provide disputed testimony that CP should have known of WFS's misclassification, neither opines that misclassification was causally related in any manner to the Derailment. Hemming Supp. Dec. at Ex. 121 (Richard Dep. at 261:16-25; 262:2-5; Ex. 137 (Gaudet Dep. at 74:19-22; 117:8-18; 170:5-16).

As discussed, the TSB conducted an extensive investigation into the Derailment.  Its report, which Keach has stipulated is admissible, (ECF 588 (Hemming Dec.) at Ex. 2; ECF 587 (SMF) at ¶ 6), the TSB identified 18 causes and contributing factors to the Derailment.  ECF 587 (SMF) at ¶ 68.  Fifteen of those 18 causes and contributing factors relate to MMA's acts or omissions.  *Id* at ¶ 69.  The other three causes and contributing factors the TSB Report identifies relate to Transport Canada's insufficient oversight of MMA.  *See id*.  Keach does not dispute the majority of TSB's findings as to the causes and contributing factors, and did not identify any admissible evidence disputing them.  *See* SMF Response at ¶¶ 5-6; 31-40; 43-61; 63-64); but *see* ¶ 84 (disputing safety culture).

Similarly, Judge Wilson also found that MMA's negligence, rather than misclassification, caused the Derailment.  "Misclassification did not cause" or "impact the outcome of the Derailment" but rather "the [D]erailment and disaster were caused by a number of negligent actions by another carrier, MMA, *Whatley*, 2020 WL 8268878, at *3.  As discussed above, Judge Wilson's decision involved the same parties and same issues as this case and is binding on Keach.

Keach attempts to discount the testimony of MMA officials in which they uniformly agree that the rule violations of MMAC engineer, Tom Harding, caused the Derailment.  According to Keach, two lifelong railroaders cannot provide testimony regarding the cause of the Derailment.[12] *See* SMF Response at ¶¶ 72-74.  Contrary to Keach's baseless objections, Burkhardt and Grindrod are permitted to provide fact-based testimony regarding railroad operating rules and practices.  Even if their positions on MMA's rules, train operations, and the Derailment are deemed to be opinions, they are admissible pursuant to Federal Rule of Evidence 701:

> [i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c)

---

[12] Keach admits that MMA's Manager of Operating Rules testified that if that if Harding had applied enough handbrakes, "the train would not have rolled."  SMF Response at ¶ 75.

not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

As discussed, the First Circuit has held that it is permissible for "lay witnesses to express opinions about a business based on the witness's own perceptions and 'knowledge and participation in the day-to-day affairs of [the] business." *Munoz-Franco*, 487 F.3d at 35 (internal quotation marks omitted). Indeed, in *Portland Pipe*, the court permitted lay opinion testimony from the president of a company regarding the general factors underlying the company's success:

> Lay opinion testimony is also admissible when the inference is a conclusion drawn from a series of personal observations over time"—in other words, when the testimony is based on the witness' own particularized knowledge. WEINSTEIN § 701.03. As with the "pure" form of lay testimony, this "particularized knowledge" testimony must be based on the witness' own perception. However, the meaning of "perception" takes on slightly different meanings in the two contexts of lay testimony. In the case of "pure" lay testimony, "perception" means personal observation of the event or situation in question.  In the case of "particularized' lay testimony, by contrast, "perception" refers to "the product of a witness's process of observing patterns and drawing logical conclusions.

*Portland Pipe*, 288 F. Supp. 3d at 335 n.10.  Similarly, in *National Starch & Chem. Trading Co.*, the court permitted a corporate employee to offer lay testimony about the propriety of rejecting a shipment even though he did not personally inspect the shipment because a lay witness may testify to inferences that he could draw from his perception of a business's records, or facts or data perceived by him in his corporate capacity.  2006 WL 1876996, at *3 (D. Me. July 5, 2006).  Testimony from Grindrod and Burkhardt regarding Derailment causation is admissible under *Portland Pipe* and *National Starch*.  *See id.* Both have "particularized knowledge of [MMA] that [they have] acquired over [their] long career[s]" that allow them to testify about the Derailment and causes thereof.  *See Portland Pipe*, 288 F. Supp. 3d at 335 n.10.

Keach relies on a non-binding case, *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 226 (3d Cir. 2008), to argue that Burkhardt and Grindrod cannot testify on proximate causation.  SMF Response at ¶¶ 72, 74, 114.  *Hirst* is distinguishable.  In that case, the Third Circuit found that the district court

erred in permitting the witness to offer lay opinion testimony in the first place. *Hirst*, 544 F.3d at 226.

Specifically, the court found that the witness's testimony was "not based on his own perception" and

everything he had learned about the offense in question was "second hand through either his attorney

or…the vice president of [the defendant]." *Id.* In fact, the witness spent most of his trial deposition

explaining that "he could not adequately answer many of counsel's questions because he knew little

about [the defendant's] operations…and/or the circumstances surrounding [the offense at issue]." *Id.*

In stark contrast, Burkhardt and Grindrod have testified competently to the Derailment causation's,

and their testimony that MMA's negligence caused the Derailment is based on their own perceptions,

observations, and years of experience in the rail industry. *See, e.g.* ECF 588 (Hemming Dec.) at Ex. 6

(Burkhardt 1/9/20 Dep. at 23-30); *Id.* at Ex. 41 (Grindrod 1/16/20 Dep. at 12-15). Both were both

involved with MMA prior to and after the Derailment, and both were involved in the post-Derailment

investigation regarding the facts and circumstances surrounding the Derailment. *See, e.g.*, ECF 588

(Hemming Dec.) at Ex. 6 (Burkhardt 1/9/20 Dep. at 30-44; 170-183); *id.* at Ex. 41 (Grindrod 1/16/20

Dep. at 122-131). Based on that involvement, both determined that MMA caused the Derailment.

*See, e.g.*, ECF 587 (SMF) at ¶¶ 72, 74.

Finally, as mentioned in CP's opening brief, Gary Wolf, CP's derailment causation expert, has

opined that MMA caused the Derailment. *Id.* at ¶ 76 ("The sole cause of the derailment at Lac

Megantic on July 6, 2013, was the failure of MMA Locomotive Engineer, Mr. Thomas Harding, to

properly secure Train MMA-002. Mr. Harding failed to apply sufficient handbrakes, failed to perform

a handbrake effectiveness test, before leaving Train MMA-002 unattended. The derailment had no

other causes."). As he does with all of CP's evidence that he dislikes, Keach objects to Mr. Wolf's

testimony, arguing (without support) that the statement of fact is "not material" and that Mr. Wolf's

opinions "have no impact on the relevant inquiry in this case, whether CP's acts and omissions were

the proximate cause of the [D]erailment." SMF Response at ¶ 76. Specifically, Keach argues that Mr.

Wolf's opinion is based on the incorrect standard for proximate causation, but fails to explain what the correct standard is or how Mr. Wolf's opinion relies on the incorrect standard. *See id.* As with Keach's other improper "qualified" responses, Keach should be deemed to have admitted Paragraph 76 because he failed to identify record evidence to dispute Mr. Wolf's opinion. *See, e.g., S.D. Warren Co.*, 229 F.R.D. at 32-22 (Striking response to statement of material fact because the response was "not relevant to whether the . . . statement of material fact is true" and the qualifications were "argumentative.").

Based on the uncontroverted record before this Court, all admissible evidence supports finding that MMA's negligence was the proximate cause of the Derailment, rather than misclassification or CP not stopping the Train. CP is therefore entitled to summary judgment.

### D.   Evidence of an Alleged Regulatory Violation Without Causation Cannot Defeat Summary Judgment

Keach argues that summary judgment should be denied because a violation of a safety statute is evidence of negligence. ECF 598 (Opp. Br.) at 43-44. Specifically, Keach argues that "[i]f a juror were to determine that CP did violate either of the applicable safety regulations, such a finding constitutes evidence of negligence and it is all that is needed to support a judgment" in his favor. *Id.* Keach incorrectly argues that a violation of a safety statute is "evidence of the cause of action itself," implying that a violation of a safety statute concerning classification of cargo demonstrates the necessary causation for a negligence claim. *See id.* The case Keach cites for that proposition, *Russel v. Accurate Abatement Inc.*, 694 A.2d 921, 923 (Me. 1997) does not so hold. It relates to a jury instruction on negligence when a safety statute is violated and has nothing to do with causation. *See id.*

Even assuming, *arguendo*, that CP violated a safety statute and that amounts to negligence, Keach is still required to demonstrate causation, specifically that CP's supposed negligence (allegedly violating a safety statute) was the proximate cause of the Derailment. *See, e.g., Bell ex rel. Bell v. Dawson*, 2013 ME 108, ¶ 17, 82 A.3d 827, 831-32; *Ames v. Dipietro-Kay Corp.*, 617 A.2d 559, 561 (Me. 1992);

*Crowe*, 755 A.2d at 512-513.  As established, Keach cannot demonstrate causation, and the Court should grant CP's motion for summary judgment.

## IV.  MMA'S NEGLIGENCE AND CRIMINAL MISCONDUCT SUPERSEDED CP'S ALLEGED NEGLIGENCE

"Proximate cause is that cause which, in natural and continuous sequence, *unbroken by an efficient intervening cause*, produces the injury, and without which the result would not have occurred." *Webb v. Haas*, 728 A.2d 1261, 1267 (Me. 1999) (emphasis added) (internal quotation marks omitted).  "In order to break that chain, the intervening cause must also be a superseding cause, that is, neither anticipated nor reasonably foreseeable." *Ames*, 617 A.2d at 561 (citing *Johnson v. Dubois*, 256 A.2d 733, 735 (Me. 1969)).  Even if the Court accepts Keach's argument that CP breached its duty by not stopping the train pending confirmation of classification, Keach still cannot demonstrate causation because MMA's negligence—which includes but is not limited to Harding parking the Train on a descending grade, failing to set the minimum number of handbrakes in violation of MMA rules, failing to conduct a required handbrake efficiency test, relying on a malfunctioning locomotive that ultimately caught fire (due to a non-standard MMA repair on the engine) to provide braking support, and failing to return to the Train to apply additional handbrakes or start another locomotive after being advised that the lead locomotive had been shut down due to the fire (*see e.g.*, ECF 587 (SMF) at ¶¶ 30-77)—was an unforeseeable superseding cause breaking the chain of alleged causation between misclassification/CP's alleged duty to stop and the Derailment.

In his opposition brief, Keach argues that a "derailment" was a foreseeable harm and "CP cannot achieve summary judgment by branding such a foreseeable event a 'superseding' cause." ECF 598 (Opp. Br.) at 58.  Whether a "derailment" was foreseeable is only a sliver of the analysis.  The analysis is not, as Keach incorrectly argues, simply whether a derailment of some type could be envisioned by someone as a possibility, but whether the superseding cause was foreseeable.

"The chain of causation can be interrupted by an intervening cause, which forecloses a defendant's liability. An intervening cause, under Maine law, is a *new and independent cause*, which is neither anticipated nor reasonably foreseeable by the defendant; it must operate independently of the defendant's tortious conduct." *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 124 (1st Cir. 2000) (emphasis added); *Russo v. Baxter Healthcare Corp.*, 140 F.3d 6, 11 (1st Cir. 1998) ("Intervening forces insulate a party from liability only if they are not foreseeable consequences of that party's original negligence or, in other words, if they are not a natural and probable consequence of the initial tortfeasor's act."); *Johnson v. Dubois*, 256 A.2d at 735 (Under Maine law, proximate cause is "a new and independent cause, which is neither anticipated nor reasonably foreseeable by the [defendant], is not a consequence of his negligence, is not controlled by him, operates independently of his negligence, and is the efficient cause of the injury in the sense that the injury would not occur in its absence."); Restatement (Second) of Torts § 441 (1965) ("An intervening force is one which actively operates in producing harm to another after the actor's negligent act or omission has been committed."). Because Keach fails to properly analyze the correct event as the superseding cause, his argument that derailments will always occur is not the point. *See* Reply to Pl's SMF at ¶¶ 73-86.

Here, MMA's negligence, including its admitted rule violations and admitted criminal conduct (*see* SMF Response at ¶ 67), was a superseding cause that was not reasonably foreseeable. Even Keach admits this. *See* ECF 598 (Opp. Br). at 56 ("the actual circumstances leading up to the Derailment occurred in such a bizarre manner that they could not have been predicted in advance"). These unforeseeable rule violations and criminal acts, all of which occurred well after CP interchanged the Train to MMAC without incident, broke the causal chain between any alleged negligence by CP and the Derailment itself. *See Boltax v. Joy Day Camp*, 67 N.Y.2d 617, 620, 490 N.E.2d 527, 528 (1986) (finding that "the reckless conduct of plaintiff, an adult experienced in swimming and knowledgeable about the general dangers of diving, who admitted his familiarity with the various water levels at each

part of the pool, yet chose to dive head first from the lifeguard chair into shallow water, was an

unforeseeable superseding event that absolves defendants of liability.")

Citing Dobbs' Law of Torts, Keach claims that "the defendant is liable for harms he

negligently caused so long as a reasonable person in his position should have recognized or foreseen

the general kind of harm the plaintiff suffered.  He is not ordinarily relieved of liability merely because

the precise manner of injury was unforeseeable."  DOBBS, LAW OF TORTS, § 207.  ECF 598 (Opp.

Br.) at 55.  Keach then quotes Dobbs' example:

> Dobbs puts himself in the driver's seat of a car and puts the pedal to the metal,
> exceeding the speed limit.  In doing so, he create[s] the general risk of injury to those
> on the road or even off it.  *Id.*  In this instance,
>
> I probably cannot foresee all the ways in which that general risk might actually come
> about, but I do know that injury might come about in many particular ways resulting
> from my speed, including some so bizarre that I might not ever be able to imagine
> them in advance.  In this kind of case, the risk rule does not readily relieve me of
> liability.  The case calls for the rule that if I foresee the risk in general, I need not
> foresee the details.

*Id.* at 55-56.  Omitting a key part of Dobbs' example, Keach contends that the "Derailment certainly

falls into this category—the actual circumstances leading up to the Derailment occurred in such a

bizarre manner that they could not have been predicted in advance … but the lack of capacity for

imagination and prediction as to how exactly an injury might occur does not relieve a defendant of

liability."  *Id.*

Keach stretches Dobbs' example beyond recognition.  The "bizarre" and unimaginable details

referenced by Dobbs do not, as Keach suggests, extend to the unrelated and separate negligent and

criminal acts of an entirely different entity.  Rather, in Dobbs' "speeding driver" example, Dobbs

concluded, in the sentence omitted by Keach, that "Consequently, if my speeding causes me to lose

control and drive my car into someone's living room, I am liable for the damage done, even if no one

would have ever said in advance that the risk of living-room damage is a reason not to speed."  DOBBS,

LAW OF TORTS, § 207.  That a speeding driver could end up in some type of accident, whether it

involves colliding with another car, driving into a ditch, or driving into someone's living-room, is in no way analogous, as Keach suggests, to the bizarre string of events that occurred after CP's alleged negligence in not identifying the misclassification, which include "Harding start[ing] his shift late resulting in his stop at Nantes rather than further along the route, the lead locomotive experience[ing] mechanical trouble requiring the stop; Harding improperly set[ting] the handbrakes; the lead locomotive [catching] fire and the fire department shut[ting] off power; the power shut off caus[ing] the air brake system failure and the handbrakes [being] unable, on their own without the assistance of the air brakes, to hold the train." *See* ECF 598 (Opp. Br.) at 56.

There are no genuine issues of material fact that MMA's negligence was an unforeseeable superseding cause that broke the chain of causation between CP's alleged negligence and the Derailment. Keach's entire argument rests on the wrong analysis—whether the Derailment was foreseeable. That is not the law. The law is whether MMA's criminal conduct and the admittedly "bizarre" sequence of events that "could not have been predicted" were foreseeable and the parties agree, they was not. Accordingly, Keach cannot demonstrate causation and the Court should grant CP's motion for summary judgment.

## V.      THE JUDGMENT REDUCTION PROVISION BARS KEACH'S CLAIMS

There is now only a single act or omission of CP upon which this adversary proceeding is based: the alleged failure to identify and correct WFS's misclassification of the Packing Group of the oil provided to CP for transport by WFS.[13]  As discussed elsewhere in this Reply, Keach's suit is

---

[13] This Court has found that "the Third Amended Complaint is replete with allegations that suggest CP and Soo Line should not have used DOT-111 cars to transport crude oil, but those cars were expressly permitted for that use, so I do not see how using them could possibly provide the basis for a negligence claim." ECF 285 at 19 n.12. Keach's opposition to CP's summary judgment motion does not attempt to resurrect CP's acceptance of the DOT-111 tank cars from WFS as a basis for his negligence claim, although he claims they are "fragile." *See* ECF 598 (Opp. Br.) at 15, 55.

meritless for a number of reasons, but even if his suit otherwise had merit he would not be entitled to any recovery from CP because WFS has a clear indemnification obligation, under both the regulatory mandate in the Uniform Bill of Lading ("Uniform BOL"), found at 49 C.F.R. Pt. 1035 App. B § 6, as well as the BOL, which incorporated by reference CP's Tariffs.  As noted in CP's initial brief, the Uniform BOL unequivocally provides:

> Every party, whether principal or agent, shipping explosives or dangerous goods, without previous full written disclosure to the carrier of their nature, shall be liable for and indemnify the carrier against all loss or damage caused by such goods, and such goods may be warehoused at owner's risk and expense or destroyed without compensation.

49 C.F.R. § Pt. 1035, App. B, Sec. 6 (emphasis added).

It is undisputed that WFS did not provide CP with "full written disclosure" of the oil shipped, as WFS flatly represented in the BOL that the oil was properly classified as Packing Group III and that classification was fully in compliance with all applicable laws and regulations:

> I, Ell JASSO acting for WESTERN PETROLEUM CO, hereby declare that the contents of this consignment are fully and accurately described by proper shipping name(s) and are classified, packaged, marked and labeled/placarded, and are in all respects in proper condition for transport according to applicable international and national government regulations.

ECF 588 (Hemming Dec.) at Ex. 16 (BOL at 9).  *See also* SMF Response at ¶ 27 (admitting PG III on BOL was incorrect).

In short, WFS not only failed to provide the required disclosure concerning the correct packing group of the oil, but falsely represented that the oil was properly classified.  As Judge Levy previously held in the *Wheeling* adversary proceeding involving Keach and the very same indemnification issue, albeit with respect to indemnification owed to MMA, WFS's indemnification obligations under the Uniform BOL apply to the shipment at issue.  *See Wheeling & Lake Erie Ry. Co. v. Keach*, 606 B.R. 1, 6-9 (D. Me. 2019), *aff'd sub nom. without reaching the issue, In re Montreal, Maine & Atl. Ry., Ltd.*, 956 F.3d 1 (1st Cir. 2020).

In addition to the Uniform BOL indemnity, the Tariffs to which WFS agreed in the BOL also require indemnification under these circumstances. Indeed, Judge Levy came to this very conclusion, holding that the carriers of the cargo are "entitled to indemnification under the terms of both the Uniform BOL and the BOL." *Wheeling*, 606 B.R. at 6.

Tariff 6, Item 20, for example, requires, as Judge Levy observed, that the shipper:

fully indemnify, defend and hold harmless CP from all losses, including, without limitation, attorneys' fees and other costs of litigation, damage, injury, death or any other liability ... to the extent such losses are caused by or otherwise arise from ... Shipper's failure to comply with the terms and conditions of this Tariff.

*Id.* at 6.

Judge Levy also noted:

Tariff 6 further required the Shipper to comply with the terms of all other CP tariffs and applicable laws, *see id.* ("At all times when Private Equipment owned, leased or provided by, or on behalf of, Shipper are used on CP, Shipper shall be responsible for ensuring that the Private Equipment ... comply with all applicable tariffs."), which included provisions requiring proper labeling of crude oil for shipment. *See* CP Tariff 8, Item 20 (Plaintiff's Exhibit 15) ("Shippers are responsible for product classification and selection of packaging in accordance with legal requirements."); *id.*, Item 21 ("Hazardous Commodities shall be properly marked, labelled and placarded by Customer as required by the Dangerous Goods Laws.").

*Id.*

Keach's arguments against WFS's indemnification obligation are without merit. As to the Uniform BOL, Keach first contends that "previous full written disclosure" was provided because "World Fuel did properly classify the crude oil as a Class 3 Flammable Liquid; it failed only to identify the correct packing group." ECF 598 (Opp. Br.) at 85. This is ludicrous on its face, as failure to identify the correct packing group was unlawful and caused the written disclosure to be materially incorrect.[14]

---

[14] Ironically, Keach claims that WFS "did properly classify the crude oil as a Class 3 Flammable Liquid" and "failed only to identify the correct packing group" (ECF 598 (Opp. Br.) at 85) while simultaneously asserting multimillion dollar tort claims based on CP's alleged failure to identify that WFS's packing group was incorrect.

Keach also contends that the indemnification required by the Uniform BOL does not apply because "CP already knew of the dangerous properties of Bakken crude, including its volatility, flammability, and correct packing group." *Id.* There are at least three major flaws with this argument.

First, CP's knowledge is not a factor in the Uniform BOL's indemnification requirement, and Keach does not cite a single case or other authority to the contrary. The indemnification is a regulatory requirement whenever the shipper fails to provide "full written disclosure." Moreover, because the Uniform BOL was expressly incorporated by reference into the contract with WFS by virtue of CP's Tariff 1, Item 200 ¶ 2 (*see* Hemming Supp. Dec. at Ex. 105), the indemnity is also an express contractual one. This express indemnity, whether viewed as a regulatory or contractual one, contains no caveats or exceptions based on alleged equitable factors. *Laiho v. Consol. Rail Corp.*, 4 F. Supp. 2d 45, 51 (D. Mass. 1998) ("If otherwise triggered, Industrial's obligation to indemnify Conrail arises 'irrespective' of Conrail's joint or concurrent negligence. Such express contractual language is valid and enforceable."); *Kelly v. Dimeo, Inc.,* 581 N.E.2d 1316, 1318 (Mass. App. Ct. 1991) (an express indemnity clause "is valid and enforceable—even where the indemnitee is found to be 'concurrently' negligent and where the indemnitor is free from any negligence" and "rescues the indemnitee from paying damages, even when it is negligent."); *In re ResCap Liquidating Tr. Litig.*, 428 F. Supp. 3d 53, 75 (D. Minn. 2019) ("Indeed, when the duty to indemnify arises from contractual language, it generally is not subject to equitable considerations; rather, it is enforced in accordance with the terms of the contracting parties' agreement.") (quoting 41 Am. Jur. 2d Indemnity §13 (2019)); *Prince v. Pac. Gas & Elec. Co.*, 45 Cal. 4th 1151, 1158, 202 P.3d 1115, 1120 (2009) ("Express indemnity generally is not subject to equitable considerations or a joint legal obligation to the injured party; rather, it is enforced in accordance with the terms of the contracting parties' agreement.").

Even full oral disclosure would not defeat this express indemnification obligation, much less a third party's allegation concerning what the carrier supposedly should have known without shipper

disclosure; the requirement for shipper indemnification absent "full written disclosure" by the shipper was clearly intended to cut off any such factual disputes. Keach's view that the Uniform BOL should be construed to contain an implied exception based on the carrier's alleged knowledge finds no support in the provision itself or any case law, and would run counter to the purpose of requiring indemnification absent "full written disclosure."

Second, Keach's opposition does nothing to demonstrate that CP actually knew, as opposed to allegedly having constructive knowledge, that WFS's representation as to the oil's packing group was incorrect. It cannot be disputed that even if Keach were correct that MSDSs for other oil or shipments are relevant to what the packing group of this particular oil in this particular shipment was, the testimony of Eli Jasso (who completed the BOL on WFS's behalf) as well as the classification of Bakken oil on some truck tickets for Bakken oil demonstrate that the oil on various occasions was described as Packing Group III. *See* Reply to Pl's SMF at ¶ 57. *See also* ECF 588 (Hemming Dec.) at Ex. 17 (Jasso Dep. at 38:4-8 (testifying that 40-50 percent of the trucking tickets showed Packing Group III)); *Id.* at 68:12-23 (Jasso testimony that "it was standard protocol" to ship Bakken crude oil as Packing Group III" in June 2013); Hemming Supp. Dec. at Ex. 116 (CP's responses to discovery indicating that other shippers were classifying crude oil as Packing Group III).

Third, Keach's argument disregards Judge Levy's express finding that WFS's indemnification obligation under the UBL applies. Keach presumably made all the same arguments to Judge Levy, and they were categorically rejected.

As to the indemnification provisions of CP's Tariffs, Keach argues that the indemnification applies only to "mechanical defects in, or failure of, Private Equipment" and that the Court should find there was no such problem because "CP's stated position in its MSJ is that the Derailment was ***not*** caused by a defect in or mechanical failure of any of World Fuel's private equipment; rather, it

was solely caused by MMA's employee." ECF 598 (Opp. Br.) at 84; (emphasis original). There are at least three major flaws in this argument as well.

First, Tariff 6's requirements extend well beyond mechanical defects in or failure of Private Equipment. As Judge Levy noted, Item 20 of Tariff 6 requires WFS to comply with the terms of "all other CP tariffs and applicable laws," including provisions dealing with proper classification of crude oil. *See Wheeling*, 606 B.R. at 6, citing CP Tariff 6 ("At all times when Private Equipment owned, leased or provided by, or on behalf of, Shipper are used on CP, Shipper shall be responsible for ensuring that the Private Equipment ... comply with all applicable tariffs."); *id.*, citing CP Tariff 8, Item 20 ("Shippers are responsible for product classification and selection of packaging in accordance with legal requirements."); *id.*, citing CP Tariff 8, Item 21 ("Hazardous Commodities shall be properly marked, labelled and placarded by Customer as required by the Dangerous Goods Laws.").

Second, if CP is correct that the only proximate cause of the Derailment and resulting damage is, as Judge Wilson has already found in the North Dakota Carmack litigation, MMA's fault, then there will be no basis on which to find CP liable in the instant action. The Judgment Reduction Provision prong of CP's summary judgment motion, however, is based on the fact that if liability were to be imposed on CP, any such liability would necessarily be eliminated by the indemnification credit to which CP is entitled.

Third, as Keach does with respect to the effect of the Uniform BOL, he also ignores the ruling of Judge Levy concerning the contractual indemnification required of WFS by CP's Tariffs. Keach implicitly contends that Judge Levy's decision concerning the applicability of CP's Tariffs is irrelevant and argues that the applicability of the Tariffs to the shipment "has already been decided against [CP's position] by this Court in the Wheeling Adversary Proceeding and the District of North Dakota in the Whatley case." ECF 598 (Opp. Br.) at 84. The Bankruptcy Court's decision concerning WFS's indemnification obligations in *Wheeling*, however, was – as Keach is well aware – rejected by Judge

Levy on appeal. Similarly, Keach relies on a decision in *Whatley* even though a subsequent decision in that case specifically held that the terms of the Uniform BOL applied to the shipment. *See Whatley v. Canadian Pac. Ry. Ltd.*, 2020 WL 8268878, at *4 (D.N.D. Aug. 6, 2020). And on a motion for reconsideration, the *Whatley* court reaffirmed its conclusion, citing Judge Levy's decision in *Wheeling* for support. *Whatley*, D.N.D. Docket No. 16-cv-00074, ECF 278 (Dec. 10, 2020).

Even though Judge Levy's decision was affirmed by the First Circuit without reaching the indemnification issue, the district court decision is nonetheless binding on this court as a matter of stare decisis. Unless and until Judge Levy's decision that World Fuel was required to indemnify the railroads for any liability due to its misclassification is reversed, that decision is binding on the Bankruptcy Court. *United States v. Cardales-Luna*, 632 F.3d 731, 734–36 (1st Cir. 2011) (applying stare decisis to conclusion reached in prior case involving same evidence); *Drive Fin. Servs., L.P. v. Jordan*, 521 F.3d 343, 349 (5th Cir. 2008) ("[W]hen a future case presents the same facts as a past case decided by a higher court[,] stare decisis requires that we decide those cases in a similar manner."); *Briley v. City of Trenton*, 164 F.R.D. 26, 29 (D. N.J. 1995) (where "the Supreme Court declined to rule with respect to [a certain issue in reviewing a Third Circuit decision], the doctrine of stare decisis compels this Court to apply the Third Circuit's ... standard to [that issue]"). There is in any event no doubt that Judge Levy, when presented with the same arguments by the same party, would come to the same conclusion concerning indemnification obligations of WFS as he did the previous time Keach argued against such obligations.

Keach's position that the Judgment Reduction Provisions cannot be the basis for a pre-judgment dispositive motion because they require an actual judgment to take effect ECF 598 (Opp. Br.) at 83, makes no sense, either as a matter of construction or the judicial policy in favor of expeditious resolution of litigation in an efficient manner that conserves the resources of the parties and the court. In fact, section 66, subsections (a) and (b), of the Confirmation Order makes clear that

CP can "provide notice of this Order to any Trial Court hearing a Derailment-Related Cause of Action *at any point*, and "*raise any issues, claims or defenses regarding the Judgment Reduction Amount*, including, without limitation, the contractual liability and/or relative or comparative fault of any Person, including any Released Party, in any court or tribunal hearing any Derailment-Related Cause of Action *in accordance with applicable law or procedure.*" *In re: Montreal, Maine & Atlantic Ry, Ltd.* D. Me. Docket No. 15-cv-00329-JDL, ECF 1 (Order Confirming Trustee's Revised First Amended Plan of Liquidation Dated July 15, 2015 and Authorizing and Directing Certain Actions in Connection Therewith) (emphasis added.) Under this section of the Judgment Reduction Provisions, CP is entitled to bring up their effect "at any point" and raise "any issues" concerning the provisions "in accordance with applicable law or procedure" – including the law or procedure governing summary judgment motions.

Because the effect of the Judgment Reduction Provision on any judgment against CP based on misclassification of the cargo's packing group is clear, there is no need to require a trial on the issue any more than if there were other matters that are normally fact questions decided at trial but which are clear and thus ripe for decision at the summary judgment stage. Pursuant to the Judgment Reduction Provision of MMAR's Confirmation Order, no judgment can be entered against CP. And if any such judgment were entered, the amount of that judgment would have to be reduced to zero.

Finally, Keach takes issue with CP's failure to provide all of its Tariffs, including Tariff 1, which Keach claims is inconsistent with CP's view that it is entitled to indemnification. While CP disagrees it should have submitted Tariffs on which it was not relying in its motion, it is filed contemporaneously herewith, a full set of the Tariffs in effect at the time of the shipment in question. *See* Hemming Supp. Dec. at Exs. 105, 138-146. Tariff 1, however, is not inconsistent with CP's position that it is entitled to indemnification from WFS. The portion of this Tariff, as quoted by Keach, provides that CP can be held liable for its own negligence under certain circumstances, but this does not refer to or diminish in any way the indemnification obligation of the shipper when such

liability is imposed. Indeed, absent the imposition of liability upon CP, there would be no need for

indemnification. *See, e.g., Beazer E., Inc. v. Mead Corp.*, 34 F.3d 206, 210–11 (3d Cir. 1994) (finding that

a party liable under CERCLA is not barred from obtaining contractual indemnification against such

liability); *Jones-Hamilton Co. v. Beazer Materials & Services, Inc.*, 959 F.2d 126, 129 (9th Cir. 1992) (statutory

prohibition in CERCLA barring agreements that release a party from liability does not preclude the

liable party from obtaining full contractual indemnification).

In addition, Tariff 1, Item 200 ¶ 11(f) specifically provides that CP shall have *no liability* for

litigation like the instant one, which seeks lost revenues or profits:

> In no event shall CP be liable for any indirect or consequential damages, including
> without limitation, loss or revenue or profits which are based upon, arise out of or are
> connected with the transportation of commodities or anything done or maintained
> hereunder or anything not done or maintained as required hereunder, even if such
> damages were foreseeable.

Hemming Supp. Dec. at Ex. 105 (CP Tariff 1). Similarly, Tariff 1, Item 200 ¶ 11(j) provides that "[i]n

no event shall the Carrier(s) be liable to the claimant for any indirect, consequential, punitive or special

damages or legal fees." And Tariff 1, Item 200 ¶ 11(u) provides that CP will not be liable except

"where CP's intentional act or omission or gross negligence or simple negligence is the direct and

proximate cause of injury." Under no characterization of the facts here could CP's failure to identify

WFS's misclassification of the cargo be considered the "direct and proximate cause" of injuries

incurred as a result of MMAC's leaving the train unattended on an incline outside the town of Lac-

Megantic without applying the requisite number of handbrakes.

In short, even if a Tariff provision dealing with CP liability for its own negligence, rather than

indemnification by the shipper, were relevant, the Tariffs clearly prohibit any such liability with respect

to the claims at issue here.

Moreover, portions of Tariff 1 not quoted by Keach similarly impose obligations on the

shipper to accurately classify the contents of the cargo and indemnify CP for any such representations.

*See, e.g.*, Tariff 1, Item 200 ¶ 4 ("*Customer represents and warrants to the Carriers that the Commodity(ies),*the

packaging thereof, the loading and unloading thereof, and all other obligations of Customer under the

Contract *have been and will be performed in accordance with all applicable provincial, federal, state or local laws,*

*regulations, decisions, orders, tariffs, and schedules as well as customer responsibilities as detailed in this tariff and*

*associated tariffs.*") (emphasis added); *id.* ¶ 9 ("If any Hazardous Commodities (loaded or residue) are

transported, *Customer represents and warrants to the Carriers that such Commodities are in compliance with all terms*

*listed in CP's Tariff 8 Hazardous Commodities.* Any application of Hazardous Commodities to CP

Equipment or shipment not in compliance will be deemed unsafe and unauthorized. subject to

applicable fees.") (emphasis added).

## VI.   KEACH'S NEGLIGENCE CLAIM IS BARRED UNDER MAINE'S COMPARATIVE FAULT ACT BECAUSE MMA'S NEGLIGENCE EXCEEDED ANY ALLEGED NEGLIGENCE BY CP[15]

Even if CP's alleged negligence was a proximate cause in addition to MMA's negligence and

that MMA's negligence did not break the causal chain between CP's alleged negligence and the

Derailment, Keach's negligence claim should still be barred by Maine's comparative negligence statute

because it is beyond dispute that MMA's negligence exceeds any alleged negligence on the part of CP.

Under Maine law, "where a claimant is found to be equally at fault by the jury, the claimant may not

recover." 14 M.R.S.A. § 156. Although the statute specifically references a jury finding, Maine courts

expressly permit a court to make a finding on comparative fault at the liability stage. *See, e.g., Amica*

*Mut. Ins. Co. v. Estate of Esther Pecci*, 953 A.2d 369 (Me. 2008) (*Levy, J.*) (affirming summary judgment

in favor of defendant on basis of application of Maine Act); *Page v. Amtrak, Inc.*, 168 F. Supp. 3d 337,

346 (D. Me. 2016) (same). Keach fails to address these cases in his opposition brief.

---

[15] A number of the negligent acts and omissions referenced in this section were by MMAC. To the extent the Court finds that Keach, on behalf of MMAR, has standing to bring a claim for injuries occurring directly by MMAC rather than MMAR (*see supra*, Section II), negligence by MMAC should be viewed as part of the Court's analysis under Maine's Comparative Fault Act, and such negligence bars Keach's claim.

Keach cites to a single case to argue that comparative negligence is "a matter exclusively for the judgment of the jury." ECF 598 (Opp. Br.) at 53 (relying on Simmons, *Maine Tort Law*, § 17.01, which quotes *Lyman v. Bourgque*, 374 A.2d 588 (Me. 1977)). *Lyman* is distinguishable. In reversing an order granting a directed verdict, the Maine Supreme Court found, on the evidence presented by plaintiff, that "it was not possible to say as a matter of law that the plaintiff's causal negligence, if any, was equal to or greater than the defendant's, if any." *Id.* at 590. *Lyman* does not foreclose the possibility that a court is permitted to find, as a matter of law, that a plaintiff's negligence was equal or greater to the defendant's, as Keach argues. Rather, the *Lyman* court simply found, on the record before it, comparative negligence was a jury question.

There are scenarios where it "may be proper to hold as a matter of law that the plaintiff's negligence was equal to our greater than the defendant's." *Peair v. Home Ass'n. of Enola Legion No. 751*, 430 A.2d 665, 669 (Pa. Super. Ct. 1981); *see also Peters v. Chicago, M., St. P. & P. R. R.,* 283 N.W. 803, 804 (Wis. 1939) ("Where, however, it appears that the negligence of the plaintiff is as a matter of law greater than that of the defendant, it is not only within the power of the court but it is the duty of the court to so hold."); *Gagnier v. Bendixen*, 439 F.2d 57, 63 (8th Cir. 1971) (finding that the railroad's negligence, if any, "was of much less serious character" and "the negligence on the part of the railroad cannot be deemed to be greater than that of the decedent's as the proximate cause of the accident."). The present case is one of those rare scenarios.

Keach has admitted, in an understatement, that MMA was "likely contributorily negligent." *Wheeling & Lake Erie Ry. Co. v. Keach*, No. 1:18-CV-00262-JDL, 2019 WL 2518109 at *11 (D. Me. Jun. 18, 2019). It is beyond dispute that MMA's acts and omissions the night of July 5, 2013, were negligent and that they caused the Derailment. Moreover, a comparison of CP's *alleged* negligence to the multiple undisputed and *admitted* negligent acts and omissions of MMA makes clear that this is precisely the type of case where a court could grant summary judgment under Maine's Comparative Fault Act.

| **Alleged CP negligence** | **Undisputed MMA negligence** |
|---|---|
| • CP allegedly breached a duty to identify WFS's misclassification and stop the Train pending obtaining confirmation from the consignor of correctness of the packing group classification. | • MMA did not ensure all its employees were familiar with new operating bulletins. SMF Response at ¶ 79. |
| • CP did not advise MMA regarding the "true nature" of the crude oil. | • MMA's "rules, supplements, and general operating instructions were organized in multiple documents, which made it difficult to refer to those documents and increased the risk of misinterpreting rules." *Id.* at ¶ 80. |
| | • MMA was not adequately testing its employees to confirm their compliance with CROR 112. *Id.* at ¶ 81. |
| | • When CROR 112 tests were performed, "MMA managers usually only ensured that the required number of handbrakes had been applied" and "managers seldom checked that a proper handbrake effectiveness test was conducted," and "[t]herefore, MMA's oversight of equipment securement rules and procedures did not effectively ensure that crews properly verified that the handbrake retarding force was sufficient to hold a train." *Id.* at ¶ 82. |
| | • MMA's employee oversight program was not effective in identifying the unsafe train securement practices being used in the Lac-Megantic area. *Id.* at ¶ 83. |
| | • MMA (Harding) parked the Train on a descending grade. *Id.* at ¶¶ 31, 33-34, 37, 75. |
| | • MMA (Harding) failed to conduct a required handbrake efficiency test. *Id.* at ¶¶ 42-47 . |
| | • MMA relied on a malfunctioning locomotive that ultimately caught fire (due to a non-standard MMA repair on |

the engine) to provide braking support. *Id.* at ¶ 52.

- MMA (Harding) failed to return to the Train to apply additional handbrakes or start another locomotive after being advised that the lead locomotive had been shut down due to the fire. *Id.* at ¶¶ 59-61.

- Six MMA employees, including Harding, pled guilty to violating "Rule 112(b) of the Canadian Rail Operating Rules (CROR), in force pursuant to section 19 of the Railway Safety (RSA), R.S.C. (1985), c 32 (4th Supp.), by omitting, after applying handbrakes, to ensure that a sufficient retarding force was present to prevent the equipment from moving…" in the Court of Quebec, Criminal and Penal Division. *Id.* at ¶ 67.

- In addition to the admittedly negligent acts identified above, MMA, like CP, did not identify or correct WFS's misclassification.

*See also* ECF 591 (Br.) at 46-47 (list of MMA's negligent and criminal conduct). As demonstrated above, given the facts of this case, this Court could easily find that Keach may not recover because MMA's fault is at least equal to any alleged fault by CP. 14 M.R.S.A. § 156. Stated another way, any "negligence on the part of [CP] cannot be deemed greater than that of [MMA's] as the proximate cause of the Derailment." *Gagnier*, 439 F.2d at 63. Accordingly, because MMA was at least equally or more at fault than CP, Keach's claim is barred by the Maine Act and CP is entitled to judgment as a matter of law.

**VII.   KEACH'S NEGLIGENT MISREPRESENTATION CLAIM FAILS BECAUSE MMA DID NOT RELY ON THE ALLEGED MISREPRESENTATION TO ITS DETRIMENT**

For Keach to survive summary judgment on his negligent misrepresentation claim, Keach must demonstrate that there are genuine issues of material fact as to whether MMA relied upon a false representation to its pecuniary detriment. *See Perry v. H.O. Perry & Son. Co.*, 711 A.2d 1303, 1305 (Me. 1989). There is no basis for a negligent misrepresentation claim where the record is "devoid of any evidence of detrimental reliance." *MacDonnell v. Maine Med. Ctr.*, 2003 WL 21957088 (Me Super. Ct. July 29, 2003). *See also Perry*, 711 A.2d at 1305 (granting summary judgment where plaintiff did not detrimentally rely on statements made by the defendant). Because Keach's opposition presents no evidence of detrimental reliance, CP is entitled to summary judgment on the negligent misrepresentation claim.

Keach claims that CP "supplied false information to MMAR in the Bill of Lading for guidance in MMA's business transactions." ECF 230 (Third Am. Compl.) at ¶ 112. According to Keach, MMA justifiably relied on the information contained in the BOL and that but for the negligent misrepresentations, MMA would have declined to contract with CP, would have halted the shipment, or would have taken steps that would have prevented the Derailment. *Id.* at ¶¶ 115-116. That is not what the undisputed record evidence demonstrates.

Grindrod specifically testified that packing group "*on its own*" would not have changed how MMA operated the train. ECF 587 (SMF) ¶ 116; *see also* ECF 388 (Hemming Dec.) at Ex. 29 (Grindrod Dep. at 118:14-121:1). Packing group designation, which is the only alleged misrepresentation Keach attributes to CP, was not relevant to Grindrod because he allegedly believed the oil was like road tar and that it was not flammable regardless of packing group. ECF 587 (SMF) at ¶ 117. Accordingly, there are no genuine issues of material fact as to whether MMA relied on an alleged packing group

misrepresentation to its detriment and CP is entitled to judgment as a matter of law on Keach's negligent misrepresentation claim.

## VIII.   THE ECONOMIC LOSS DOCTRINE BARS KEACH'S NEGLIGENCE AND NEGLIGENT MISREPRESENTATION CLAIMS

Keach misrepresents this Court's prior rulings by asserting that CP's economic-loss-doctrine argument is "zombie-like" and was "previously rejected." ECF 598 (Opp. Br.) at 1 n.1. To the contrary, in the Court's July 7, 2017 Memorandum of Decision, which denied CP's motion to dismiss Keach's negligence and negligent misrepresentation claims, the Court did not address the merits of CP's economic-loss-doctrine argument because it did "not know at this time whether Maine, Delaware or … North Dakota law will control this analysis." ECF 285 at 15-16. In fact, the Court explicitly held that its "denial of the Motion to dismiss on [CP's economic-loss-doctrine argument] is *obviously without prejudice* to CP and Soo Line's rights to file a similar motion or a motion for summary judgment as the case moves forward and the choice of law becomes clearer and the facts crystalize." *Id.* at 16-17 (emphasis added).

Keach also argues that the Court should reject CP's argument because: (1) federal courts are limited to making "an informed prophecy" on "'interstitial questions' of state law," and cannot "create new rules or significantly expand existing rules"; and (2) Maine's economic loss doctrine "is limited to product liability or professional services claims where the sole injury is to a product itself and the plaintiff otherwise had available to it actual or potential contract and warranty claims." ECF 598 (Opp. Br.) at 2-3; *see also id.* at 72-73, 79. As detailed below, however, courts in the District of Maine – including decisions issued after this Court's initial rejection of CP's motion to dismiss – regularly determine whether Maine's economic loss doctrine applies to various circumstances, and such precedent demonstrates that Maine's economic loss doctrine should apply to Keach's tort claims in this case. Because Keach only seeks economic losses, unaccompanied by personal injury or damage to other property, the Court should dismiss Keach's tort claims with prejudice.

A.    **The Application of Maine's Economic Loss Doctrine to These Facts is a
Interstitial Question Properly Before the Court**

Keach contends that because Maine has not applied the economic loss doctrine to a case "involving tort claims by one rail carrier against another arising out of a catastrophic train derailment that caused extensive loss-of-life, property damage, environmental contamination and destruction of the plaintiff's business, … CP's argument seeks an unprecedented, transformational, expansion of the economic loss doctrine" that the Court should reject.  ECF 598 (Opp. Br.) at 72-73.  According to Keach, CP's argument would significantly expand Maine's economic loss doctrine and does not present an "interstitial question" of Maine law upon which the Court can make an "informed prophecy." *Id.*; *see also id.* at 79.  For the reasons set forth below, because CP's argument presents an "interstitial question" relating to the scope of Maine's economic loss doctrine, the Court can, and must, make an "informed prophecy" on the application of the economic loss doctrine to these circumstances.

As an initial matter, Keach is correct that a federal court considering state law claims "must apply the state's law on substantive issues and [is] 'bound by the teaching of the state's highest court.'" *Phoung Luc v. Wyndham Mgmt. Corp.*, 496 F.3d 85, 88 (1st Cir. 2007) (quotation omitted).  "In the absence of applicable Maine common law, one must look to persuasive precedent from other states to determine whether an 'informed prophecy' can be made about the rule Maine's highest court would adopt under the circumstances." *Ursa Major Underground, Inc. v. Liberty Mut. Ins. Co.*, 1:14-CV-00162-DBH, 2015 WL 9596001, at *6 (D. Me. Nov. 19, 2015) (citing *Phoung Luc*, 496 F.3d at 88); *see also Taupier v. Davol, Inc.*, 490 F. Supp. 3d 430, 441–42 (D. Mass. 2020) (quoting *Brochu v. Ortho Pharm. Corp.*, 642 F.2d 652, 655 (1st Cir. 1981) (stating that in making its "informed prophecy" on how Maine's Law Court would rule, courts "'consider the decisions of other state and federal courts and the general weight of the authority.'")); *Musto v. Liberty Ins. Corp.*, 1:20-CV-00188-GZS, 2021 WL 5501765, at *7 (D. Me. Nov. 21, 2021) (relying on *Couch on Insurance* and making "'an informed prophecy' that the

Law Court would do the same."). Contrary to Keach's unsupported contentions, CP does not ask the Court to "significantly expand" the economic loss doctrine or create a new rule; instead, CP's argument presents an "interstitial question" of whether Maine's economic loss doctrine, as set forth in *Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors, Inc.*, 659 A.2d 267 (Me. 1995) ("*Peachtree*") should apply to this case and bar Keach's tort claims, which seek mere economic losses.

As CP's opening brief states, since the Maine Law Court issued the 1995 *Peachtree* opinion, that particular court has not issued further guidance on the scope of the economic loss doctrine. ECF 591 (Br.) at 59. Nevertheless, federal courts and Maine's Superior Courts have not hesitated to do exactly what Keach contends the Court should not do here — "extrapolate from the *Peachtree* decision … how or whether it applies to other circumstances." *Fletch's Sandblasting & Painting, Inc. v. Fay, Spofford, & Thorndike LLC*, 2:15-CV-76-DBH, 2019 WL 847731, at *2 (D. Me. Feb. 21, 2019). When confronted with questions as to the scope of Maine's economic loss doctrine, these courts have determined that the doctrine applies to "more than a physical product," including service contracts, and that privity of contract between the parties is not necessary. *See generally id.* In other words, CP's economic-loss-doctrine argument does not ask the Court to significantly expand Maine's economic loss doctrine or create any new rules; rather, CP merely asks the Court to do what it has done before and "extrapolate from the *Peachtree* decision … whether it applies" to Keach's claims, which seek mere economic losses unaccompanied by personal injury or damage to other property. Because it is well-established that it is proper for the Court to consider *Peachtree*, along with precedent from other states, to determine whether Maine's economic loss doctrine should apply to the circumstance of this case, and such authority demonstrates that Maine's economic loss doctrine bars Keach's claims, the Court should grant CP's motion.[16]

---

[16] *See Am. Aerial Services, Inc. v. Terex USA, LLC*, 39 F. Supp. 3d 95, 111–12 (D. Me. 2014) (extending Maine's "economic loss doctrine to claims for fraudulent misrepresentation by a seller to a buyer

**B.    Maine's Economic Loss Doctrine Bars Keach's Tort Claims, Which Seek Mere
Economic Losses Based on WFS's Statements in the BOL**

Keach argues that the Court should reject CP's argument because Maine's economic loss
doctrine "is limited to product liability or professional services claims where the sole injury is to a
product itself and the plaintiff otherwise had available to it actual or potential contract and warranty
claims." ECF 598 (Opp. Br.) at 2-3; *see also id.* at 72-73. As set forth above, Keach is wrong; Maine
courts look to *Peachtree* and other persuasive authority to determine whether Maine's economic loss
doctrine applies to the circumstances raised in each case. In addition, Maine courts have applied the
economic loss doctrine in multiple circumstances, including to various service contracts,[17] cases in
which the parties were not in privity,[18] and claims for which the plaintiffs sought damages for
economic losses not limited to the injury to the product itself.[19]

As set forth in CP's opening brief, the operative facts of this case are nearly identical to those
in *Fletch's Sandblasting*, which should control this case and produce the same result—the dismissal of
tort claims pursuant to Maine's economic loss doctrine. Again, in *Fletch's Sandblasting*, the plaintiff, a

---

where the misrepresentation concerns the quality of the goods or product promised in the sales
contract.")

[17] For instance, the District of Maine has applied the economic loss doctrine to, among other things,
claims relating to service contracts for boat construction, construction and installation of a pipeline,
providing an environmental site assessment, and design and engineering services. *See Fletch's
Sandblasting*, 2019 WL 847731 (contract for design and engineering services); *Gannett v. Pettegrow*, CIV-
03-CV-228-B-W, 2005 WL 217036 (D. Me. Jan. 28, 2005), *report and recommendation adopted sub nom.
Gannet v. Pettegrow*, CIV-03-228-B-W, 2005 WL 763276 (D. Me. Feb. 17, 2005) (contract for boat-
building services); *Schmid Pipeline Const., Inc.,* 2014 WL 3600437 (contract for the construction and
installation of a pipeline); *Maine Rubber Int'l,* 298 F. Supp. 2d 133 (contract to provide an environmental
site assessment).

[18] *See Fletch's Sandblasting*, 2019 WL 847731; *Arundel Valley, LLC v. Branch River Plastics, Inc.*, 2014 WL
12880584, at *6 (Me. B.C.D.); *Peachtree,* 659 A.2d at 268.

[19] *See, e.g., Maine Rubber Int'l,* 298 F. Supp. 2d at 134-35 (stating that "Maine Rubber asserts no personal
injuries or property damage, but claims unexpected expenses, and shutdown and relocation costs
because of numerous environmental problems on the site not uncovered by" the defendants); *Fletch's
Sandblasting*, 2019 WL 847731, at *1, 3.

67

subcontractor on a Navy project, sued the defendant, an entity that the Navy hired "to perform the design, engineering, and supervision," alleging that the defendant breached its duty to properly design and engineer the work the plaintiff was hired to perform and misrepresented that the structures were suitable for the plaintiff's work.  2019 WL 847731, at *1.  Based on the foregoing allegations concerning breach of a tort duty, the plaintiff sought to recover for "the substantial time and expense incurred in determining the cause of the" problem, and its "expenses 'in rendering additional services.'"  *Id.*

In finding that the plaintiff's claims were barred by Maine's economic loss doctrine, Judge Hornby recognized that the plaintiff "asserts no personal injury and no damage to other property such as its equipment," acknowledged there was no privity of contract between the plaintiff and defendant, stressed that the plaintiff had "the opportunity to negotiate the terms of its subcontract with the prime contractor and thereby establish its risks and liabilities," recognized that the plaintiff's allegations centered on the defendant's contract with the Navy, and stated that "[*i*]*f the Navy is dissatisfied with what it received, it could sue [the defendant] under the contract but not for a separate tort.*" *Id.* at 2-3 n.5 (emphasis added); *see also Workgroup Tech. Partners, Inc. v. Anthem, Inc.*, 2:15-CV-00002-JAW, 2016 WL 424960, at *19 (D. Me. Feb. 3, 2016) ("for the economic loss doctrine to apply, the dispute must center on the subject of the contract.").  In sum, while the Court recognized that the "dispute is not about a physical product," the Court was "satisfied that the Law Court would apply the [economic loss] doctrine to a design and engineering services contract like the one [the defendant] entered into with the Navy." *Fletch's Sandblasting*, 2019 WL 847731, at *3.

Here, Keach's negligence and negligent misrepresentation claims arise out of the misclassification of the crude oil on the Train.  *See* ECF 230 (Third Am. Compl.) at ¶¶ 9, 68, 99-103, 112-116.  While Keach alleges that CP should have known about the misclassification, it is undisputed that WFS inputted the BOL information for the Train certifying that the petroleum crude oil offered

for transport was Packing Group III, and that WFS, as the shipper, was responsible for the crude oil

classification.[20] *See* ECF 587 (SMF) ¶¶ 21-26; *see also* ECF 588-1 at 53; ECF 588 (Hemming Dec.) at

Ex. 17 (Jasso Dep. at 17:13-19:1). Because of this, in *Wheeling & Lake Erie Railway Co. v. Keach*, Judge

Levy "conclude[d] that MMA was entitled to indemnification under the terms of … the BOL," which

is "'a contract that binds the shipper and all of the carriers involved in the shipment—not just the

originating carrier.'" 606 B.R. 1, 6, 10, 12 (D. Me. 2019) (quotation omitted).[21] Judge Levy's decision

demonstrates that Keach's claims, if there were any, which there are not, would have been grounded

in contract (notably against WFS), not tort, and are barred by the economic loss doctrine. *See CSX*

*Transp., Inc. v. Meserole St. Recycling*, 618 F. Supp. 2d 753, 774-75 (W.D. Mich. 2009).[22]

Keach does not dispute that his claims seek only economic losses, not damages related to

personal injuries or damages to other property (such claims are being pursued by other plaintiffs in

other venues). *See* ECF 598 (Opp. Br.) at 64 (stating that Keach "seeks to recover (i) the difference

between MMA's "Enterprise Value" just prior to the Derailment and thereafter less the amount

recovered by the sale of MMA's and MMA Canada's assets in the Court-approved sale; plus (ii) the

---

[20] WFS employee Eli Jasso "declared that the contents of this consignment are fully and accurately described by proper shipping name(s) and are classified, packaged, marked, and labeled/placarded, and are in all respects proper condition for transport according to applicable international and national government regulations." ECF 588 (Hemming Dec.) at Ex. 16 at 7; *see also* ECF 587 (SMF) at ¶¶ 26-27.

[21] Keach repeatedly argues that the Court should not apply the economic loss doctrine in this case because "absent his claims for negligence and negligent misrepresentation, the Estate Representative has no claims at all against CP in this case." ECF 598 (Opp. Br.) at 79. The fact that Keach would not have any claims remaining against CP is no different than the plaintiff's claims being dismissed in *Fletch's Sandblasting*.

[22] In *Meserole Street Recycling*, the Western District of Michigan addressed tort claims brought by two carriers against the shipper for misrepresenting the nature of the cargo. 618 F. Supp. 2d at 774. In dismissing the tort claims based on the economic loss doctrine, the court held that since the carriers' tort claims "are premised on statements contained on the face of the bills of lading—namely, the shippers' representations that the cargo shipped was [accurately described]"—the economic loss doctrine barred tort recovery. *Id.* at 774-75.

amount of unrecovered expenses incurred in MMA's Chapter 11 Case, including repayment of the debtor-in-possession loan used to fund MMA's operations and professional fees."); *see Peachtree*, 659 A.2d at 270 n.4 (quoting *Moorman Mfg. Co. v. Nat'l Tank Co.* 435 N.E.2d 443, 449 (Ill. 1982) (stating that Maine was adopting the "majority approach," which requires personal injury or property damage to recover economic losses in tort, and defining "economic loss" as "'damages for inadequate value, costs of repair and replacement of defective product, or *consequent loss of profits—without any claim of personal injury or damage to other property*.'") (emphasis added). In other words, like the plaintiff in *Fletch's Sandblasting*, Keach's negligence and negligent misrepresentation claims do not seek any damages for personal injury or damage to other property and are therefore barred by the economic loss doctrine. *See Fletch's Sandblasting*, 2019 WL 847731, at *3; *see also Peachtree*, 659 A.2d at 270 (recognizing that the "majority of jurisdictions require some property damage or personal injury in order to recover for economic loss," and stating that "*we agree with the majority approach*.") (emphasis added); *Maine Rubber Int'l v. Envtl. Mgmt. Group, Inc.*, 298 F. Supp. 2d 133, 134–35 (D. Me. 2004) (dismissing claims pursuant to the economic loss doctrine and stating that the plaintiff "asserts no personal injuries or property damage").

Ultimately, like the plaintiff in *Fletch's Sandblasting*, Keach's allegations and claims center on a contract, the BOL, which was a contract between the carriers (MMA and CP) and the shipper (WFS) to transport crude oil that a carrier (CP or MAA) agreed to ship. In addition, like other cases in which Maine's economic loss doctrine has applied, MMA was a sophisticated company that had the opportunity to negotiate contracts[23] (including its contracts with CP) "and thereby establish its risks and liabilities." 2019 WL 847731, at *3; *see also Redzone Wireless, LLC v. NETGEAR, Inc.*, 2:16-CV-

---

[23] As set forth in CP's opening brief, CP and MMA negotiated and entered into a number of long-term agreements that applied to the Train and the Derailment, detailed the parties' rights and obligations, and allocated the risks and liabilities between CP and MMA. *See* ECF 587 (SMF) ¶¶ 17-18; ECF 588 (Hemming Dec.) at Exs. 11-13.

00595-JDL, 2019 WL 10255541, at *8 (D. Me. Sept. 20, 2019) ("[T]he economic loss doctrine protects parties' abilities to allocate risk by mutual agreement and thereby form reliable expectations about their potential financial exposure with respect to the duties and liabilities that they have contractually assumed."); *Maine Rubber Int'l*, 298 F. Supp. 2d at 137–38 (applying the economic loss doctrine and noting that "[t]hese were two commercial entities able to bargain over the terms of their agreement, and they entered into a written contract to govern their relationship."); *Schmid Pipeline Const., Inc. v. Summit Nat. Gas of Maine, Inc.*, 1:13-CV-464-GZS, 2014 WL 3600437, at *4 (D. Me. July 22, 2014) (same); *Koken v. Auburn Mfg., Inc.*, CIV. 02-83B-C, 2004 WL 1877808, at *14 (D. Me. Aug. 20, 2004) (stating that a principal rationale of the economic loss doctrine is that commercial entities "recognize and allocate, or should recognize and allocate, the risk of economic loss and often, as here, require that one or more party to the contract procure insurance to guard against such losses.")

Again, a fundamental purpose of the economic loss doctrine is to protect the freedom to allocate economic risk by contract. Here, CP and MMA entered into several contracts allocating the parties' economic risks. In addition, pursuant to the BOL—a contract between MMA and WFS—MMA was entitled to indemnification from WFS and already received $110 million in exchange for releasing all of its claims against WFS. Because Keach's claims seek mere economic losses unaccompanied by personal injury or damage to other property, the economic loss doctrine bars Keach's claims and requires that the Court grant CP's motion.

## IX.    <u>A CIRCUITY OF OBLIGATIONS BARS KEACH'S CLAIMS</u>

Keach contends that the Court should reject CP's circuity-of-obligation argument because: (1) the Saint-Jean Operating Agreement's ("Operating Agreement") purpose and scope is limited to MMA's operations on the "CPR Line,"[24] not claims arising from the Derailment, which did not occur

---

[24] "CPR Line" is defined as a "line of railroad in the Province of Quebec at Saint-Jean, Quebec extending westward from … Milepost 20.0 … to Milepost 21.97." ECF 588-4 at 1.

on the CPR Line; and (2) the purpose and scope of the Operating Agreement is ambiguous and presents a fact issue on whether the Operating Agreement's terms applied to the Derailment.[25]  ECF 598 (Opp. Br.) at 80-82.  As set forth below, however, the plain and unambiguous terms of the Operating Agreement demonstrate that MMAC's obligation to indemnify CP for its failure to comply with all applicable laws governing the transportation of hazardous materials is not limited to claims arising solely from MMAC's operations on CP's Line.  In addition, Keach does not dispute that other provisions in the parties' agreements, including the Interchange Trackage Rights Agreement ("Interchange Agreement," which is Schedule F to the Master Agreement), require MMAC to indemnify CP for all claims arising from the Derailment—including Keach's claims.  For the reasons set forth below, the Court should grant CP's motion and dismiss Keach's claims with prejudice.

A.      **The Operating Agreement Requires MMAC to Indemnify CP against Keach's Claims**[26]

As stated above, Keach contends that MMAC is not required to indemnify CP for claims arising from MMA's failure to comply with all laws, rules and regulations governing the transportation of hazardous materials, as set forth in Sections 10.1 and 10.3 of the Operating Agreement, because the Operating Agreement's scope is limited to MMAC's operations on the CPR Line, not where the Derailment occurred.  As Keach concedes, while the Master Agreement, Operating Agreement, and Interchange Agreement are governed by Quebec law, "'the court must apply the plain terms of the

---

[25] Keach also asserts that CP's argument should be rejected because the Operating Agreement contains an "integration clause, which expressly confines its scope 'to the subject matter hereof and the transactions contemplated hereby.'" ECF 598 (Opp. Br.) at 81. As explained below, however, in December 2002, CP, MMAR, and MMAC entered into a Master Agreement that incorporated various Schedules, including the Operating Agreement (Schedule J). ECF 588-3 § 22.1.  As such, the Master Agreement and all its Schedules, including the Operating Agreement, determines the scope of the parties' rights and obligations.

[26] This section addresses the contractual indemnification obligation owed by MMAC to CP.  To the extent the Court finds that Keach, on behalf of MMAR, has standing to bring a claim for injuries occurring directly by MMAC rather than MMAR (*see supra*, Section II), MMAC's contractual obligations should be viewed as part of the Court's analysis and bar Keach's claim.

contract so long as they are clear.'" ECF 598 (Opp. Br.) at 80-81 (quoting *Foodmark, Inc. v. Alasko Frozen Foods, Inc.*, No. 12-10837, 2013 WL 1285539, at *3 (D. Mass. Mar. 26, 2013)).  As explained below, however, while one purpose of the Operating Agreement relates to the service of rail customers on the CPR Line (as Keach points out), the plain language of Section 10.1 demonstrates it is not limited to MMAC's operations on the CPR Line.[27]

As stated in CP's opening brief, in December 2002, CP, MMAR, and MMAC entered into a Master Agreement that broadly speaking governed the parties' relationship from a contractual standpoint.  ECF 587 (SMF) at ¶ 17; ECF 588-3.  The parties entered into the Master Agreement "to pursue mutual long-term benefits" and agreed to: "(a) establish and maintain divisions over Saint Jean Quebec and physically interchange cars at [CP's] St. Luc Yard; (b) develop strategies to increase their interline traffic …; and (c) endeavor to maximize the routing of traffic over CPR lines."  ECF 588-3 at 5; *see also id.* § 1 (stating that the Recital quoted above is "an integral part" of the Master Agreement). In conjunction with the Master Agreement, the parties entered into other agreements, which were "Schedules" to the Master Agreement and "form[ed] an integral part of this [Master] Agreement and remain a part hereof and are incorporated by reference." *Id.* § 22.1.  Accordingly, unless provisions are expressly limited to the Operating Agreement or a particular stretch of railroad, such provisions are incorporated into the Master Agreement and generally apply to CP's and MMAC's business relationship. *See e.g.*, ECF 588-4 § 3.1 (limiting MMAC's obligation to obtain "all necessary permits, certificates and clearances for the operation of its trains *over the CPR Line* prior to operating its trains, engines and cars *onto or over the CPR Line*.") (emphasis added).

---

[27] Keach does not dispute that the "Operating Agreement and the Interchange Agreement were extended at least through April 30, 2014." ECF 587 (SMF) ¶ 19; *see generally* ECF 598 (Opp. Br.) at 79-83.  In addition, Keach does not dispute that MMA failed to comply with all laws, rules and regulations governing the transportation of hazardous materials.  *See* ECF 591 (Br.) at 54; *see generally* ECF 598 (Opp. Br.) at 79-83.

Here, Section 10.1's obligation that MMAC "comply with all applicable federal, provincial, municipal and local laws, rules, regulations, and ordinances governing solid waste, hazardous materials and commodities" is not limited to MMAC's operations while on the CPR Line or the Operating Agreement.[28] *See id.* § 10.1. Similarly, the indemnification provision contained in Section 10.3 is not limited to claims arising from MMAC's operations on the CPR Line and unambiguously states that MMAC "shall indemnify and hold [CP] harmless against all resulting claims related to or arising" from MMAC's failure "to comply with or perform its undertakings under Section[] 10.1." *See id.* § 10.3. Because it is uncontested that: (1) MMAC failed to comply with its Section 10.1 obligations, which led to the Derailment; and (2) Keach's claims relate to and arise from the Derailment, Section 10.3 of the Operating Agreement requires MMAC to indemnify CP from the very claim Keach asserts. Under these circumstances, a circuity of obligation exists, which "defeats a plaintiff's claims as a matter of law." *Smith v. Hartman Walsh Painting Co.*, 1:15-CV-94, 2016 WL 11491652, at *5 (D.N.D. Nov. 17, 2016).

In an attempt to avoid the plain and unambiguous terms of the Operating Agreement, Keach also contends that "the purpose and scope of the Saint-Jean Agreement presents a factual issue that must be resolved by testimony and evidence as to the intention of the parties." ECF 598 (Opp. Br.)

---

[28] Contrary to Keach's argument that the terms of the Operating Agreement only apply to MMA's operations on the CPR Line, Section 7.1 of the Operating Agreement requires MMAC and CP to comply with all "laws, regulations and rules respecting the maintenance, operation, condition, inspection, construction and safety of railways." ECF 588-4 § 7.1. And despite the Operating Agreement specifically defining the CPR Line, Section 7.1 is not limited to the CPR Line. *Id.* Moreover, Section 7.1 provides that "[e]ach party shall indemnify … the other party … from and against all fines, penalties and liabilities imposed upon the other party … under such laws, rules and regulations by any public authority or court having jurisdiction when attributed solely to the failure of the first party to comply with this paragraph." *Id.* As discussed, of the eighteen "Findings as to causes and contributing factors" to the Derailment identified by the TSB, fifteen of the causes relate to MMAC's acts and omissions, including its failure to comply with all laws, rules and regulations, as set forth in Section 10.1. *See* ECF 588-1 at Ex. 3 at ¶¶ 129-30 (the other three causes and contributing factors relate to Transport Canada's inadequate oversight of MMAC). No fault of CP was identified as having contributed to the Derailment. *Id.*

at 81.  To support this argument, Keach puts the cart before the horse and relies exclusively on Bob

Grindrod's deposition testimony stating that the Operating Agreement deals with railroad traffic on

the CP Line.  *Id.* at 81-82.  Mr. Grindrod, however, did not testify that MMA's indemnification

obligations were limited to MMAC's operations on the CP Line.  *See generally* ECF 604-7.  Keach also

does not dispute that the Operating Agreement was incorporated into the Master Agreement or that

Section 10.1 and 10.3's plain language require MMAC to indemnify CP.  Finally, Keach does not

identify any provision, word or phrase in the Operating Agreement that is ambiguous.  Accordingly,

because a circuity of obligation exists requiring MMAC to indemnify CP from Keach's claims, the

Court should grant CP's motion and dismiss Keach's claims with prejudice.

> **B.** **Keach does not Dispute that the Interchange Agreement Requires MMAC to Indemnify CP from Keach's Claims**

As set forth in CP's opening memorandum and summarized above, the Master Agreement

and all its Schedules comprehensively governed CP, MMAR, and MMAC's relationship.[29]  In addition

to MMAC's indemnification obligation in Section 10.3 of the Operating Agreement, Keach does not

dispute that other provisions in the parties' agreements require MMAC to indemnify CP against

Keach's claims, thereby presenting the same circuity of obligation that requires the dismissal of

Keach's claims.

---

[29] As stated in Section VIII, a critical rational supporting the economic loss doctrine in the context of commercial transactions and contracts is that "entities recognize and allocate, or *should recognize and allocate*, the risk of economic loss and often, as here, require that one or more party to the contract procure insurance to guard against such losses." *Koken v. Auburn Mfg., Inc.*, CIV. 02-83B-C, 2004 WL 1877808, at *14 (D. Me. Aug. 20, 2004) (emphasis added).  Here, the Master Agreement and its Schedules demonstrates that CP and MMA had the opportunity to negotiate and allocate the risk of various economic losses.  Accordingly, while Keach's claims should be dismissed based on a circuity of obligation, for the reasons set forth in Section VIII, Keach's claims should also be dismissed pursuant to the economic loss doctrine as CP and MMA, two sophisticated commercial parties, exercised their freedom to contract and allocate economic risk.

For instance, to enable MMAC "to deliver to and receive from [CP] loaded and empty freight cars, locomotive and work and inspection equipment at Montreal Terminal pursuant to the terms of this Agreement, the Plastics Haulage Agreement and the Saint-Jean Agreement," CP and MMAC entered into the Interchange Agreement, which granted MMAC the right to operate trains over an extended portion of CP's line. *See* ECF 588-5 § 1.1; *see also* ECF 587 (SMF) at ¶¶ 17-18. Similar to the Operating Agreement, the Interchange Agreement provides:

> 10.1    Without limitation to Section 3.1,[30] for trains, engines, cars and equipment *operated by [MMA] on the Access Tracks*, MMAC will comply with all applicable federal, provincial, municipal and local laws, rules, regulations, and ordinances governing solid waste, hazardous materials and commodities, and air, water, noise and other pollution….

…

> 10.3    *In addition to any allocation of responsibility in Section 7,*[31] if [MMA] fails to comply fully with or perform its undertakings under this Section 10 … [MMA] will indemnify

---

[30] Unlike the Operating Agreement and Section 10 of the Interchange Agreement, Section 3.1 limits its application to operations on the Access Tracks and only requires MMA to indemnify CP if MMA fails comply with all "laws, regulations and rules respecting the operation, condition, inspection and safety of trains, engines, cars and equipment *while such trains,* engines, cars and equipment *are being operated over the Access Tracks.*" ECF 588-5 § 3.1. Contrary to Keach's argument, Section 3.1's explicit limitation to trains "*being operated over the Access Tracks*" demonstrates that the requirements set forth in Sections 10.1 and 10.3 of the Operating Agreement and Interchange Agreement are *not limited* to claims arising only while such trains are "being operated over" the CPR Line or the Access Track, respectively. *See Mason v. Telefunken Semiconductors Am., LLC*, 797 F.3d 33, 42 (1st Cir. 2015) ("'[w]here the same word or phrase might have been used ... in different portions of a [contract] but a different word or phrase having different meaning is used instead, the construction employing that different meaning is to be favored'") (quotation omitted). *Fashion House, Inc. v. K mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989) ("Contract interpretation presents, in the first instance, a question of law, and is therefore the court's responsibility."); *Blackie v. State of Me.*, 75 F.3d 716, 721 (1st Cir. 1996) (quoting *United States Liab. Ins. Co. v. Selman,* 70 F.3d 684, 687 (1st Cir. 1995) ("'questions about the meaning of contractual provisions are questions of law, and we review the district court's answers to them de novo.'")

[31] Like the provisions above, Section 7 of the Interchange Agreement also requires MMAC to indemnify CP against Keach's claims. Specifically, Section 7.1 states that the "apportionment of responsibility for all" damages, which is broadly defined, "*in any manner* originating or occurring upon or *in connection with the use,* operation or maintenance of the Access Tracks, shall be governed by" Section 7. ECF 588-5 § 7.1 (emphasis added). Section 7.2 provides that each party is responsible for all damages and expenses as set forth in Section 7 and "*shall forever indemnify and save harmless the other party* … from and against all liability and claims of whatever kind or nature by reason thereof." *Id.* §

and hold CPR harmless against all resulting claims related to or arising therefrom and all liability, cost, and expense of cleanup.

*Id.* §§ 10.1, 10.3 (emphasis added); *see also* ECF 587 (SMF) at ¶ 18.

It is uncontested that MMAC operated the Train on the Access Tracks and failed to comply with all applicable laws, rules, and regulations governing hazardous materials. *See* SMF Response at ¶¶ 46, 67, 75 (MMAC engineer violated numerous rules in not applying a sufficient number of handbrakes and not conducting a brake effectiveness test; following Derailment, six MMA employees pled guilty to violating Rule 112(b) of the CROR) ECF 588-1 at 26-27. The Access Tracks are those tracks over which MMAC and CP "deliver to and receive" … "traffic to be interchanged" to one another per Section 1.1. Like the Operating Agreement, the Interchange Agreement was incorporated into and formed an "integral part" of the Master Agreement. *See* ECF 588-3 § 22.1. Moreover, as stated in footnote 30, because various provisions of the Interchange Agreement demonstrate the parties' ability and choice to limit MMAC's obligations *while operating* on the Access Tracks (*see* Section 3.1), the plain and unambiguous language of Paragraph 10.1 illustrates the parties' intent that MMAC comply with all laws, rules, and regulations governing hazardous materials for any trains that are—or have been—"operated by [MMA] on the Access Tracks." ECF 588-5 § 10.1. In other words, the indemnity obligation MMAC owed CP applied to traffic interchanged on the Access Tracks. Because MMAC's failure to comply with Section 10.1 requires MMAC to indemnify CP from Keach's claims, another circuity of obligation exists requiring the dismissal of Keach's claims.

---

7.2 (emphasis added). Critically, Section 7.6 states that when any damage "occurs in connection with the separate operations of [MMA], without involvement by [CP], [MMA] shall assume all expense in connection with such Damage. *Id.* § 7.6. As the Court knows, CP interchanged the Train with MMA *on the Access Tracks. See* ECF 588-1 at 26-27. From that point forward, MMAC controlled the Train "in connection with separate operations of" MMA, without involvement by CP. *See id.* at 21-23. Accordingly, because Keach's claims, which are based on the Derailment, occurred in "separate operations of [MMA], without involvement by [CP]," and in connection with MMAC's use of the Access Tracks, Section 7 requires MMAC to indemnify CP against Keach's claims.

X.    **CONCLUSION**

For the foregoing reasons, the Court should grant CP's motion for summary judgment.

Dated:  March 29, 2022

**TAFT STETTINIUS & HOLLISTER LLP**

By: *s/ Paul J. Hemming*
Paul J. Hemming
Stacey L. Drentlaw
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
(612) 977-8400
phemming@taftlaw.com
sdrentlaw@taftlaw.com

**SULLIVAN & CROMWELL LLP**

Mark F. Rosenberg
125 Broad Street
New York, NY  10004
(212) 558-4000

and

**PEARCE, DOW & BURNS, LLP**

*/s/ Aaron P. Burns*
Aaron P. Burns
Two Monument Square, Suite 901
PO Box 108
Portland, Maine 04112-0108
(207) 822-9900 (Tel)
aburns@pearcedow.com

**ATTORNEYS FOR CANADIAN
PACIFIC RAILWAY COMPANY AND
SOO LINE RAILROAD COMPANY**

## Certificate of Service

I certify that I filed the Reply Memorandum in Support of the Defendants' Motion for Summary Judgment, Reply Statement of Material Fact and the Supplemental Declaration of Paul Hemming with the Court using the Court's ECF/CM system, and that to the best of my knowledge, said system caused the foregoing to be served on counsel for the Plaintiff and all other persons who have entered an appearance in this Adversary Proceeding as set forth in the Notice of Electronic Filing on March 29, 2022.

Dated:  March 29, 2022

_/s/ Aaron P. Burns_ _____
Aaron P. Burns