**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>MONTREAL, MAINE &<br>ATLANTIC RAILWAY, LTD.,<br><br>    Debtor, | Bk. No. 13-10670<br>Chapter 11 |
| ROBERT J. KEACH, solely in his capacity as<br>the estate representative of the post-effective<br>date estate of MONTREAL, MAINE &<br>ATLANTIC RAILWAY, LTD.,<br><br>    Plaintiff,<br><br>v.<br><br>CANADIAN PACIFIC<br>RAILWAY COMPANY and<br>SOO LINE RAILROAD COMPANY,<br><br>    Defendants. | Adv. Proc. No. 14-1001 |

**MEMORANDUM DECISION AND ORDER
GRANTING CANADIAN PACIFIC RAILWAY COMPANY AND SOO LINE
RAILROAD COMPANY'S MOTION FOR SUMMARY JUDGMENT**

The issue before the Court is whether the decisions of two other courts—one from the

Quebec Court of Appeal affirming a decision of the Quebec Superior Court and the other from the

Eighth Circuit Court of Appeals reversing a decision of the United States District Court for the

District of North Dakota—preclude this Court from independently analyzing the facts and issues

raised in this adversary proceeding.  The answer is "yes" and for the reasons set forth below, the

1

Court grants Defendants Canadian Pacific Railway Company and Soo Line Railroad Company's

Motion for Summary Judgment (Docket Entry ("D.E.") 670) (the "Motion").

### Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a); *see* Fed. R. Bankr. P. 7056 ("Fed. R. Civ. P. 56 applies in an adversary proceeding.").

"An issue is 'genuine' if a rational factfinder could resolve it in favor of either party, and a fact is

'material' if it has the capacity to change the outcome of the suit." *Rodríguez v. Encompass Health

Rehab. Hosp. of San Juan, Inc.*, 126 F.4th 773, 779 (1st Cir. 2025).

In assessing whether there are material, genuine disputes, the court reviews the factual

record in the light most favorable to the non-moving party, resolving evidentiary conflicts and

drawing reasonable inferences in the non-movant's favor. *Perry v. Roy,* 782 F.3d 73, 77 (1st Cir.

2015).  However, "[a] party asserting that a fact cannot be or is genuinely disputed must support

the assertion by citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other

materials." Fed. R. Civ. P. 56(c)(1)(A)).  If the court's review of the record reveals evidence

sufficient to support findings in favor of the non-moving party, a trialworthy controversy exists

and summary judgment must be denied. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986).

In considering the Motion, the Court draws from the parties' properly supported statements

of material fact, the summary judgment record, and other sources of which the Court may take

judicial notice.[1]  The non-movant in this case is plaintiff Robert J. Keach, the estate representative of the post-effective date estate of debtor Montreal, Maine & Atlantic Railway, Ltd. ("MMAR"). Accordingly, the Court reviews the record in the light most favorable to him.

### Background[2]

This adversary proceeding and the underlying bankruptcy case stem from a catastrophic train derailment that occurred on July 6, 2013 in Lac-Mégantic, Quebec, resulting in one of the deadliest rail disasters in Canadian history.  Since the derailment, the question of who is responsible and should pay for the resulting damages has narrowed to several rail entities: MMAR; Montreal, Maine & Atlantic Company ("MMAC"), a Canadian subsidiary wholly owned by MMAR; and Canadian Pacific Railway Company and Soo Line Railroad Company (collectively, "Canadian Pacific" or "CP").[3]

### I.       The Train Derailment

By way of background, the matter concerns the extraction and subsequent transportation of crude oil across the United States and Canada.  Specifically, the crude oil involved in the derailment was extracted from the Bakken formation in North Dakota and was to be transported

---

[1]  Courts may take judicial notice of facts not subject to reasonable dispute when those facts are generally known within the court's jurisdiction or can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned.  Fed. R. Evid. 201(b) (made applicable here by Fed. R. Bankr. P. 9017); *see Shuttlesworth v. Birmingham*, 394 U.S. 147, 157 (1969) (noting that the court may properly take notice of the record in prior litigation between the same parties as those before it).

[2]  The Court relies on two decisions from courts in Quebec for much of the factual background: the 2022 Quebec Superior Court decision in the consolidated cases of *Ouellet et al. v. Canadian Pacific Railway Company and Montreal, Maine & Atlantic Railway Company*, *Promutuel Centre Sud et al. v. Canadian Pacific Railway Company and Montreal, Maine & Atlantic Railway Company*, *Procureure Generale du Quebec v. Canadian Pacific Railway Company and Montreal, Maine & Atlantic Railway Company* ("*Ouellet et al.*, 2022 QCCS 4643"); and the 2025 Quebec Court of Appeal decision involving the same cases ("*Quebec et al.*, 2025 QCCA 230").  The Court cites to certified English translations of the two decisions, which are available at D.E. 634 and D.E. 660.  Defs.' Statement of Material Fact ("Def. S.M.F.") (D.E. 670-6) ¶ 1.  Unlike in this opinion, both Quebec courts refer to MMAC as MMA.

[3]  The Court refers to the defendants collectively as "Canadian Pacific" as the two entities have a parent-subsidiary relationship, and it is in keeping with how the parties have referred to them in their briefing and during oral argument.

by rail from New Town, North Dakota through parts of Canada and Maine to its intended destination of St. John, New Brunswick.  Transportation of oil by rail involves a complex interplay of U.S. and Canadian statutes and regulations, as well as many contractual and other relationships among railway transportation stakeholders including shippers, receivers/consignees, carriers, processors, and the owners of tank cars, locomotives, and tracks.

Since the early 2010s, Irving Oil Company G.P., a processor, vendor and the recipient of crude oil, has routinely purchased crude oil from World Fuel Entities ("World Fuels").  *Ouellet et al.*, 2022 QCCS 4643, 35.  World Fuels operated as a shipper and entered into various agreements to lease tank cars, load crude oil into them, and then transport them by rail.  *Id*. at 20, 34, 35.  As the shipper, World Fuels was responsible for classifying which packing group the crude oil belonged to (based on its level of hazard) and labelling the tanks accordingly.  *Quebec et al*., 2025 QCCA 230, 6-7, 44-45.  The tank cars containing the crude oil at times were hauled by locomotives owned and operated by Canadian Pacific and at other times were hauled by locomotives owned and operated by MMAC.  *See Ouellet et al*., 2022 QCCS 4643, 15-16.

The rail tracks over which the crude oil was transported were owned by several different parties, including MMAR and MMAC, which – despite being separate entities – operated an integrated shortline freight railroad system and were run as a single company with the same management during the relevant time period leading up to the derailment.  Def. S.M.F. ¶¶ 5-6.[4]  Canadian Pacific's locomotives transported the tank cars carrying the crude oil to Montreal where, on July 5, 2013, Canadian Pacific transferred them to MMAC, in accordance with Canadian Pacific's agreement with MMAC to act as the carrier for the final leg of the journey to St. John.  *Ouellet et al*., 2022 QCCS 4643, 15-16.  At that point, the train, consisting of seventy-two tank

---

[4] Whenever the record allows, the Court distinguishes between MMAC and MMAR.

cars (containing over seven million liters of crude oil), one "special" car, one "buffer" car, and five locomotives, was 4,700 feet long and weighed approximately 10,290 tons. *Id*. at 16. The five locomotives were owned by MMAC. *Id*. at 15-16.

Leaving Montreal, the train was handled and operated by only one person, locomotive engineer and MMAC employee Thomas Harding, in a practice known as "single person train operation," or "SPTO." *Id*. at 16; *Quebec et al.*, 2025 QCCA 230, 7-8. During that leg of the trip, Mr. Harding reported to MMAC that the lead locomotive was experiencing mechanical difficulties that affected the ability of the train to maintain its speed. *Ouellet et al.*, 2022 QCCS 4643, 16. On the evening of July 5, 2013, the train arrived in Nantes, a Quebec town approximately seven miles west of Lac-Mégantic and where Mr. Harding was scheduled to take an overnight break. Mr. Harding observed white and black smoke and crude oil droplets emanating from the lead locomotive. *Quebec et al.*, 2025 QCCA 230, 8.

Mr. Harding parked the train on the main track on a 0.92% descending grade. *Id*. at 8. MMAC instructed him to leave the train on the grade unattended overnight and another locomotive engineer would drive it to New Brunswick the next morning. *Ouellet et al.*, 2022 QCCS 4643, 16-17.

After he stopped the train in Nantes, Mr. Harding employed two types of brakes: mechanical brakes (also known as hand brakes) and independent brakes, which require pressure produced by running locomotives. *Id*. at 17; *Quebec et al.*, 2025 QCCA 230, 17, n.154. He first applied the independent brakes and then seven hand brakes: one on each of the five locomotives, one on the special car, and one on the buffer car. *Ouellet et al.*, 2022 QCCS 4643, 17. He left the lead locomotive running, which powered the compressor which in turn powered the train's independent brake system. *Id*. Notably, although it was standard procedure, Mr. Harding did not

5

carry out an efficiency test to confirm that the number of hand brakes used was sufficient to restrain the train. *Quebec et al.*, 2025 QCCA 230, 8-9.  In fact, the seven hand brakes that Mr. Harding applied provided only about one-third of the 146,700 pounds of braking force necessary to keep the train stationary on the descending grade. *Ouellet et al.*, 2022 QCCS 4643, 18.  When Mr. Harding left the train to check into a nearby hotel, the independent brakes powered by the first locomotive were providing 215,500 pounds of braking force, more than enough to hold the train in place. *Id.*

Shortly before midnight, an emergency call center received a call reporting a fire on the train. *Id.*  The Nantes fire department arrived and extinguished the fire by shutting down the engine on the lead locomotive. *Id.*  The provincial police then notified MMAC rail traffic controller Richard Labrie of the fire and informed him and an MMAC foreman that the lead locomotive was shut down. *Quebec et al.*, 2025 QCCA 230, 9.  Mr. Labrie in turn called Mr. Harding and informed him of the events. *Id.*  Mr. Harding asked Mr. Labrie if he should return to the train to start another locomotive engine. *Id.*  Mr. Labrie, not realizing that Mr. Harding had not applied a sufficient number of hand brakes to hold the locomotive in place, told Mr. Harding that it was not necessary for him to return to the train that night to start another engine. *Id.*  Mr. Harding then went to sleep, and the train was left unattended after the fire department departed. *Id.*

After the engine to the lead locomotive was shut off, it set off a domino effect: the compressor feeding the air brake system was no longer operating, thus the pressure in the air brake system gradually decreased, and the air brakes slowly released. *Id.* at 10; *Ouellet et al.*, 2022 QCCS 4643, 18. Eventually, only the hand brakes remained engaged and they were insufficient to keep the train stationary. *See id.*   Early in the morning of July 6, 2013, the unattended train began to move down the track.   *Quebec et al.*, 2025 QCCA 230, 10.  As it travelled downhill

towards the town of Lac-Mégantic, the train picked up speed and was travelling at sixty-five miles per hour, "more than three times the acceptable speed at that location." *Ouellet et al.*, 2022 QCCS 4643, 18-19. Rounding a curve in the track at the entrance to downtown Lac-Mégantic, sixty-three of the train's seventy-two cars derailed, spilling millions of liters of crude oil and causing a series of massive explosions that killed forty-seven people and destroyed the center of the town. *Quebec et al.*, 2025 QCCA 230, 10; *Ouellet et al.*, 2022 QCCS 4643, 6.

Not surprisingly, litigation followed in various courts, including here in Maine, in Quebec, and in North Dakota. A month after the derailment, MMAR filed for bankruptcy relief in this Court under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532. Six months later, on January 30, 2014, Mr. Keach filed this adversary proceeding, seeking to recover from Canadian Pacific for damages incurred as a result of the derailment. Meanwhile, in Quebec, MMAC commenced insolvency proceedings, and several parties filed three separate actions against Canadian Pacific and MMAC.[5] And, in the United States District Court for the District of North Dakota, Joe R. Whatley, Jr., the trustee for the wrongful death claimants of the accident, sued Canadian Pacific, alleging liability for the value of the train's crude oil.

The decisions in those courts impact this Court's determination of the Motion.

## II.    The Quebec Litigation

### A.    The Quebec Superior Court Decision

The Quebec Superior Court held a trial lasting just over sixty days. The trial focused mainly on determining Canadian Pacific's liability, if any, for the derailment. *Ouellet et al.*, 2022

---

[5] The original proceedings were a class action brought on behalf of victims of the derailment incident (*Ouellet et al. v. Canadian Pacific et al.*), a subrogatory action brought by insurers that had compensated people whose property had been destroyed or damaged (*Promutuel Centre Sud et al. v. Canadian Pacific et al.*), and an action by the Attorney General of Quebec for damages suffered by the Province of Quebec (*Procureure Generale du Quebec v. Canadian Pacific et al.*). The actions were joined to be heard and judged on the same evidence, with liability and damages bifurcated. *Ouellet et al.*, 2022 QCCS 4643, 7-8.

QCCS 4643, 6-7 ("The purpose of this judgment is to determine whether the Canadian Pacific Railway (CP) is responsible, in whole or in part, for this accident and the many consequences that resulted from it."). Even though named as a defendant, MMAC did not appear or participate in the proceedings because MMAC "did not have the financial capacity to assume or participate in any way in the compensation of victims." *Id.* at 9-10. That said, several former employees testified at trial. *Id*. at 10, 211-214.

On December 14, 2022, the Quebec Superior Court issued a 169-page decision holding that Canadian Pacific had no legal liability for the derailment and finding instead that the actions of MMAC and its employee Mr. Harding caused the derailment. Def. S.M.F. ¶ 1; *Ouellet et al.*, 2022 QCCS 4643, 7. Specifically, the Superior Court found no fault on the part of Canadian Pacific related to risk assessments not performed, its choice of MMAC as a connecting carrier, or its alleged failure to address MMAC's operating practices. *Id*. at 88, 96-97, 126-132, 154-165. The Superior Court also found no causal link between Canadian Pacific's conduct of not checking the crude oil classification and the derailment. *Id.* at 97-118. It further noted that even if the crude oil had been properly classified as Class I or II instead of Class III, the oil would have been transported in the same type of tank cars, and the same procedures would have been followed. *Id.* at 160. The Superior Court determined that MMAC's and Mr. Harding's faults were the only "logical, direct and immediate cause" of the derailment. *Id*. at 154. Specifically, the Superior Court cited Mr. Harding's failure to apply a sufficient number of hand brakes and failure to return to the train after he learned that the lead locomotive was no longer operating. *Id*. at 154-155. As his employer, MMAC was liable for Mr. Harding's actions. *Id*. at 137.

The Superior Court also detailed a number of other circumstances that contributed to the derailment and could be traced back to MMAC, such as the practice of single person train operation

8

and MMAC management's decision to leave trains parked unattended at the top of a slope overnight with only one employee responsible for securing them. *Id.* at 155-156. These factors were "shortcomings in the operation of [MMAC's] network and its failure to implement measures to prevent" incidents like the derailment. *Quebec et al.*, 2025 QCCA 230, 18.

The plaintiffs then appealed the Superior Court's decision that Canadian Pacific was not liable for the derailment to the Quebec Court of Appeal. *Id*. at 3.

### B.      The Quebec Court of Appeal Decision

On February 25, 2025, the Quebec Court of Appeal issued a 67-page decision affirming the Superior Court of Quebec in all respects. Def. S.M.F. ¶ 2; *Quebec et al.*, 2025 QCCA 230. Reviewing the Superior Court's analysis of the principles applicable to civil liability, the Quebec Court of Appeal upheld its conclusion that Canadian Pacific had no fault in the derailment. *Id*. at 3. It also reviewed and upheld the legal conclusion that even if Canadian Pacific had been negligent in not properly classifying the crude oil, that conduct did not cause the derailment. *Id*. at 3, 61-62. The Quebec Court of Appeal found that the Superior Court committed no error in its fault analysis or its factual determinations. *Id.* at 25, 33, 42-43, 49-50, 61-62, 64-65. Specifically, the Quebec Court of Appeal concluded: "In the end, Harding's and MMA's faults remain the only logical, direct and immediate cause of the catastrophe." *Quebec et al*., 2025 QCCA 230, 65.

The plaintiffs applied to the Supreme Court of Canada for leave to appeal the Quebec Court of Appeal's decision on April 8, 2025. That application remains under consideration.[6]

---

[6] Case Information Search Result, Sup. Ct. of Can., https://www.scc-csc.ca/cases-dossiers/search-recherche/41783/ (last visited April 21, 2026); *see also* Defs.' Status Report (D.E. 689) at 1-2.

III.     **The Eighth Circuit Carmack Amendment Litigation**

In addition to the Quebec litigation, Canadian Pacific was also sued in the United States District Court for the District of North Dakota for damages under the Carmack Amendment to the Interstate Commerce Act.  49 U.S.C. § 11706.  The Carmack Amendment is incorporated into the terms of bills of lading issued by rail carriers.  *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 96 (2010).  Generally, the Carmack Amendment requires rail carriers receiving property for transportation to issue bills of lading and "imposes upon 'receiving rail carriers' and 'delivering rail carriers' liability for damage caused during the rail route under the bill of lading, regardless of which carrier caused the damage." *Whatley v. Canadian Pac. Ry. Ltd.*, 904 F.3d 614, 618 (8th Cir. 2018) (quoting *Kawasaki Kisen Kaisha Ltd.*, 561 U.S at 97-98 (quoting 49 U.S.C. § 11706(a))).

In Carmack Amendment litigation, a plaintiff makes a prima facie claim by establishing that the cargo was delivered to the carrier in good condition but arrived at its destination damaged, and by showing the amount of damages caused by the loss.  *Camar Corp. v. Preston Trucking Co.*, 221 F.3d 271, 274 (1st Cir. 2000).  Absent a limited set of affirmative defenses, carriers are liable for damages under the Carmack Amendment regardless of causation.  *See Missouri Pac. R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137 (1964).  World Fuels, as the originating shipper of the crude oil, thus had Carmack Amendment claims against Canadian Pacific, the carrier.

World Fuels assigned its Carmack Amendment claims against Canadian Pacific to Mr. Keach (MMAR's Chapter 11 trustee at the time) and MMAC as part of a settlement agreement pursuant to which World Fuels also paid $110 million to the MMAR bankruptcy estate.  Def. S.M.F. ¶ 8.  Mr. Keach then assigned the Carmack Amendment claims to Mr. Whatley, who commenced the Carmack Amendment litigation against Canadian Pacific.  Def. S.M.F. ¶¶ 9, 10.

10

The assignment provided for retention of Mr. Keach to prosecute the assigned Carmack Amendment claims on behalf of Mr. Whatley.  *Id*.  Extensive litigation then ensued concerning the bill of lading for the crude oil lost in the derailment and an expired contract between the parties for shipment of the crude oil.[7]

The Eighth Circuit Court of Appeals described the travel of the North Dakota case as follows:

> The district court ultimately determined that Canadian Pacific was liable under the Carmack Amendment for the value of the train's crude oil cargo.  Whatley and Canadian Pacific submitted a joint stipulation to the district court.  This joint stipulation contained two key provisions: (1) that the crude oil cargo had been worth one of three possible, specified amounts and (2) that the district court "shall decide whether the Judgment Reduction Provision applies in this action, and if so how, prior to entry of final judgment ...."  The district court adopted the joint stipulation "in its entirety."  Canadian Pacific accordingly moved to apply the judgment reduction provision and Whatley cross-moved for the value of the crude oil and for prejudgment interest.  In a single order resolving both motions, the district court found the value of the crude oil to be $3,950,464 and granted Whatley that amount, along with prejudgment interest.  However—despite accepting the parties' joint stipulation in its entirety—the district court declined to address whether the judgment reduction provision applied, concluding that it was "a matter properly reserved to the Bankruptcy Court" that had approved the plan.  Canadian Pacific filed a motion for reconsideration, asking the court to reconsider its decision not to apply the judgment reduction provision, which the court denied.

*Whatley v. Canadian Pac. Ry. Co.*, 142 F.4th 1030, 1033 (8th Cir. 2025).

Both parties appealed.  *Id.*  One issue on appeal was whether the judgment reduction provision in MMAR's confirmed bankruptcy plan (the "Plan") required the District Court to reduce

---

[7] *See Whatley v. Canadian Pac. Ry. Ltd.*, No. 1:16-CV-00074, 2017 WL 3687853 (D.N.D. Mar. 24, 2017) (granting Canadian Pacific's motion for judgment on the pleadings); *Whatley v. Canadian Pac. Ry. Ltd.*, 904 F.3d 614 (8th Cir. 2018) (reversing and remanding the grant of Canadian Pacific's motion for judgment on the pleadings), *cert. denied*, 587 U.S. 1039 (2019); *Whatley v. Canadian Pac. Ry. Ltd.*, No. 1:16-CV-00074, 2020 WL 8268878 (D.N.D. Aug. 6, 2020) (granting in part and denying in part Whatley's partial motion for summary judgment and Canadian Pacific's motion for summary judgment), *recon. denied*, 2020 WL 13575106 (D.N.D. Dec. 10, 2020), *recon. denied*, 2023 WL 6390534 (D.N.D. Jan. 20, 2023); *Whatley v. Canadian Pac. Ry. Co.*, No. 1:16-CV-00074, 2023 WL 6392768 (D.N.D Jan. 20, 2023) (granting in part and denying in part Canadian Pacific's renewed motion for summary judgment), *recon. denied,* 2023 WL 6390526 (D.N.D. Feb. 8, 2023); *Whatley v. Canadian Pac. Ry. Ltd.*, No. 1:16-cv-00074, 2024 WL 63044 (D.N.D Jan. 5, 2024) (denying Canadian Pacific's motion to apply the judgment reduction provision), *recon. denied,* 2024 WL 756187 (D.N.D. Feb. 23, 2024).

11

the judgment against Canadian Pacific. *Id.* at 1036. The inclusion of the judgment reduction

provision in the Plan was essential in obtaining Canadian Pacific's agreement to (1) withdraw its

objections to the Plan, (2) dismiss its appeal of this Court's August 26, 2015 Chapter 15

Recognition and Enforcement Order, and (3) withdraw its challenge to the related Canadian

insolvency proceeding. *In re Montreal Maine & Atl. Ry., Ltd.*, Case No. 13-10670, D.E. 1801,

¶ 67.

In simple terms, the judgment reduction provision protects released parties from being sued

for derailment-related claims and ensures that if a party is sued and found liable, any damages

awarded to the prevailing party are reduced so the prevailing party is not paid more than once for

such damages. The reduction is the largest of three possible amounts: the "Settlement Credit," the

"Insurance Credit," and the "Contribution/Indemnity Credit." *Id*. ¶ 64. In this case, these amounts

are determined as follows:

- The "Settlement Credit" is the amount that MMAR or MMAC would receive under the

  Plan or the Canadian insolvency plan for its type of claim against Canadian Pacific. *Id*.

  ¶ 64(a).

- The "Insurance Credit" is the amount of coverage that would have been recoverable to

  Canadian Pacific under any insurance policies owned by MMAR or MMAC on account

  of their claim or cause of action if the Plan had not been confirmed. *Id*. ¶ 64(b).

- The "Contribution/Indemnity Credit" is the value of the contribution or indemnification

  claims that Canadian Pacific would have been entitled to as against other parties

  released by the Plan but for operation of the [Confirmation] Order. *Id*. ¶ 64(c).

Additionally, the Contribution/Indemnity Credit of the judgment reduction provision includes

methodologies for determining allocation of fault among the parties. *Id*. If the trial court is in the

United States, the court's determination of fault allocation must comply with the methodology adopted in *Austin v. Raymark Industries*, 841 F.2d 1184 (1st Cir. 1988). *Id.*[8]

On July 3, 2025, the Eighth Circuit held that any Carmack Amendment judgment against Canadian Pacific for the value of the crude oil must be reduced to zero given the judgment reduction provision contained in the Plan. *Whatley*, 142 F.4th at 1036. The judgment reduction provision prevented Canadian Pacific from asserting a contribution or indemnity claim against MMAR or any released party that settled with MMAR.[9] *Id.* at 1035. The Eight Circuit explained that any initial damages determinations against Canadian Pacific must be reduced by a judgment reduction amount, which the parties agreed would be whatever the court calculated as the contribution/indemnity credit (the value of all contribution or indemnification claims that Canadian Pacific would be entitled to from any released parties but for operation of the Plan). *Id.* In effect, the contribution/indemnity credit acted to ensure Canadian Pacific paid only its proportionate liability for the derailment. *Id.* Specifically, the Eighth Circuit held:

> [T]he district court already determined—and the parties do not dispute—that MMA was solely liable for the Lac-Mégantic derailment tragedy. Thus, under *Austin*, 100% of the liability belongs to MMA. Unlike in *Austin*, there are no joint

---

[8] The Eighth Circuit explained the *Austin* damage calculation methodology:

> *Austin* addresses the calculation of a damages award when multiple defendants are liable, but some have settled out-of-court and others have gone bankrupt. In *Austin*, the wife of a man who had died due to asbestos exposure sued multiple asbestos suppliers. At trial, the jury both awarded damages and apportioned liability for the death among four asbestos manufacturers—two of which had already settled and one of which was bankrupt. The First Circuit found that the damages award should be reduced by a percentage based on the settling defendants' respective portions of fault. It also found that the bankrupt manufacturer's portion of the award should be allocated proportionately among the remaining defendants, even those that had already settled. This ensured each party proportionately bore the shortfall of the bankrupt party. This had the effect of reducing the plaintiff's award by the percentage of the bankrupt company's liability that was assigned to the defendants who had already settled. Even so, the court explained that this was fair because the plaintiff had agreed in settlement agreements to satisfy any contribution claims made against the settling defendants.

*Whatley*, 142 F.4th at 1035-1036 (citations omitted).

[9] The Eighth Circuit refers to MMAR as "MMA." *Whatley*, 142 F.4th at 1036.

tortfeasors who share liability with MMA. Thus, no other party can fairly be made to take on MMA's share of the liability. Therefore, Canadian Pacific is entitled to a 100% judgment reduction credit; regardless of the ultimate damages determination under the Carmack Amendment, any judgment against Canadian Pacific must be reduced to zero.

*Id*. at 1036 (citation omitted).

Mr. Whatley did not pursue further appellate review by filing a petition for writ of certiorari in the United States Supreme Court, and the deadline to do so has now passed. *See* 12/11/25 Status Report (D.E. 689) at 2.

## Discussion

The operative complaint before the Court, Mr. Keach's Third Amended Complaint (D.E. 230), pled four counts: Negligence (Count I), Breach of Contract (Count II), Negligent Representation (Count III), and Disallowance of Claim (Count IV).[10]   Canadian Pacific asserts that the application of the doctrine of res judicata bars the relitigation of Mr. Keach's remaining claims. Specifically, Canadian Pacific maintains that the Quebec judgment gives rise to both claim and issue preclusion in this proceeding, and that the North Dakota judgment results in issue preclusion in this proceeding.

The parties agreed, during oral argument and in their briefing, that federal common law applies to this Court's preclusion analysis. Under federal common law, "[t]he preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). "Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'" *Id.* (quoting *New Hampshire*

---

[10] Count II was dismissed on July 1, 2017. Order (D.E. 284); *see* Mem. of Decision dated July 7, 2017 (D.E. 285), at 20-25 (citing judicial admissions as the basis for dismissing Count II); Revision and Amendment to the Ct.'s Mem. of Decision dated July 7, 2017 (D.E. 560), at 3-4 (citing judicial estoppel as the amended basis for dismissal).

14

*v. Maine*, 532 U.S. 742, 748 (2001)).  "Issue preclusion, in contrast, bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim."  *Id.* (quoting *New Hampshire,* 532 U.S. at 748-749).

In the current adversary proceeding, Mr. Keach advances a negligence claim and a negligent misrepresentation claim.[11]  A plaintiff establishes a negligence claim by proving: "(1) a duty of care owed to the plaintiff; (2) a breach of that duty; (3) an injury; and (4) causation, that is, a finding that the breach of the duty of care was a cause of the injury." *Anderson v. Univ. of New England*, 610 F. Supp. 3d 306, 312 (D. Me. 2022) (quoting *Bell v. Dawson*, 82 A.3d 827, 831-832 (Me. 2013)).  Likewise, a negligent misrepresentation claim requires that: (1) the defendant supplies false information to the plaintiff; (2) of a material fact; (3) the defendant did not exercise reasonable care or competence in communicating the information; and (4) the plaintiff justifiably relied on that false information causing him economic harm.  *Knowlton v. Shaw*, 791 F. Supp. 2d 220, 261 (D. Me. 2011) (citing *Binette v. Dyer Library Ass'n*, 688 A.2d 898, 903 (Me. 1996)).  Although Quebec's civil code uses the term "fault" in referring to the duty of care and breach of that duty, the elements of negligence claims in Quebec are the same as those under Maine law.  *See* Civil Code of Québec, C.C.Q. 1991, art. 1457 (Can.); *Kosoian v. Société de transport de Montréal*, 2019 SCC 59 (Can.), [2019] 4 S.C.R. 335, ¶¶ 40-44, 50; *Infineon Technologies AG v. Option consommateurs*, 2013 SCC 59 (Can.), [2013] S.C.R. 600, ¶¶ 77-145.[12]  Notably, the burden of

---

[11]  The parties previously agreed that Maine law applies to the negligence and negligent misrepresentation claims in this adversary proceeding.  *See* Defs.' Mot. for Summ. J. (D.E. 591), at 16-24; Pl.'s Opp'n to Defs.' Mot. for Summ. J. (D.E. 598), at 25-30.

[12]  Article 1457 states:

> Every person has a duty to abide by the rules of conduct incumbent on him, according to the circumstances, usage or law, so as not to cause injury to another.  Where he is endowed with reason

proof is the same in a Quebec civil trial as it would be in a trial on the facts in this Court –

preponderance of the evidence. *Dumensnil v. Sheehy*, [1976] 1 S.C.R. 152 (Can.), 161.

In the context of the pending Motion, the parties do not dispute that the Quebec judgments

are generally recognizable in this Court, nor has anyone suggested that the Quebec forums failed

to provide due process or that Quebec applies a different negligence standard. The Court thus

turns to the negligence claims that Canadian Pacific argues are precluded by the outcome in the

Quebec litigation.

## I.      The Negligence Claims

### A.      Claim Preclusion

"The essential elements of claim preclusion are: (1) a final judgment on the merits in an

earlier action; (2) an identity of parties or privies in the two suits; and (3) an identity of the cause

of action in both suits." *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30 (1st Cir. 1994) (citing

*Aunyx Corp. v. Canon U.S.A., Inc.,* 978 F.2d 3, 6 (1st Cir. 1992), *cert. denied,* 507 U.S. 973

(1993)). The Court discusses each element in turn.

#### 1.      Final Judgment on the Merits

Trial court judgments are considered final for preclusion purposes "even though the loser

has not exhausted his appellate remedies." *Williams v. Comm'r of Internal Revenue*, 1 F.3d 502,

504 (7th Cir. 1993); *Kittery Point Partners, LLC v. Bayview Loan Servicing LLC & Todd Enright*

*(In re: Kittery Point Partners, LLC, Debtor)*, Case No. 17-20316, Adv. Proc. No. 17-2065, 2018

WL 1613573, at *5 (Bankr. D. Me. Mar. 12, 2018); *see also Restatement (Second) of Judgments*

---

and fails in this duty, he is liable for any injury he causes to another by such fault and is bound to make reparation for the injury, whether it be bodily, moral or material in nature. He is also bound, in certain cases, to make reparation for injury caused to another by the act, omission or fault of another person or by the act of things in his custody.

Civil Code of Québec, C.C.Q. 1991, art. 1457 (Can.).

§ 13, cmt. f (1982).[13]  Here, the Quebec Court of Appeal decision affirming the Quebec Superior Court is final for claim preclusion purposes even though the application for leave to appeal to the Supreme Court of Canada is still pending.  Mr. Keach argues that in the interest of judicial economy this Court should wait to rule on the pending summary judgment motion until after the Supreme Court of Canada finally acts on the application.  Estate Representative's Opp'n to Defs.' Mot. For Summ. J. ("Pl.'s Opp'n") (D.E. 671), at 17-18.  While the Court is mindful that the Supreme Court of Canada could overturn the Quebec Court of Appeal's decision, the Court concludes that waiting to issue a decision on the Motion would not serve the interests of justice given the length of time that this adversary proceeding has been pending and the depth of consideration given to the issue of Canadian Pacific's negligence by the Quebec courts.  In support, the Court notes, "it is well settled that in the federal courts the pendency of an appeal does not destroy the res judicata effect of a judgment."  *Taunton Gardens Co. v. Hills*, 557 F.2d 877, 879 n.2 (1st Cir. 1977); *see also Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 189 (1941) ("[I]n the federal courts the general rule has long been recognized that while appeal with proper supersedeas stays execution of the judgment, it does not—until and unless reversed—detract from its decisiveness and finality."); *Restatement (Second) of Judgments* § 13, cmt. f.

"[A] judgment is 'on the merits' if the underlying decision 'actually passes directly on the substance of a particular claim before the court.'" *Brownback v. King*, 592 U.S. 209, 215 (2021) (quoting *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 501-502 (2001)).  Both Quebec courts undertook painstaking, extensive and thorough examinations of the central question of Canadian Pacific's and MMAC's negligence and liability for the derailment.  *See Ouellet et al.*, 2022 QCCS 4643, 6 ("In this judgment, the Court intends, after evaluating all of the evidence

---

[13]  *See In re Kane*, 254 F.3d 325, 328 (1st Cir. 2001) (noting that, when determining the preclusive effects of prior judgments, the federal courts "tend to follow the general approach of the *Restatement (Second) of Judgments* (1982)").

presented to it by both parties, to determine, in accordance with the rules of Quebec civil law, CP's liability in this accident."). Specifically, the Quebec Superior Court examined whether Canadian Pacific's failure to reclassify the crude oil had any role in the derailment. *See Quebec et al.*, 2025 QCCA 230, 16 ("In [the trial judge's] opinion, the appellants had not discharged their burden of showing, on a balance of probabilities, that CP knew or should have known that the classification made by [World Fuels] was erroneous. Accordingly, the judge found no wrongdoing on the part of CP in this respect."). On appeal, the Quebec Court of Appeal then focused its review on the Quebec Superior Court's determination that Canadian Pacific was not liable for the derailment incident, but rather that MMAC was solely liable, through the actions of its employee Mr. Harding and MMAC's own "gross faults." *Quebec et al.*, 2025 QCCA 230, 43-62; *Ouellet et al.*, 2022 QCCS 4643, 157. The lengthy appellate decision affirmed the trial court's decision in full, including its dismissal of further proceedings against Canadian Pacific.

In this adversary proceeding, the negligence claims are identical to those presented in the Quebec litigation: was Canadian Pacific negligent in not reclassifying the crude oil, and if so did that negligence lead to the derailment. *See* Third Am. Compl. ¶¶ 98-106, 111-118. The Quebec decisions directly examined and comprehensively answered these questions. *See Quebec et al.*, 2025 QCCA 230, 17 ("In sum, the [trial] judge concluded that CP had committed no fault."); *id.* at 50 ("[E]ven if the judge had erred on this, it would not be decisive, since the evidence shows that a change in classification from PG-III to PG-I or PG-II would not have changed the way MMA should have handled the cargo."). The Court concludes that the Quebec judgments pass directly on the substance of the Canadian Pacific negligence claims and are on the merits for purposes of claim preclusion.

## 2.      Identity of the Parties

Canadian Pacific asserts that there is an identity of parties for claim preclusion purposes because MMAC and MMAR are in privity as they are in essence the same entity due to their corporate relationship, and because Canadian Pacific and MMAC were both named parties in the Quebec litigation.  Mr. Keach counters that the identity of parties element is not met because the parties were not adversaries in the Canadian proceeding; they were codefendants.

As to privity, the Court won't waste much ink.  Mr. Keach concedes for purposes of the Motion that MMAR and MMAC "are in privity under a res judicata analysis as a result of the parent-subsidiary relationship."  Pl.'s Opp'n at 11 n.4.  Thus, the Court concludes that the privity requirement is satisfied here.  *See, e.g., Airframe Sys., Inc. v. Raytheon Co.,* 601 F.3d 9, 13 n.3 (1st Cir. 2010) ("Corporate parents and subsidiaries are generally considered identical parties for claim preclusion purposes.").

The second question—identity of the parties—merits more discussion because in the Quebec cases, MMAC and Canadian Pacific were codefendants.  "Three identifiable rules have emerged to govern the limits within which a judgment should preclude later relitigation among former coparties."  18A *Wright & Miller's Federal Practice & Procedure* § 4450 (3d ed.).  At one end of the spectrum is the "traditional rule" that former coparties "are precluded in subsequent litigation among themselves only if they become adversaries in the prior action through the formal assertion of a claim by one against the other."  *Id.*  Courts following this approach have held that "claim preclusion bars suits between the same parties on causes of action which have already been litigated or could have been litigated in an earlier proceeding."  *Unisys Med. Plan v. Timm*, 98 F.3d 971, 973 (7th Cir. 1996).  At the other end of the spectrum is a broader rule that precludes coparties from "relitigating any issue they had a full and fair opportunity to litigate, without regard to

19

whether they were in any sense adversaries in the prior action." *Id.* Finally, in between these two approaches is a third "practical" or "intermediate" test, which holds coparties to the "determination of any issue that they in fact litigated as adversaries, even though no claim was advanced by either against the other" so long as the issue was "actually and necessarily decided." *Id.* The Restatement endorses this third approach for parties aligned on the same side:

> Parties who are not adversaries to each other under the pleadings in an action involving them and a third party are bound by and entitled to the benefits of issue preclusion with respect to issues they actually litigate fully and fairly as adversaries to each other and which are essential to the judgment rendered.

*Restatement (Second) of Judgments* § 38.

The First Circuit has not had the opportunity to expressly decide which of the three approaches to adopt. Mr. Keach cites the intermediate rule from the Restatement, *see* Pl.'s Opp'n at 9, while Canadian Pacific points to the Ninth Circuit, which has followed the broader application of res judicata as to codefendants if the same issue had been actually litigated in the earlier proceeding. Reply Mem. in Supp. of Defs.' Mot. for Summ. J. on Res Judicata Grounds (D.E. 676), at 1-2 (citing *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 911 & n.4 (9th Cir. 1997)). The Court agrees with Canadian Pacific that MMAC and Canadian Pacific could still have been adversarial in the prior litigation even though they were codefendants in Quebec. But even under the Restatement approach urged by Mr. Keach, the parties need not have been on opposite sides of the prior litigation for claim preclusion to apply. Their interests need only be adverse to one another in the prior litigation. *See Restatement (Second) of Judgments* § 38, illus. 1 (explaining that where two defendants have been sued together on the basis that their negligence caused an accident, and each had a full and fair opportunity to litigate this contention, then a judgment finding one defendant not negligent is preclusive against the other defendant in a subsequent action between the two defendants). The relationship between MMAC and Canadian Pacific in the

20

Quebec litigation, and between MMAR and Canadian Pacific in this proceeding, mirrors that of the just-cited Restatement illustration. And, MMAC could have initiated crossclaims against Canadian Pacific in the Quebec Superior Court or otherwise litigated the comparative negligence of the parties but elected not to do so.[14] Thus, the Court finds that in the Quebec litigation, MMAC and Canadian Pacific had interests adverse to one another despite having been named codefendants. Accordingly, there is an identity of parties for claim preclusion purposes.

### 3.      Identity of the Cause of Action

The First Circuit applies the "transactional" test to determine whether there is an identity of the causes of action in the two proceedings. *Haag v. United States*, 589 F.3d 43, 46 (1st Cir. 2009). "[A]s long as the new complaint grows out of the same transaction or series of connected transactions as the old complaint, the causes of action are considered to be identical." *Id*. This analysis "boils down to whether the causes of action arise out of a common nucleus of operative fact." *Airframe Sys.*, 601 F.3d at 15 (quoting *Mass. Sch. of Law at Andover, Inc. v. Am. Bar. Ass'n*, 142 F.3d 26, 38 (1st Cir. 1998)).

Applying the transactional test to the facts here, the crucial issue in the Quebec action was to determine liability between MMAC and Canadian Pacific for the derailment. *See Ouellet et al.*, 2022 QCCS 4643, 6; *Quebec et al.*, 2025 QCCA 230, 3. The actions or failures to act complained of in this adversary proceeding arise from the same common nucleus of operative fact as those identified in the Quebec litigation: the cause of the derailment as between the actions of MMAR and its employee Mr. Harding with respect to single person train operation and insufficient braking,

---

[14] *See Ouellet et al.*, 2022 QCCS 4643, 9-10. MMAC's choice not to participate in the Quebec Superior Court trial does not alter the res judicata analysis here because MMAC had a full and fair opportunity to litigate, and the plaintiffs in the Quebec litigation still had to meet evidentiary burdens to prevail. *See infra*, Discussion I.B.2

and Canadian Pacific in not reclassifying the crude oil, and resulting liability.  As the Quebec Court

of Appeal noted:

> The cause of action advanced . . . at trial specifically raises safety issues. It revolves
> around four main themes. . . .   The third relates to the misclassification of the crude
> oil transported.  According to the appellants, CP knew or ought to have known that
> the oil in question had been misclassified and was more volatile, explosive and
> flammable than "Class 3 and Packing Group III crude oil."   It should have
> complained to [World Fuels] and insisted that this error be corrected.  According to
> the appellants, if MMA had known the true classification of this oil, it would not
> have transported it in a train in SPTO mode and would not have immobilized it
> unattended, on a main track, at the top of a slope, for an entire night.  Again, a train
> derailment would have been avoided.

*Quebec et al.*, 2025 QCCA 230, 12-13.

> Mr. Keach makes the same claim in this adversary proceeding:

> Had the Defendants made MMAR aware that the crude oil cargo was, in fact,
> Packing Group I, a hazardous substance, MMAR would have implemented safety
> procedures and protocols that would have prevented the Derailment.  Among other
> things, these procedures and protocols would have required that the Train never be
> left unattended, always be parked on a blocked, side track, and never be parked on
> a main track.

Third Am. Compl. ¶ 84.

This Court therefore concludes that there is simply no question that there is an identity of

the cause of action in the proceedings for claim preclusion purposes.

### 4.      Conclusion

Accordingly, because the Quebec judgments were final judgments on the merits, there is

an identity of parties between the Quebec litigation and this adversary proceeding, and the causes

of action in the litigations are the same, the Quebec judgments preclude this Court from

reexamining Canadian Pacific's fault in the context of Mr. Keach's negligence and negligent

misrepresentation claims.  As the Quebec Court of Appeal determined, "CP was not liable" and

"Harding's and MMA's faults remain the *only* logical, direct and immediate cause of the

22

catastrophe." *Quebec et al.*, 2025 QCCA 230, 4, 65 (emphasis added); *Ouellet et al.*, 2022 QCCS 4643, 157.   The Quebec judgments therefore foreclose a finding by this Court that Canadian Pacific's actions, including any misclassification of the crude oil, proximately caused the derailment.  Thus, summary judgment will be entered on both the negligence claim (Count I) and the negligent misrepresentation claim (Count III) of the Third Amended Complaint.

### B.      Issue Preclusion

The application of the doctrine of issue preclusion is an alternate basis for granting summary judgment in favor of Canadian Pacific.  "When there is an identity of the parties in subsequent actions, a party must establish four essential elements for a successful application of issue preclusion to the later action: (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and binding final judgment; and (4) the determination of the issue must have been essential to the judgment."  *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30 (1st Cir. 1994) (citing *NLRB v. Donna–Lee Sportswear Co., Inc.,* 836 F.2d 31, 34 (1st Cir. 1987); *In re Sestito,* 136 B.R. 602, 604 (Bankr. D. Mass. 1992); *In re Dubian,* 77 B.R. 332, 337 (Bankr. D. Mass. 1987)).  Here, the Court has already concluded that there is sufficient identity of the parties, and it turns to the analysis of the four issue preclusion elements.  *See supra*, Discussion I.A.2 (analyzing identity of the parties for claim preclusion purposes).

### 1.      Same Issue as Prior Action

The scope of issue preclusion "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding."  *Faigin v. Kelly*, 184 F.3d 67, 78 (1st Cir. 1999) (quoting *C.I.R. v. Sunnen,* 333 U.S. 591, 599-600 (1948)).  "The mere presence of a modicum of factual commonality does not establish the requisite identity of issues for purposes of collateral estoppel."  *Id*.  "[C]ourts have readily perceived that for

23

purposes of preclusion, issues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits be the same." *In re Relafen Antitrust Litig.*, 286 F. Supp. 2d 56, 65 (D. Mass. 2003) (citation omitted). "[T]he issues must be defined by reference to the judicial determinations at stake." *Faigin,* 184 F.3d at 78.

The Quebec litigation addressed and resolved Canadian Pacific's alleged liability for the derailment, finding that "[i]n the end, Harding's and MMA's faults remain the only logical, direct and immediate cause of the catastrophe." *Quebec et al.*, 2025 QCCA 230, 65. In this adversary proceeding, the identical issue is presented: whether Canadian Pacific's alleged negligence caused the derailment. Specifically, here Mr. Keach advances the theory that, had Canadian Pacific ensured that the crude oil cargo was properly classified, MMAR would have taken steps that would have avoided the derailment. But the Quebec plaintiffs put forward that exact same theory at trial and continued to press it on appeal. Both Quebec courts considered this misclassification argument in great detail and rejected it. Moreover, as previously discussed, if this issue were tried in this adversary proceeding, this Court would apply the same negligence standard and the same burden of proof as applied by the Quebec courts.

Here in Count I, Mr. Keach relies upon 49 C.F.R. § 171.2, maintaining that Canadian Pacific breached the regulation's safety requirement that "[n]o person may offer or accept a hazardous material for transportation in commerce unless the hazardous material has been properly classed, described, packaged, marked, labeled, and in condition for shipment." Third Am. Compl. ¶¶ 100-102 (emphasis removed). He contends that Canadian Pacific "conducted either no investigation and analysis, or a faulty investigation and analysis, or failed to ensure that some other responsible party had conducted a proper investigation and analysis to determine the properties of the crude oil." *Id*. ¶ 67. Mr. Keach also alleges that Canadian Pacific knew or should have known

24

"that the information provided by the shippers or prior carrier was incorrect" but "failed to challenge the classification of the entire crude oil shipment as Packing Group III, which indicates a high flash point and initial boiling point, and, hence, a low danger, despite reasonable grounds to suspect such classification was wrong." *Id*. ¶¶ 68, 103(c).

Similarly, Count III, Mr. Keach's claim for negligent misrepresentation, is based on Canadian Pacific allegedly supplying false information to MMAR in the bill of lading and failing "to exercise reasonable care or competence in obtaining or communicating this information." *Id*. ¶¶ 112-113. Mr. Keach asserts that if Canadian Pacific had "made MMAR aware that the crude oil cargo was, in fact, Packing Group I, a hazardous substance, MMAR would have implemented safety procedures and protocols that would have prevented the Derailment," including requiring that the train never be left unattended or parked on a main track. *Id*. ¶ 83.

These are exactly the same issues that the Quebec Superior Court and the Quebec Court of Appeal focused on with respect to Canadian Pacific's obligations concerning the transportation of the crude oil and the packing group classification. The Quebec Superior Court considered 49 C.F.R. § 171.2 in some depth in response to the plaintiffs' assertion that Canadian Pacific as the carrier should have "refuse[d] transportation" and "require[d] not only that [World Fuels] revise its classification, but also that it submit convincing evidence of its correctness." *Ouellet et al*., 2022 QCCS 4643, 116; *see generally id.* 99-118. The Quebec Superior Court also determined that "such interventions" are not required under "the provisions of the U.S. and Canadian legislation" and, after considering the relevant legislative and regulatory landscape, found that "the evidence does not allow [the court] to conclude that CP, with respect to the transportation of crude oil from New Town to St. John, is in breach of its obligations and is not acting in a prudent and reasonable manner in assessing, managing and evaluating the data available to it concerning the particular

25

dangerousness and classification of this product." *Id*. at 116-117.   In fact, the Quebec Superior Court judge "devoted most of his analysis to how CP handled and understood the information in its possession" and "concluded that CP had committed no fault." *Quebec et al.*, 2025 QCCA 230, 17, 47 (rejecting the appellants' argument that "the judge should have held CP responsible for this erroneous classification"); *see id*. at 4 (affirming the trial judge's conclusion that "CP did not fail in any of its obligations").  The issue of Canadian Pacific's fault, which was thoroughly considered by the Quebec courts, is thus identical to the issue of Canadian Pacific's negligence alleged here in Count I by Mr. Keach.

As to Mr. Keach's negligent misrepresentation claim, that is based on the same argument advanced before, and rejected by, the Quebec courts—that Canadian Pacific's "failure to inform MMA [of the accuracy of the crude oil classification made by World Fuels] constitutes fault" and that Canadian Pacific "misled MMA concerning the dangerous nature of the crude oil in question and thus breached its duty to inform." *Id*. at 45-46.  Further, the Quebec courts addressed in detail Mr. Keach's argument that MMAR would have acted differently had Canadian Pacific informed MMAC of the true dangerous nature of the crude oil it was transporting.  For example, MMAC's president testified that MMAC would have made immediate crew changes and not left the train unattended for long periods of time if the company "had been properly informed." *Ouellet et al*., 2022 QCCS 4643, 158-159.  But the trial judge strongly "doubted the veracity of [the president]'s testimony and dismissed it entirely." *Quebec et al.*, 2025 QCCA 230, 59; *see also Ouellet et al*., 2022 QCCS 4643, 159.  Further, the Quebec Court of Appeal agreed that "the evidence shows that a change in classification from PG-III to PG-I or PG-II would not have changed the way MMA should have handled the cargo." *Quebec et al.*, 2025 QCCA 230, 50.  The issue raised in Mr.

26

Keach's negligent misrepresentation claim in Count III thus mirrors what the Quebec courts already decided.

Accordingly, the Court concludes that the identicality of issues element for issue preclusion purposes is satisfied as it relates to both negligence and negligent misrepresentation.

### 2.      Issue Actually Litigated in Prior Action

Actual litigation for issue preclusion purposes "involves something more than having an issue resolved as a result of some determinative legal doctrine that short-circuits the merits." *In re Kane*, 254 F.3d at 329 (citing *Restatement (Second) of Judgments* § 27 cmt. e). Thus, issues are "not actually litigated" in "situations where a matter is stipulated, admitted without controversy, or determined by default leading to the entry of judgment." *Id.* (citing *Restatement (Second) of Judgments* § 27 cmt. e). In those situations, issue preclusion normally would not apply because "there has been no judicial decision on the merits." *Id.*

In the Quebec litigation, there *was* a judicial decision on the merits. The negligence issue was litigated at a trial that lasted over sixty days and included fifty-five witnesses, thirteen expert reports, and thousands of exhibits. *Quebec et al.*, 2025 QCCA 230, 3. After evaluating the evidence at trial, the judge held that Canadian Pacific was not negligent and could not be held responsible for the derailment; instead he found that the derailment was solely caused by the actions of MMAC and its employee. *Ouellet et al.*, 2022 QCCS 4643, 17, 154, 157. The Quebec Court of Appeal fully affirmed this judgment, determining that the trial court "correctly stated the state of the law regarding [Canadian Pacific]'s liability and correctly applied it." *Quebec et al.*, 2025 QCCA 230, 3. Specifically, "[s]ince the Court [i]s of the opinion that the [trial] judge did not err in concluding that CP did not have reasonable grounds to suspect that the crude oil had been misclassified, it follows that CP's conduct cannot be characterized as wrongful with respect

27

to MMA." *Id*. at 49. In this adversary proceeding Mr. Keach seeks to relitigate this same issue of whether Canadian Pacific's conduct in not reclassifying the crude oil caused the derailment. The robust Quebec litigation involved something much "more than having an issue resolved as a result of some determinative legal doctrine that short-circuits the merits." *See In re Kane*, 254 F.3d at 329. The Quebec Court of Appeal explained how the misclassification issue was front and center in the Quebec litigation:

> As a reminder, the appellants' main theory of causation on this issue boils down to this: if CP had demanded a reclassification, MMA would then have become aware of the particularly dangerous nature of the cargo and, consequently, would have adopted practices designed to mitigate the risks associated with its transportation.

*Quebec et al.*, 2025 QCCA 230, 59. That issue was litigated to conclusion on the merits with the Court of Appeal holding that "the judge committed no reviewable error in concluding that misclassification was not a causal factor in the derailment." *Id*. at 61-62. This Court is satisfied that the issue of Canadian Pacific's negligence was actually litigated for issue preclusion purposes. *See In re Roberts*, 505 B.R. 555, 566-567 (Bankr. N.D. Okla. 2014) ("[T]he fact that an issue was actually litigated in a prior proceeding may . . . be substantiated by a 'reasoned opinion' of the trial or appellate court.").

Notably, MMAC was named as a defendant in the Quebec litigation but chose not to participate in the trial due to its insolvency. That choice does not insulate it from the application of issue preclusion, as it had the opportunity to litigate the claims against it, and the plaintiffs in the Quebec Superior Court trial were still required to meet their evidentiary burden to prove that Canadian Pacific's negligence caused the derailment. *See Matter of Pancake*, 106 F.3d 1242, 1244-1245 (5th Cir. 1997) (holding that where a defendant fails to appear at trial, collateral estoppel may be found to be appropriate if it can be demonstrated that the trial court conducted a hearing where the plaintiff was put to its evidentiary burden); *In re Roberts*, 505 B.R. at 567 (citing

28

*Restatement (Second) of Judgments* § 27) (explaining that under the actually litigated element of issue preclusion, the party with the burden of proof at trial is not excused from that burden of proof when the other party fails to appear at trial); *RX Data Corp v. Dep't of Soc. Servs*, 684 F.2d 192, 196-197 (2d Cir. 1982) (citing *Restatement (Second) of Judgments* § 82 and *Wright & Miller's Federal Practice & Procedure* § 4450) (holding that "the absence of adversity in th[e] first state court action does not automatically preclude a collateral estoppel effect" in the second action).[15] Thus, the issue of Canadian Pacific's liability for the derailment was actually litigated.

### 3. Valid and Binding Final Judgment

Decisions after evidentiary hearings constitute valid and binding final judgments. *See Rogers v. Town of Northborough*, 188 F. Supp. 2d 10, 14-15 (D. Mass. 2002); *Cardillo v. Zyla*, 486 F.2d 473, 475-476 (1st Cir. 1973) (holding that a civil claim was barred by collateral estoppel, even though the parties were not the same in an earlier criminal action, because the issues had already been litigated and decided in a prior nine-day criminal trial). Mr. Keach does not dispute that the decision of the Quebec Court of Appeal affirming the Quebec Superior Court's judgment after trial is a valid and binding judgment. He merely advocates for the judicial economy benefit of waiting to see if the Supreme Court of Canada grants the Quebec plaintiffs leave to appeal. As discussed above, the fact that the available appeals process has not yet been exhausted does not

---

[15] Citing *RX Data Corporation v. Department of Social Services*, Mr. Keach argues that "there can be no res judicata effect" because MMAC did not participate in the Quebec trial. Pl.'s Opp'n, at 12-13. Even if Mr. Keach is correct that *RX Data* forecloses claim preclusion, *RX Data* and the authority cited above support the application of issue preclusion where a party has an opportunity to participate in litigating an issue but simply chooses not to, as MMAC did in the Canadian litigation. *See Restatement (Second) of Judgments* § 38, illus. 1. What matters is that the issue in question was actually litigated in the earlier proceeding. As outlined earlier, despite MMAC's limited participation, the issue of fault as between MMAC and Canadian Pacific was still very much "stage center" in the Quebec litigation so there is nothing more that "the white light of controversy would have revealed" on the issue of their comparative negligence. *See* Pl.'s Opp'n at 12-13 (quoting *Farmington Dowel Prods. Co. v. Forster Mfg. Co.,* 421 F.2d 61, 79 (1st Cir. 1969)).

impact the finality of the Quebec Court of Appeal decision for issue preclusion purposes. Thus, the binding and final judgment element is satisfied.

### 4.      Issue Essential to the Judgment

Resolution of an issue of law or fact is essential to a prior court's judgment if it is "necessary to its holding." *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 978 (1st Cir. 1995); *Restatement (Second) of Judgments* § 27, cmt. j. As explained above, the determination of whether Canadian Pacific's negligence, including its failure to challenge the misclassification of the crude oil being transported by MMAC, was a cause of the derailment was the focus of the Quebec litigation and determinative of the outcome and thus was a necessary component to the final decision. *See Quebec et al.*, 2025 QCCA 230, 3-4 (holding that "even if CP's conduct had been at fault, it would not have been the cause of the derailment" and affirming the trial court's determination that "the responsibility for this tragedy lies with the locomotive engineer . . . and his employer, MMA").

### 5.      Conclusion

As explained above, all the elements needed to apply issue preclusion are present here. There is sufficient identity of the parties (MMAR/MMAC and Canadian Pacific) to the Quebec litigation, the issue of whether Canadian Pacific bears any liability for the derailment is the same issue that was presented in the prior Quebec litigation, that same issue was thoroughly considered and litigated in Quebec and was determined by a valid final judgment, and determination of Canadian Pacific's culpability was essential to that judgment. Finding that all the elements of issue preclusion are met, the Court concludes that further consideration of the issue of Canadian Pacific's liability for the derailment is foreclosed by the resolution reached by the Quebec Court of Appeal: Canadian Pacific was not negligent in connection with the derailment. Based on the

application of issue preclusion, Mr. Keach is precluded here from relitigating the issue of Canadian Pacific's allegedly negligent acts, and thus Canadian Pacific is entitled to summary judgment on the two negligence theories raised in Count I and Count III.

## II.   The Remaining Claims

The Court now turns to the two other claims raised in the operative complaint: breach of contract (Count II) and disallowance of claim (Count IV).

### A.   Breach of Contract

The Court has already dismissed Count II for breach of contract on judicial estoppel grounds. *See supra*, n.10.  However, issue preclusion based on the Carmack Amendment litigation in the Eighth Circuit provides an additional and independent reason for judgment to enter for Canadian Pacific on this claim.  As pled, Mr. Keach's breach of contract claim asserts a breach of the bill of lading.  *See* Third Am. Compl. ¶ 108.  Likewise, in the North Dakota litigation, Canadian Pacific's liability under the Carmack Amendment ultimately turned on the bill of lading.  *Whatley*, 142 F.4th at 1033; *Whatley as WD Tr. of WD Tr. v. Canadian Pac. Ry. Co.*, No. 1:16-cv-00074, 2023 WL 6392768, at \*4-5 (D.N.D. Jan. 20, 2023); *see also* 49 U.S.C. § 11706 (titled "Liability of rail carriers under receipts and bills of lading").  Mr. Keach's litigation of the issues raised in Count II tills that same ground. Thus, there is the requisite identicality of issues required for the application of issue preclusion.[16]

Moreover, the issue of Canadian Pacific's liability under the bill of lading was actually litigated in the Carmack Amendment litigation.  It was the subject of two summary judgment

---

[16]  While a Carmack Amendment claim may sound more in tort than it does in contract, *see Whatley*, 2023 WL 6392768, at \*9, the Eighth Circuit's analysis focused on whether there could be any damages found against Canadian Pacific related to the bill of lading, taking into consideration the judgment reduction provision found in the Plan, "the approved bankruptcy agreement."  *Whatley v. Canadian Pac. Ry. Co.*, 142 F.4th 1030, 1035-1036 (8th Cir. 2025). Through that lens there is still sufficient identicality of the issues for issue preclusion purposes.

31

decisions, motions for reconsideration, an order denying the motion to apply the judgment reduction provision, and two appeals to the Eighth Circuit. *See supra* n.7. These multiple decisions on the merits clearly constitute actual litigation of the issue. The *Whatley* case also resulted in a valid and binding final judgment. *Restatement (Second) of Judgments* §§ 1, 27, cmt. k (incorporating § 13 on finality); *see Whatley v. Canadian Pac. Ry. Co. & Soo Line R.R. Co.*, No. 1:16-cv-00074, Fourth Am. J. in a Civil Case, (D.E. 482) (entering judgment in favor of the plaintiff and against the defendants but granting Canadian Pacific "a complete reduction in the Judgment against it"). Further, Canadian Pacific's liability under the bill of lading was essential to the final judgment and "was actually recognized by the parties as important and by the trier as necessary to the first judgment." *Restatement (Second) of Judgments* § 27, cmt. j.

Lastly, there is an identity of parties between this proceeding and the Carmack Amendment litigation. As noted above, World Fuels previously assigned its Carmack Amendment claims against Canadian Pacific to MMAR and Mr. Keach, who then assigned them to Mr. Whatley in an agreement that provided for the retention of Mr. Keach to prosecute the claims. This assignor-assignee relationship establishes privity of parties for purposes of issue preclusion. *See Taylor*, 553 U.S. at 894 (holding that substantive legal relationships such as "assignee and assignor" may justify nonparty preclusion).

Ultimately, the Eighth Circuit, applying the judgment reduction provision in the Plan, specifically held that Canadian Pacific "is entitled to a 100% judgment reduction credit" for any damages arising from its liability under the bill of lading. *Whatley*, 142 F.4th at 1035-1036; *see also Whatley*, 2023 WL 6392768, at *4 (noting that, in briefing a renewed motion for summary judgment, the parties did not dispute that the plaintiff was "a party entitled to recover under the bill of lading" but there was a remaining dispute regarding the actual loss). Even if this Court had

32

not already dismissed Mr. Keach's breach of contract claim (Count II), the application of *Whatley* would preclude him from pursuing it here.[17]

### B.    Disallowance of Claim

A count for disallowance of a claim is a debtor's objection to a creditor's claim. To succeed, a debtor must show that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1).[18] "When a proof of claim is based on a cause of action that would be barred by principles of *res judicata*, that claim is unenforceable under applicable nonbankruptcy law and should be disallowed." *In re Woodbridge Grp. of Companies, LLC*, 617 B.R. 796, 801 (D. Del. 2020), *aff'd*, 2022 WL 539446 (3d Cir. Feb. 23, 2022) (citing *In re: Residential Cap., LLC*, No. 12-12020, 2016 WL 4487635, at *7 (Bankr. S.D.N.Y. Aug. 25, 2016)).

Mr. Keach alleges that this adversary proceeding arises out of Canadian Pacific's "individual and/or collective negligence and/or violation of applicable laws and regulations in connection with the shipment of crude oil upon and the subsequent derailment of a freight train transporting seventy-two tank cars loaded with crude oil . . . in Lac-Mégantic," and that "MMAR is not liable to CP . . . for any amount, whether based on contract, tort, subrogation, indemnification, contribution, reimbursement, or otherwise." Third Am. Compl. ¶¶ 1, 121. As previously discussed, this Court gives preclusive effect to the Quebec Court of Appeal's finding

---

[17]  If the Eighth Circuit's holding regarding the judgment reduction provision is interpreted as foreclosing any award of damages against Canadian Pacific related to the derailment, the Court acknowledges that this holding could provide an alternative basis for summary judgment in favor of Canadian Pacific on the negligence claims as well.

[18]  In this adversary proceeding, Mr. Keach pled that the claims in Canadian Pacific's proof of claim No. 92-2 "are unenforceable and should be disallowed pursuant to 11 U.S.C. 502(a)(1)." Third Am. Compl. ¶ 122. The Court assumes that Mr. Keach in fact means 11 U.S.C. § 502(b)(1), which is what he cited in his objection in the main bankruptcy case. *See In re Montreal Maine & Atl. Ry., Ltd.,* 13-10670, D.E. 1581.

that Canadian Pacific was not negligent in connection with the derailment, and the Eighth Circuit's determination that any damages found against Canadian Pacific must be reduced to zero under the judgment reduction provision of the Plan. Accordingly, the preclusive effect of the Quebec and Carmack Amendment litigations forecloses Mr. Keach's basis for objecting to Canadian Pacific's claim, and Canadian Pacific is entitled to summary judgment on Count IV.

## Conclusion

The Court concludes that Canadian Pacific is entitled to judgment as a matter of law on all counts and therefore grants the Motion for Summary Judgment (D.E. 670).

So ORDERED.

Dated: April 21, 2026                    /s/ Peter G Cary
                                         Chief Judge Peter G. Cary
                                         United States Bankruptcy Court for
                                         the District of Maine